**2014-1495**

---

In The
# UNITED STATES COURT OF APPEALS
### For The Federal Circuit

---

### PI-NET INTERNATIONAL, INC.,
*Plaintiff-Appellant,*

**AND**

### DR. LAKSHMI ARUNACHALAM,
*Plaintiff-Appellant,*

**V.**

### JPMORGAN CHASE & CO.,
*Defendant-Appellee,*

---

Appeal from the United States District Court for the District of Delaware
in Case No. 1:12-cv-00282, Judge Sue L. Robinson

---

### PLAINTIFF-APPELLANTS' MOTION SEEKING PERMISSION TO FILE CORRECTED BRIEF

April 8, 2015

Dr. Lakshmi Arunachalam,   and
222 Stanford Avenue,
Menlo Park, CA 94025
Tel: 650.690.0995

*Pro Se Plaintiff-Appellant,*
*Dr. Lakshmi Arunachalam*

William J. Weidner
Bell Law Firm, P.C.
29100 SW Town Ctr Loop W, #200
Wilsonville, Oregon 97070
Telephone: (503) 682-8840
Facsimile: (503) 682-9895

*Attorney for Plaintiff-Appellant*
*Pi-Net International, Inc.*

i

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Pi-Net International, Inc. and  Dr. Lakshmi Arunachalam
v.
JPMorgan Chase & Co.
No. 2014-1495

## CERTIFICATE OF INTEREST

Attorney for Plaintiff-Appellant, Pi-Net International, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

Pi-Net International, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Pi-Net International, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

William J. Weidner, Bell Law Firm, P.C.

Dr. Lakshmi Arunachalam,

Withdrawn: George Pazuniak, Victoria Brieant, John Carpenter

April 8, 2015                                    /s/*William Weidner*
    Date                                         Signature of counsel

                                                 William J. Weidner
                                                 Printed name of counsel

ii

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST…………………………………………………ii

PLAINTIFF-APPELLANTS' MOTION SEEKING PERMISSION
TO FILE CORRECTED BRIEF……………………………………………....1

CERTIFICATE OF SERVICE………………………………………………..3

EXHIBIT  I…………………………………………………………………...4

**PLAINTIFF-APPELLANTS' MOTION SEEKING PERMISSION TO FILE CORRECTED BRIEF**

Plaintiff-Appellants hereby file this Motion Seeking Permission from the Court to File Corrected Brief, that takes care of the procedural issues raised by J.P. Morgan Chase & Co, the Defendant-Appellee in this case. Attached is Exhibit I, a version that has 13,851 words, which Plaintiff-Appellants respectfully request the Court to grant them permission to file with the Court, when the Court grants approval to file it.

*Pro Se* Plaintiff-Appellant Dr. Lakshmi Arunachalam ("Dr. Arunachalam") understands that *Pro Se* parties are given latitude. Dr. Arunachalam had been ill for which Plaintiff-Appellant Pi-Net International, Inc. ("Pi-Net") requested the Court in November 2014 on an emergency basis for extended time due to health reasons, as per her doctor's orders. A letter from her doctor was provided to the Court at that time. The deadline for filing was not clear as there was some clarification required on December 1, 2014 from the Court to find out in writing if the briefing schedule had been stayed or whether Pi-Net was required to file on December 1, 2014. Plaintiff-Appellant discussed this with the Clerk's office, but the ambiguity was never clarified in writing by the Court, after Pi-Net filed an Emergency Motion for clarification.

Furthermore, the Defendant –Appellee is not prejudiced, as they have not yet filed their Response Brief. Moreover, Plaintiff-Appellants consented to Defendant –Appellee's request for more words on December 18, 2014. Defendant –Appellee provided to the Court and to Plaintiff-Appellants in detail only recently what they meant by the issue they raised in December without providing any details. When Dr. Arunachalam called Defense Counsel, Doug Nemec before Christmas holidays, he told her that they would address it when the Court lifts the stay after the Motion to Substitute was ruled upon and for Dr. Arunachalam to not worry about it just yet.

**CONCLUSION:**  Plaintiff-Appellants respectfully request that the Court grant their Motion and to allow Plaintiff-Appellants to file a Corrected Brief.

April 8, 2015                                    Respectfully submitted,


_/s/William Weidner_

Dr. Lakshmi Arunachalam        and
222 Stanford Avenue,
Menlo Park, CA 94025
Tel: 650.690.0995
Email: laks22002@yahoo.com

*Pro Se Plaintiff-Appellant*,
*Dr. Lakshmi Arunachalam*

William J. Weidner
Bell Law Firm, P.C.
29100 SW Town Ctr Loop W, #200
Wilsonville, Oregon 97070
Telephone: (503) 682-8840
Facsimile: (503) 682-9895
Email: Bill@blf-pc.com
*Attorney for Plaintiff-Appellant*
*Pi-Net International, Inc.*

- 2 -

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT
### Pi-Net International, Inc. and Dr. Lakshmi Arunachalam
v.
### JPMorgan Chase & Co.
### No. 14-1495

## CERTIFICATE OF SERVICE

I, William Weidner, certify that on April 8, 2015, I electronically filed the

foregoing **PLAINTIFF-APPELLANTS' MOTION SEEKING PERMISSION**

**TO FILE CORRECTED BRIEF along with Exhibit I** with the Clerk of the

Court using the CM/ECF System, which will serve via e-mail notice of such filing

to any of the following counsel registered as CM/ECF users and we, William

Weidner and Dr. Lakshmi Arunachalam each, caused to be served on counsel of

record by Electronic Means (by email):


Robert S. Saunders           rob.saunders@skadden.com
Jessica Raatz Kunz           jessica.kunz@skadden.com
Daniel A. DeVito             Daniel.DeVito@skadden.com
Douglas R. Nemec             Douglas.Nemec@skadden.com
Edward L. Tulin              Edward.Tulin@skadden.com
Andrew D. Gish               Andrew.Gish@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
920 N. King Street, 7th Floor   Four Times Square
Wilmington, Delaware 19801   New York, New York 10036
Tel.: (302) 651-3000         Tel.: (212) 735-3000.

April 8, 2015                              Respectfully submitted,

                                           */s/William Weidner*

                                           William J. Weidner


Dr. Lakshmi Arunachalam,      and          Bell Law Firm, P.C.
222 Stanford Avenue,                       29100 SW Town Ctr Loop W, #200
Menlo Park, CA 94025                       Wilsonville, Oregon 97070
Tel: 650.690.0995                          Telephone: (503) 682-8840
                                           Facsimile: (503) 682-9895

*Pro Se Plaintiff-Appellant*,
*Dr. Lakshmi Arunachalam*                  *Attorney for Plaintiff-Appellant*
                                           *Pi-Net International, Inc.*

**EXHIBIT  I**

2014-1495

_____

IN THE
# UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

_____

## PI-NET INTERNATIONAL, INC.,
*Plaintiff-Appellant,*

AND

## DR. LAKSHMI ARUNACHALAM,
*Plaintiff-Appellant,*

V.

## JPMORGAN CHASE & CO.,
*Defendant-Appellee,*

_____

Appeal from the United States District Court for the District of Delaware
in Case No. 1:12-cv-00282, Judge Sue L. Robinson
_____

### PLAINTIFF-APPELLANTS' CORRECTED BRIEF

April 8, 2015

Dr. Lakshmi Arunachalam,     and
222 Stanford Avenue,
Menlo Park, CA 94025
Tel: 650.690.0995

*Pro Se Plaintiff-Appellant,*
*Dr. Lakshmi Arunachalam*

William J. Weidner
Bell Law Firm, P.C.
29100 SW Town Ctr Loop W, #200
Wilsonville, Oregon 97070
Telephone: (503) 682-8840
Facsimile: (503) 682-9895

*Attorney for Plaintiff-Appellant*
*Pi-Net International, Inc.*

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pi-Net International, Inc. and  Dr. Lakshmi Arunachalam
v.
JPMorgan Chase & Co.
No. 2014-1495

**CERTIFICATE OF INTEREST**

Attorney for Plaintiff-Appellant, Pi-Net International, Inc. certifies the following:

1. The full name of every party or amicus represented by me is:

Pi-Net International, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Pi-Net International, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

William J. Weidner, Bell Law Firm, P.C.
Dr. Lakshmi Arunachalam,
Withdrawn: George Pazuniak, Victoria Brieant, John Carpenter


April  8, 2015                          /s/*William Weidner*
        Date                            Signature of counsel

                                        William J. Weidner
                                        Printed name of counsel

ii

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST……………………………………………..ii

TABLE OF AUTHORITIES…………………………………………....vi

STATUTES……………………………………………………….ix

OTHER AUTHORITIES……………………………………………….ix

TABLE OF NOTATIONS AND ABBREVIATIONS………………….......ix

STATEMENT OF RELATED CASES………………………………….xii

JURISDICTIONAL STATEMENT ......................................................................1

STATEMENT OF ISSUES ..................................................................................1

STATEMENT OF CASE .....................................................................................1

STATEMENT OF FACTS ...................................................................................1

A.      Pioneering Invention: Exchange of Structured Data from Web Applications Displayed on a Web browser ......................................................................1

SUMMARY OF ARGUMENT ...........................................................................2

ARGUMENT .......................................................................................................2

I.      Standard of Review..................................................................................2

II.     DDC's Claim Construction Errors .........................................................2

1) "Real-Time" ...................................................................................................2

2) "Value-Added Network (VAN)  Service Provider," "VAN Service," "VAN," "Service Network," "VAN Switch," "VAN System ..................................3

"VAN Service ....................................................................................................4

iii

"VAN ..............................................................................................5

"Service Network ..........................................................................5

"VAN Switch ................................................................................10

"VAN System" ..............................................................................23

3) "Switching" ..............................................................................23

4) "Point-of-Service Application" ................................................25

5) "Transactional Application (TA)," "Back-End TA," "the Selected Back-End TA," "Computer System Executing The Back-End TA For Processing the Transaction Request in Real-Time" ........................................29

6) "Web Application" and "Network Application" ........................37

7) "Means for switching to a transactional application in response to a user specification from a network application" ..............................39

8a) "Means for receiving said user specification" .......................44

8b) "Means for Enabling a Switch to Said Transactional Application" ................44

8c) "Means for Activating Said Transactional Application" ........45

9) "Means for creating a transaction link between said network application and said transactional application" ................................45

10a) "Means for presenting said user with a list of transactional applications, each of said transactional application[s] being associated with a particular value-added network service provider" ........................................46

10b) "Means for submitting said user specification according to a user's selection of said transactional application from said list of transactional applications" ........46

11) "Means for transmitting a transaction request from said transactional application" ................................................................47

12) "Means for Processing Said Transaction Request" ................48

iv

13) "Means for coupling said means for transmitting to a host means"..................48

14) "Means for Activating an Agent to Create a Transaction Link between Said User Application and Said  Transactional Application."........................................48

15) "Object Routing" .................................................................................................49

16)  "A routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application" ...........................53

17) "Keeping the transaction flow captive"...........................................................57

    B.I.    DDC  ERRED IN RULING THAT CLAIMS ARE INDEFINITE....57

    B.II.    DDC ERRED IN RULING THAT THE CLAIMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION .....................................58

    B.III.  DDC  ERRED IN RULING THAT THE CLAIMS ARE INVALID FOR LACK OF ENABLEMENT .......................................................61

    B.IV. DDC ERRED IN RULING THAT THE CLAIMS ARE NOT INFRINGED ................................................................................62

    CONCLUSION AND STATEMENT OF RELIEF SOUGHT.....................63

CERTIFICATE OF SERVICE ...............................................................................64

CERTIFICATE OF COMPLIANCE WITH FRAP 32(a)(7)(B).66.......................66

ADDENDUM ………………………………………………………………….67

# TABLE OF AUTHORITIES (TOA)

<u>**Cases**</u>:

**TOA1:**  *Phillips .v. AWH Corp*,
    415 F.3d 1303,1311, 1313 (Fed. Cir. 2005) (en  banc)............................2, 33

**TOA2:** *Thorner v. Sony Computer Entm't Am. LLC*,
    669 F3d 1362, 1365 (Fed. Cir. 2012) .............................................................2

**TOA3**: *NTP Inc. v. RIM,*
    418 F3d 1282 (Fed. Cir. 2005) .................................................................4, 30

**TOA4:** *Omega  Engg Inc. v. Raytek Corp,*
    334 F3d 1314, 1334 (Fed. Cir. 2003) ............................................................4

**TOA5**: *Halliburton Energy Servs. v. M-L LLC,*
    514 F3d 1244, 1255-56 (Fed. Cir. 2008), 85 USPQ2d, 1663……......8, 12, 21

**TOA6**: *Oakley, Inc. v. Sunglass Hut Int'l,*
    316 F.3d 1331, 1341, 65 USPQ2d 1321,1326 (Fed. Cir. 2003)..........9, 13, 43

**TOA7**: *Marosi,*
    710 F.2d, 799, 803, (Fed. Cir. 1983),  218 USPQ 292..................9, 13, 21, 43

**TOA8**: *Miller,*
    441 F.2d 689,169 USPQ 597 (CCPA 1971) .................................................10

**TOA9**:*Ultimax Cement Mfg. v. CTS Cement Mfg.,*
    587 F.3d 1339,1352, 92 USPQ 2d 1865,1873 (Fed .Cir. 2010)..............10, 15

**TOA10***: C. R. Bard v. M3 Sys.,*
    157 F.3d 1340,1360 (Fed. Cir. 1998) ...........................................................15

**TOA11***: Andersen Corp. v. Fiber Composites, LLC*,
    474 F.3d 1361, 1370 (Fed. Cir. 2007) ..........................................................15

**TOA12:** *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co*,
535 U.S.722, 741, 734-735, 737 122 S. Ct. 1831, 1838,
62 USPQ 2d 1705, 1710 (2002) ........................................................19, 40, 57

**TOA13**: *Barr,*
444 F.2d 588, 170 USPQ  330 (CCPA 1971) .........................................20, 42

**TOA14**: *Venezia,*
530 F. 2d 956, 189 USPQ 149 (CCPA 1976).........................................20, 42

**TOA15**: *Swinehart,*
439 F. 2d 210,  214, 169 USPQ 230..............................................................21

**TOA16**: *Skvorecz,*
Fed. Cir. No. 2008-1221, 9/3/09.........................................25, 30, 36, 37, 40

**TOA17**: *K-2 Corp. v. Salomon S. A.,*
191 F.3d 1356, 1363 (Fed. Cir. 1999) ..........................................................33

**TOA18**: *Schreiber,*
128 F. 3d 1473, 1478 (Fed. Cir. 1997) ..........................................................33

**TOA19**: *Inventio Ag. v. ThyssenKrupp Elevator Americas Corp.,,*
649 F. 3d 1350,1356 (Fed. Cir. 2011) .....................................................33, 34

**TOA20**: 5A *Chisum on Patents*
18.05 [2] [a] [ii] (2003)................................................................................40

**TOA21**: *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
748 F.3d 1134,1141-42 (Fed. Cir. 2014).......................................................40

**TOA22**: *Lockwood v. American Airlines Inc.*,
107  F.3d 1565 (Fed. Cir. '97).......................................................................41

**TOA23**: *Innova/ Pure Water Inc. v. Safari Water Filtration Sys. Inc.,*
381 F. 3d 1111, 1117-20, 72 USPQ 2d 1001, 1006-08 (Fed. Cir. 2004)......41

**TOA24**: *Hill-Rom Servs, Inc. v. Stryker Corp,*
755 F. 3d 1367 (Fed. Cir. 2014)...................................................................50

**TOA25***: Buchner,*
   929 F.2d 660, 661, 18 USPQ 2d 1331,1332 (Fed. Cir. 1991).......................54

**TOA26***: H-W Tech. v. Overstock.com, Inc.,,*
   754 F.3d 1329, 1332 (citing *Exxon Research & Eng'g Co. v. United States*,
   265 F. 3d 1371, 1376 (Fed. Cir. 2001) ........................................................57

**TOA27**. *Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120, 2124, 2128 (2014) ............................................................57

**TOA28**. *General Elec. Co. v. Wabash Appliance Corp.*,
   304 U. S. 364, 371(1938) ..............................................................................57

**TOA29**. *United States v. Adams,*
   383 U. S. 39, 48–49 (1966) ...........................................................................57

**TOA30**. *Star Scientific, Inc. v. R. J. Reynolds Tobacco Co.*,
   655 F. 3d 1364, 1373 (Fed. Cir. 2011) ........................................................57

**TOA31**: *Shatterproof  Glass Corp. v. Libbey-Owens Ford Co.*,
   758 F. 2d 613, 624 (Fed. Cir. 1985) .............................................................57

**TOA32***: Lochner Technologies, LLC v. Vizio, Inc.*,
    2014 WL 2898496 (Fed. Cir. 2014)...........................................................58

**TOA33***: Ariad Pharms., Inc.  v.  Eli Lilly & Co.*,
   598 F.3d 1336, 1351 (Fed .Cir. 2010 (en banc) ..........................................58

**TOA34***: Abbot Labs. v. Syntron Bioresearch, Inc.*,
   334 F.3d 1343, 1351 (Fed. Cir. 2003) .........................................................60

**TOA35***: Merck & Co. v. Teva Pharms. USA, Inc.*,
   395 F.3d 1364, 1372 (Fed. Cir. 2005) .........................................................60

**TOA36***: Cephalon, Inc. v. Watson Pharm., Inc.*,
   707  F.3d 1330, 1336 (Fed. Cir. 2013) .........................................................62

**TOA37***: Wands,*
   858 F. 2d 731, 736–37 (Fed. Cir. 1988) ......................................................62

**TOA38**: *Johns Hopkins Univ. v. Cellpro, Inc.,*
  152 F. 3d 1342, 1359-60 (Fed. Cir. 1998) ....................................................62

**TOA39**: *Amgen Inc. v. Hoechst Marion Roussel, Inc.,*
  314 F. 3d 1313, 1334 (Fed. Cir. 2003) ........................................................62

**TOA40**: *Hybritech Inc. v. Monoclonal Antibodies, Inc.,*
  802 F. 2d 1367, 1384 (Fed. Cir. 1986) ........................................................62

## <u>Statutes</u>:

28 U.S.C. §1331 ......................................................................................................1

28 U.S.C. §1338(a) .................................................................................................1

28 U.S.C. §1295 ......................................................................................................1

35 U.S.C. 112(b) .............................................................................................10, 55

35 U.S.C. §101………………………………………………………………....55

35 U.S.C. §112, ¶6 ...............................................................................................32

## <u>Other Authorities</u>:

MPEP 2173.04 [R11.2013] ....................................................................................10

MPEP 2173.05(G) .................................................................................................32

MPEP 2173 ............................................................................................................44

MPEP 2161.01 .......................................................................................................54

## <u>Table of Notations and Abbreviations</u>:  (Term, Notation, page No.)

Cross-Reference 1 ................CR1 ........................................................................1, 2

Cross-Reference 2 ................CR2 ...............................................................1, 14, 27

Cross-Reference 3 ................CR3 .................................................................3, 14, 46

Cross-Reference 4 ................CR4 .................................................................4, 10, 30

Cross-Reference 5 ................CR5 .................................................................7, 10, 12

Cross-Reference 6 ................CR6 ...................................................................14, 18

Cross-Reference 7 ................CR7 ...................................................................18, 27

Cross-Reference 8 ................CR8 ........................................ 22, 23, 27, 38, 47, 49, 57

Cross-Reference 9 ................CR9 .......................................................25, 30, 37, 40

Cross-Reference 10 .............CR10 ..................................................................27, 46

Cross-Reference 11 .............CR11 .........................................................20, 21, 42

## STATEMENT OF RELATED CASES

No appeal in this case has been before any appellate court. No other case known to

Dr. Lakshmi Arunachalam will directly affect or be directly affected by this

appeal.

# JURISDICTIONAL STATEMENT

Delaware district court ("DDC") has subject matter jurisdiction under

28 U.S.C. §§1331, 1338(a). CAFC has appellate jurisdiction under 28 U.S.C.

§1295 over DDC's Order.  Notice of Appeal was filed 5/21/2014.

# STATEMENT OF ISSUES

Whether DDC's claim constructions,  ruling claim terms indefinite and  summary

judgment of invalidity and non-infringement of  asserted claims 1-6, 10-12, 14-16,

35 of U. S. Patent Nos. 5,987,500 ('500);  4 of 8,037,158 ('158); 1-8, 10-11 of

8,108,492 ('492) are incorrect.

# STATEMENT OF CASE

Appeal stems from DDC's Opinion and Orders on claim construction, summary

judgment of invalidity and non-infringement.

# STATEMENT OF FACTS

*CR1* [DDC failed to construe in light of specification, file history, or whole

claim.]

**A.    Pioneering Invention: Exchange of Structured Data from Web
       Applications Displayed on a Web browser**

Patents-in-suit derive priority from 1995 provisional application S/N

60/006,634.  *CR2* [In 1995, applications were local to a Back-office, not

connecting to the Web. The norm was one-way Web browsing, hyperlinking,

- 1 -

HTML forms, CGI (A-71, 73, '492:1:33-2:45;5:40-54).**]** Dr. Arunachalam ("DrA")
solved a complex technological problem meeting a universal need to draw Back-
office information systems and applications to the Web. Its ubiquitous use
achieved huge commercial success. She conducted beta/pilot trials with global
corporations toward commercializing a product.

## SUMMARY OF ARGUMENT

DDC erred in construing claim terms, ruling claim terms indefinite, holding
claims invalid and non-infringement. ***CR1***.

## ARGUMENT

### I.    Standard of Review

Claim construction is an issue of law reviewed *de novo*. Applying law of
regional circuit, grant of summary judgment is reviewed *de novo*.

### II.    DDC's Claim Construction Errors

***CR1*, TOA1, TOA2**. Inventor, as her own lexicographer, set out certain
definitions and provided clear, unmistakable prosecution disclaimer or disavowal.

 1) "**REAL-TIME**" Specification discloses "real-time" as "non-deferred. *CR1*.

> "…Web user's capabilities …one-way, browse-only interactions
> …limited "deferred" transactional capabilities...E-mail…referred to as
> "**deferred transactions**" because…consumer's request not processed
> until…e-mail received, read, and…person…reading…e-mail
> executes…transaction. **This transaction is thus not performed in
> real-time**." (A-15 '500:1:23-32)

Construction of "real-time" cannot include features of email or CGI.  DDC

confused CGI with real-time.

> "Davison describes how to **create a standard HTML Web page** that contains **HTML forms**…non-interactive Web pages that **do not allow a user to perform live, real-time, bi-directional transactions** …input data from…forms-based document is sent to an application program, which…generates a reply document to be sent to…user... **CGI**…does not allow a user…to perform **real-time** transactions…nor does it allow…value-added network service provider to keep… transaction flow captive at…network entry point…Davison does not teach…presently claimed invention…" (A179-183 '500 file history)

 "Real-time" relates to user experience.  DDC acknowledged (A581-583)

specification states:

> *CR3* ["…Web Merchant …POSvc Application…user **100**…moves $500 …**transaction** …**performed in real-time**, in…**same manner… transaction** …**performed by**…**live teller** at…**bank**… **ATM machine**…user **100** now…more than browse his bank account… perform…**real-time transactions** from **a Web client**…significant aspect of **the present invention**." (A-74 '492:7:10-23)]

> "…**perform**…**real-time**…**transactions**…**he can perform with**…**live salesperson at**…**car dealership**" (A-71 '492:2:24-45)

Misled by JPMC, DDC construed incorrectly.  Ruling must be reversed. It would

have been correct for DDC to construe "real-time" as "non-deferred" and stopped

at that.

**2)**    "**VALUE-ADDED NETWORK (VAN)  SERVICE PROVIDER**,"
"**VAN SERVICE**," "**VAN**,"  "**SERVICE NETWORK**,"
"**VAN SWITCH**," "**VAN SYSTEM**" **COINED BY  INVENTOR**

***CR4*** **[**DDC construed "value-added network (VAN) service provider" as "provider of a point-of-service (POSvc) application," gives guidance for <u>consistently construing</u> these terms. **TOA3.** "Because NTP's patents …derive from…same patent application and share…common terms…***must*** <u>interpret…claims consistently</u> across all asserted patents." **TOA4**. "…unless otherwise compelled…<u>same claim term in…same patent or related patents carries…same construed meaning</u>."**]**

DDC missed specification requires:  POSvc Application ***must*** be displayed on a Web page or other GUI.

> "Exchange 501…displays…Web page 505…includes… <u>POSvc Applications 510... POSvc Application… displayed via…graphical user interface component…the present invention supports HyperText Markup Language as the graphical user interface component</u>."  (A-17 '500:6:28-36)

Correct construction is "**provider of a POSvc Application <u>displayed on a Web page</u>**."

 "<u>**VAN SERVICE**</u>" Consistent with DDC's construction of

- "**VAN Service Provider**" as "**provider of a POSvc Application**," then

- "**VAN Service**" is a "**POSvc Application  displayed on a Web page, that provides a value-add to the network**," supported by specification:

A-75 '492:9:10-13, 9-23, Figs.5C, 5B, 5D, 6A: "VAN service **704**" or "application service **704**" is disclosed as a <u>point-of-service application</u> (<u>POSvc Application</u>)

displayed on a Web page. "POSvc Application" is the "value-add" to the network (eg. Web banking).

"**VALUE-ADDED NETWORK (VAN)**" is a "**network that includes a POSvc Application displayed on a Web page**, **that provides a value-add to the network**" consistent with DDC above. Specification supports "**VAN**" is "an OSI application layer network that includes a POSvc Application displayed on a Web page":

> "switching service 702 is an **OSI application layer** switch…Interconnected application layer switches form the **application network** backbone." (A-74 '492:8:52-63)
>
> "Web Application network portal." (Title of '492)

"**SERVICE NETWORK**" Consistent with DDC's construction of

- "**VAN Service Provider**" as "**provider of a POSvc Application**,"

- "**VAN Service**" is a "**POSvc Application**,"

- "**Service**" is "**VAN Service**," or "POSvc Application" displayed on a Web page. This is consistent with A-71 '492:2:9-10, which discloses "application or service."

- "**Service network**" is "**an OSI application layer network running on top of a facilities network and that provides value-added network (VAN) services**." "VAN Services" are "POSvc Applications displayed on a Web page, that provide value-add to the network," (eg, Web banking POSvc

Application is an example of a value-add to the network.) A "**facilities network**" is "**an IP-based network with physical hardware components that provides underlying network communication services up to layer 4 of the OSI model**."

DDC acknowledged:

> "…specification describes an "embodiment includ[ing] a <u>service network running on top of a facilities network</u>, namely the Internet, the Web or e-mail networks...(A-73 '492:5:55-6:5)…**service network**, operating within the boundaries of an **IP-based facilities network**."(A-73 '492:6:30-33)." (A587-588)

PTAB construed, distinguishing between a facilities network (which provides the underlying network services from layers 1-4 of the OSI model) and a service network which provides the value-added services like Web banking. (A-684)

DDC acknowledges that a service network includes an Exchange which <u>displays</u> a <u>Web page **505** that includes</u> <u>POSvc Applications **510**</u>.  Specification discloses that <u>a necessary component of a service network is a POSvc Application displayed on a Web page</u>.

DDC failed to note: priority provisional application 60/006,634 (A-483-484) distinguishes service network from facilities network, giving analogy of telephone service network. Physical poles and cables of a phone network is the facilities network. Voice service network is the application network that delivers voice services. Voice is the value-added network service or VAN service.

"…Web…medium for electronic commerce (EC), <u>new value - added network (VAN) services</u> are expected to emerge… <u>simple telephone call is…well - known example of a value - added network service…telephone network</u> has two different but interrelated aspects: <u>In terms of its physical components, it is a "facilities network." In terms</u> of the varieties of <u>VAN services that it provides</u>, it is <u>a set of many "traffic networks"</u>, each representing a particular interconnection of facilities. <u>Traffic is the flow of multi–media information through the network</u>.

…<u>transaction of daily commerce</u>, such as <u>ordering and paying for pizza…home banking… payroll services for businesses from banks, offered as a VAN service</u>. …<u>Internet, like… telecommunications network, is a system of interconnected facilities that could carry traffic from a variety of EC services</u>. <u>From the perspective of its **physical components**</u>, …<u>"Facilities Network" for EC exists</u> today…There is <u>no direct access to…end user from...VAN service providers, such as a Bank</u>. There are some missing elements needed to capture and control the end user environment. <u>The "Traffic Network" </u>is THE challenge." (A-483-484)

Ethernet cord, OSI Layer 3 network layer router or switch (eg, Cisco router/switch) (A-72 '492:4) are examples of a facilities network, which is a TCP/IP-based (A-73 '492:6:30-33) network with physical hardware components. Example of service network over the Web is a Web banking application network.

DDC missed specification A-72 '492:4:58-5:27 describes OSI application layer 307, which is distinct from layers 1-4 of the OSI model, constituting the TCP/IP-based physical Internet or "IP-based facilities network," (A-73 '492:6:32-33).

*CR5* [DDC missed specification:

- <u>distinguished between network layer vs application layer</u>, (A-72, 73 '492:4:58-5:27; Fig.3) <u>defines **metes and bounds** of what the structure is</u>;

- evidences <u>that any ambiguity has been resolved by specification disclosing a metric that distinguishes service network as application network including the POSvc Application limitation and the distinction from a facilities network, which is a TCP/IP-based physical Internet or Web</u>. **TOA5**. "…quantitative metric (eg…limitation as to a physical property) rather than a qualitative functional feature");

- provide[s] a formula for calculating a property <u>along with examples that meet the claim limitation and examples that do not</u>;"

- discloses a "**service network**" which **is an OSI layer 7 application network that includes a POSvc Application** (**providing examples** of such a "service network" **meeting the claim limitation**, eg, Web banking network, <u>that includes a Web banking POSvc Application on a Web page</u>, Figs. 6A, 5D) and is distinct from a facilities network, an IP-based facilities network, which only goes up to layer 4 of the OSI model, such as the physical Internet and the Web.

  "<u>FIG. 5B illustrates…Exchange</u> **501** comprises **Web page 505** and **point-of-service (POSvc) applications 510**. Exchange **501**…<u>includes a switching component… object routing component… management agent component…service management</u> functions according to one embodiment of the present invention.

  …**POSvc Application**…is **displayed via the graphical user interface component**…HyperText Markup Language…

  **Once Bank POSvc Application 510 has been activated, user 100 will be able to connect to Bank services and utilize the application**

**to perform banking transactions**…This connection between user **100** and Bank services is managed by exchange **501**.

…provide…services in POSvc Application **510(1)**…**merchants or other service providers**…provide services to users.

…provide intra-merchant…services…inter-merchant services. For example, if Bank creates a POSvc Application for use by… Bank Payroll department…provide…employees with a means for submitting timecards for payroll processing by…Bank's…(HR) Department…employee selects…**Bank HR POSvc Application**…" (A-73, 74 '492:6:18-7:50)

- **provides examples that do not meet the claim limitation** A-72, 73 '492:4:58-5:27; 6:32-33 of an IP-based facilities network such as…Internet, Web...

  **TOA6**. "Dialing into the bank via a modem line" is an example of a facilities network;

  > "…user **100**… **dialing into the bank via a modem line**. If user **100** is a Web user…no current mechanism for performing…real-time transaction with the bank, as illustrated in FIG. 4A…bank…unable to be a true "Web Merchant," namely… **merchant capable of providing complete transactional services on**… **Web**.
  > According to one embodiment of the present invention,… **illustrated in FIG. 4B**… **Web Merchant can provide real-time transactional capabilities to users who desire to access**… **merchants' services via**… **Web**. This embodiment includes a service network running on top of a facilities network, namely…Internet,…Web or e-mail networks." (A-73 '492:5:43-61)

- **provides** a general **guideline and examples sufficient** to **teach a person skilled in the art when claim limitation was satisfied**; **TOA7**;

- demonstrates that **boundaries of claim term in the claim as a whole are clear and precise and not insolubly ambiguous**, upon primary inquiry as to

whether… language leaves room for ambiguity or whether… boundaries are clear and precise.**]**

"Service network" is, thus, ***not*** indefinite ***nor* insolubly ambiguous.** DDC ruling "service network" indefinite ***must*** be reversed.

DDC construed "VAN service provider." DDC ***must*** construe "service network" consistent with "VAN service provider," "VAN service" and "value-added network" shown above to be construable. *See **CR4***. "…common terms… ***must*** interpret consistently..."

DDC need be guided only by intrinsic and extrinsic evidence, ***not*** by Pazuniak's or JPMC/Spielman's incorrect construction.  Scope of '492 claim claiming "service network" is clear, boundaries of protected subject matter are clearly delineated. The '492 claim and "service network" are ***not*** indefinite.

> **TOA8**. If…scope of…subject matter embraced by…claims is clear, and if applicants have not otherwise indicated that they intend the invention to be of a scope different from that defined in …claims, then …claims comply with 35U.S.C.112(b) ...
> **TOA9** ("a claim to a formula containing over 5000 possible combinations is not necessarily ambiguous if it sufficiently notifies …public of …scope of … claims."). A claim is indefinite when… boundaries of … protected subject matter are not clearly delineated and …scope is unclear… a genus claim that covers multiple species is broad, but is not indefinite because of its breadth, which is otherwise clear." *MPEP2173.04[R-11.2013]*

"**VAN SWITCH**" contains the common claim term "VAN," which is construable as shown above, consistent with DDC's construction of "VAN service provider" as

"a provider of a POSvc Application." "VAN service" is construable as "a POSvc Application."   Consistent with DDC and above construction of terms "VAN service provider," "VAN service," and "VAN,"   "VAN switch" includes a POSvc Application.  This is consistent with <u>specification</u> which <u>discloses that the "VAN switch" is an OSI application layer switch</u> (A-72-74 '492:8:52; 5:23-27; 4:58-64) <u>and includes a POSvc Application</u> (A-75 '492:9:9-16). DDC acknowledges (A-583-586) that <u>specification discloses that VAN switch is an OSI application layer switch with four components (Fig.7), boundary service</u>, <u>switching service</u>, <u>management service</u> and <u>POSvc Applications</u> (A-75 '492:9:9-16).

"boundary service 701 provides…interface between VAN switch 520, …Internet… Web, and multi-media end user devices…on-line service provider. A <u>user can…be routed or "switched" to an application</u> accessible via a remote VAN switch." (A-74 '492:8:41-51)

"Switching service 702 <u>is an OSI application layer switch,</u>... represents…core of…VAN switch...[and] performs…routing <u>of user connections to remote VAN switches</u>…Interconnected <u>application layer switches form…application network backbone. These switches are one significant aspect of the present invention.</u>" (A-74 '492:8:52-63)

"Management service 703 contains tools...to manage network resources…applications…security…fault…configuration… performance…and billing management." (A-74 '492:8:64-9:6)

"[A]pplication service 704 contains application programs that deliver customer services. <u>Application service 704 includes [point-of-service] applications</u>…Fig. 6A..." (A-75 '492:9:9-11)

 "…exchange 501 and management agent 601... together constitute a [VAN] switch" ('492:7:52-54;  8:41-42)…" "exchange   and   a

management agent component...together perform …switching, object routing, application and service management functions according to one embodiment of the present invention."   (A-73 '492:6:35-38)"

The construction for "VAN switch" as *at least* "an OSI application layer switch including a POSvc Application" is consistent with construction of terms "VAN service provider," "VAN service," "VAN." So the term "VAN switch" cannot be ambiguous, much less insolubly ambiguous and **is** amenable to construction.

*See CR5*. The <u>distinction between</u> an OSI <u>network layer switch</u> (which DDC references in (A-585-586) vs OSI <u>application layer switch</u>, (A-72, 73 '492:4:58-5:27) defines clearly the metes and bounds of what the structure is. Any ambiguity has been resolved by specification disclosing a metric that distinguishes "VAN switch" as an OSI application layer switch including POSvc Application limitation and distinction from an OSI layer 3 network layer switch (eg. Cisco switch), which is a hardware switch in a physical network, a TCP/IP-based physical Internet or Web,  as for example, a "quantitative metric (eg, numeric limitation as to a physical property) rather than a qualitative functional feature" **TOA5**; specification provide[s] a formula for calculating a property along with examples that meet the claim limitation and examples that do not  by noting that specification discloses a "VAN switch,"  a layer 7 application layer switch  that includes a POSvc Application  and is distinct from OSI layer 3 network layer switch in an IP-based facilities network, which only goes up to layer 4 of OSI model, such as the

physical Internet and Web. Specification provides **examples** of such a "VAN switch" that **meet the common claim limitation**, "VAN," (A-75 '492:9:10-16) that includes POSvc Applications, eg, a Web banking POSvc Application on a Web page as in Figs. 6A, 5C, 5B, 5D and also provides **examples that do not meet the claim limitation** (A-72, 73 '492:4:58-5:27) and of an OSI layer 3 network layer switch (A-72 '492:4:7-10) as in an IP-based facilities network ('492:6:32-33). **TOA5, TOA6**; specification provides a general guideline and examples sufficient to teach a person skilled in the art when claim limitation was satisfied (**TOA7**). Upon primary inquiry as to whether language leaves room for ambiguity or whether boundaries are clear and precise, boundaries of  "VAN switch" in the claim as a whole are clear and precise and not insolubly ambiguous, and is consistent with DDC's construction of claim term "VAN service provider," hence "VAN," "VAN service." DDC is wrong in its extrapolation (A-585-586), despite DDC acknowledging the definition of a network layer switch, which is clearly distinguished from a VAN switch, which is an application layer switch. Figs.5B, 6A, 7 show a VAN switch.  The specification shows that "VAN switch" is *not* indefinite. DDC already construed VAN service provider and hence VAN switch can and must be construed consistent with claim terms "VAN service provider," "VAN" and "VAN service." So, "VAN switch" is not insolubly ambiguous. DDC has already offered a claim construction, yet was led astray by

- 13 -

JPMC/Spielman. DDC **inconsistently** ruling this claim term as indefinite is incorrect and must be reversed.

***CR6*** [DDC failed to note that prosecution history estoppel prevents Patentee, DDC or USPTO to change the construction of term, that was agreed to between inventor and original Examiner in order for claim to issue by distinguishing a VAN switch as OSI application layer switch from network layer switch (A-72,73 '492:4:58-5:27) to distinguish from the then cited prior art, Focsaneanu, during original prosecution of 6,212,556 patent (A-395-399), deriving priority from same provisional application 60/006,634 (A-479-575). This already established the metes and bounds of "VAN switch".]

The key **applications component of a VAN switch**, POSvc Application displayed on a Web page, referred to as VAN service **704**, must be included in construction of VAN switch, as also **boundary services component of VAN switch**. *See **CR2, CR3**,* (A-73 '492:5:46-54), (A-74 '492:7:10-23), (A-73-75 '492:6:18-7:50; 9:9-21; Figs 5B, 5C, 5D, 6A), (A-74 '492:8:44-51). Without boundary services component of VAN switch, Back-Office is an island (the prior art in 1995), not connected to a front-end POSvc Application displayed on a Web page, because boundary services component provides the interface between VAN switch, Web and front-end POSvc Application displayed on a Web page **and on-line service provider or Web Merchant**.  (A-18 '500:8) This was overlooked by

DDC in its construction of VAN switch. These two key components of VAN

switch differentiate prior art from the present invention.

Nothing in intrinsic evidence supports DDC's statement: "…specification

offers overlapping and competing definitions for…VAN switch and its four

components." Specification states, as DDC acknowledged:

> "FIG.5B illustrates exchange 501. Exchange 501 comprises Web
> page 505 and point-of-service (POSvc) applications 510,… a
> <u>switching component and an object routing component</u>…(A-73
> '492:6:18-22)

"Exchange **501** and management agent **601** together constitute a VAN switch."(A-

74 '492:8:41-43). Because Exchange is a component of VAN switch, VAN switch

includes all the cited components of Exchange. There is no overlap, claims or

claim term are not rendered indefinite. The fact that both have some of the same

components does not fail to inform, with reasonable certainty, those skilled in the

art about the scope of the meaning of VAN switch.[1] **TOA9.** ( "<u>a claim to a formula</u>

<u>containing over 5000 possible combinations is not necessarily ambiguous if it</u>

<u>sufficiently notifies</u>… <u>public of</u> …<u>scope of</u>… <u>claims</u>.")

"VAN switch" has a clear meaning from the specification itself, as DDC

acknowledged. Specification provides detailed characteristics of VAN switch (A-

72-75 '492:7:51-9:23; 4:58-5:27; 6:18-25; 33-38; Figs. 3, 7, 5B, 6A, 5C, 5D, 8.)

---

[1]  **TOA10** ("It is incorrect to construe the claims as barring all overlap"); **TOA11**

Specification states: "Exchange **501** and management agent **601** together constitute a VAN switch."(A-74 '492:8:41-43) "Exchange **501** comprises Web page **505** and point-of-service (POSvc) applications **510**."(A-73 '492:6:18-20). Exchange is illustrated in Figs. 5B, 5C, 5D, 6A. Text and drawings in specification make clear that <u>application service,</u> VAN service **704**, <u>includes one or more POSvc Application(s),</u> is a key component of "VAN switch" and needs to be included in claim construction for VAN switch.  POSvc Application is and ***must*** be displayed on a Web page, as per specification (A-73 '492:6:41-47).

DDC incorrectly stated (A-585-586): "specification does not describe... switch as to allow one of ordinary skill in the art to identify…scope of…invention" "Spielman opined…"patents-in-suit provide no algorithms, source code, or any other descriptive language offering any guidance as to how to configure a VAN switch so as to perform 'real-time' transactions using TMP or any other protocol..."specification discloses only one embodiment of the VAN switch." Spielman's opinion finds no intrinsic or extrinsic support.  Specification discloses at least two or more embodiments, from <u>infinite</u> number of VAN services:

> "VAN switch 520 provides multi-protocol object routing, depending upon the specific VAN services chosen…One embodiment of the present invention utilizes TMP and distributed on-line service information bases (DOLSIBs) to perform object routing. Alternatively, TMP can incorporate s-HTTP, Java™…WinSock API or ORB with DOLSIBs to perform object routing."(A-74 '492:7, 8)

Specification (A-74 '492:8:7-39) and file history (*see CR8*) clearly spell out an algorithm for VAN switch to enable real-time transactions from a POSvc Application displayed on a Web page — the end-to-end connection managed by exchange 501 from the POSvc Application displayed on a Web page to Web Merchant's services; individual networked object with information entries and attributes routed as an encapsulated whole over OSI application layer network, the service network over the Web, from POSvc Application displayed on Web page to Web Merchant services. Individual networked object with information entries and attributes displayed in POSvc Application on Web page is a key construct in the algorithm provided in specification and is an integral part of "VAN switch." *see* Fig. 5D, *CR8*. POSvc Application is VAN service 704, which is Application Service 704 of VAN switch. VAN switch is an end-to-end solution for providing two-way real-time Web transactions from POSvc Application displayed on Web page or Web browser, utilizing boundary services, switching service, management service and application service of VAN switch. More than sufficient algorithm is presented in specification to allow one of ordinary skill or one skilled in the art at the time of the invention to be able to implement the invention without undue experimentation.

DDC acknowledged this (A-583-584), as per specification (A-73, 74 '492:7:4-6; 6:18-62). DDC acknowledged VAN switch is not same as ordinary meaning of

"switch" (A-585-586),  "network layer switches," disclaimed in file history (***CR6***)

and specification (A-72,7 3 '492:4:58-5:27):

> ***CR7***  ["FIG.3 illustrates…(OSI) reference model…**The present invention is implemented to function as a routing switch within** …**"application layer" of** …**OSI model**…
>
> Network layer 303…contains hardware units such as routers… Transport layer 304...application layer 307…provides…means for application programs to access…OSI environment…**the present invention is implemented to function as a routing switch in application layer 307**. Application layer routing creates an open channel for the management, and…selective flow of data from remote databases on a network." (A-72, 73 '492:4:58-5:27)]

Original file history (***CR6***) of related '556 patent (A-395-399) in same priority

chain established and distinguished the cited art, namely, Focsaneanu, which

involved network layer switches from inventor-coined VAN switch, which does

not take on an ordinary meaning but only what inventor ascribed to it, (inventor is

her own lexicographer) namely, that "The present invention is implemented to

function as a routing switch within… "application layer" of the OSI model." DDC

already acknowledged (A-583) that VAN switch is an OSI application layer

switch. DDC acknowledged that "network switch" (footnote 8, A-586)  is a

"computer networking device used to connect devices together on a computer

network," which is what specification states is the network layer, distinctly

different from application layer of OSI model. This OSI network layer switch has

been distinguished in file history (***CR6***), discussed above, and in specification from

OSI application layer switch. DDC literally acknowledged the difference between network layer switch, the ordinary meaning of a switch, and OSI application layer switch. DDC already acknowledged (A-588, A-591) that "Exchange 501 and management agent constitute a VAN switch," the configurable <u>VAN switch</u> <u>comprises means for switching to a transactional application in response to a user</u> <u>specification from a World Wide Web application</u>. DDC (A-593) acknowledged:

> "…patent specification describes…"switching service" as "<u>an OSI</u> <u>application layer switch</u>… switching service performs… <u>routing of</u> <u>user connections</u> to … back-office networks … <u>application layer</u> <u>switches</u> form… <u>application network backbone. These switches are</u> <u>one significant aspect of the invention</u>."

Misled by Spielman's opinion, unsupported by any intrinsic or extrinsic evidence, DDC incorrectly concluded: "Nor do the figures disclose algorithms." Misled by JPMC, DDC forgot what it already acknowledged: VAN switch is an OSI application layer switch; "means for switching…" is "switching service 702," which is an OSI application layer switch. Patent prosecution history estoppel prevents both PTO and Patentee to change what had been agreed to and accepted by the original Examiner in allowing the patent to issue. [As noted by Supreme Court in **TOA12**, a clear and complete prosecution file record is important in that "[p]rosecution history estoppel requires that… claims of a patent be interpreted in light of the proceedings in…PTO during the application process." In **TOA12**, the court held that "a narrowing amendment made to satisfy any requirement of the

Patent Act may give rise to an estoppel." The fact that VAN switch is an

application layer switch is narrow and is not broad like ordinary meaning of a

switch as network layer switch, satisfies the requirement of Patent Act and gives

rise to an estoppel. DDC completely missed this because DDC was misled by

JPMC/Spielman's incorrect, unfounded technical and legal arguments.

Specification (A-74 '492:7:10-23) spells out the invention: *See CR3, CR10*.

The object or object identity or networked object is disclosed (A-74 '492:8:8-13;

'492:7:10-20) as "information entries and attributes," related to a real-time Web

transaction from a POSvc Application displayed on a Web page (eg, user name,

amount transferred, checking, savings account numbers are "attributes" in Web

banking POSvc Application (A-74 '492:7:10-23; Fig.5D), and user 100, $500, the

specific checking, savings account numbers are "information entries.")

The limitation used to define VAN switch as an OSI application layer switch

including a POSvc Application distinguishing VAN switch from OSI layer 3

network layer switch is perfectly acceptable "because it set definite boundaries on

the patent protection sought." **TOA13**. *See CR6,* '556 (A-395-399) file history of

network layer switch vs application layer switch.

*CR11* [Distinction between layer 3 network layer switch and layer 7 VAN switch

as application layer switch…serves to precisely define present structural attributes

of interrelated component parts of the claimed assembly. **TOA14.** A

"determination of whether the limitation is sufficiently definite will be highly dependent on context (e.g., the disclosure in the specification and the knowledge of a person of ordinary skill in the art." **TOA5**. A claim limitation reciting "transparent to infrared rays" was held to be definite because specification showed that a substantial amount of infrared radiation was always transmitted even though the degree of transparency varied depending on certain factors. **TOA15**. Claims in another case were held definite because applicant provided "a general guideline and examples sufficient to enable a person of ordinary skill in the art to determine whether a process uses a silicon dioxide source 'essentially free of alkali metal' to make a reaction mixture 'essentially free of alkali metal' to produce a zeolitic compound 'essentially free of alkali metal.'" **TOA7]**

DDC incorrectly followed JPMC's incorrect argument that the four components of VAN switch describe functions and hence indefinite. Specification defines first what the four components are and then discloses what they do. Functional language is perfectly acceptable. Language is not ambiguous because the language sets forth well-defined boundaries of the invention, does not just state the problem or a result obtained; there is a clear cut indication of scope of subject matter covered by claim; one of ordinary skill in the art would know from the claim terms what structure or steps are encompassed by the claim. The primary inquiry is

whether language leaves room for ambiguity or **whether boundaries are clear and precise**. Specification of patents-in-suit clearly meets above requirements.

The algorithm, contrary to JPMC's allegations, is clearly specified in specification (A-72, 74 '492:8:8-39; 7:10-23; 8:8-9:33; 4:58-5:27) and in '500 and parent patent 5,778,178 ('178) file histories (***CR8***).

> "DOLSIBs are virtual information stores optimized for networking. All information entries and attributes in a DOLSIB virtual information store are associated with a networked object identity..."
> (A-74 '492:8:7-39)

***CR8***[

> "…Examiner contends…Davison teaches…claimed elements in "an HTML Web page with URL links to application programs," thus rendering… claimed invention unpatentable. Applicants respectfully submit… object identities according to the presently claimed invention are distinctly different from an HTML page with URL links. As claimed in…pending claims, the object identity represents a networked object…establishes the individual object as an "IP'-reachable" or accessible node on the Internet. This Internet address is used to uniquely identify and access the object from the virtual information store. This type of an "object" is significantly different from an HTML page that is accessed via a URL. Although an HTML page may be utilized by a user to specify… type of transaction desired (e.g. a POSvc Application is essentially viewed by the user as a Web page, as described in… specification),… HTML page described in Davison is simply an entry form and does not provide any type of object routing capability, as presently claimed. Davison describes how to create a standard HTML Web page that contains HTML forms. These forms are non-interactive Web pages that do not allow a user to perform live, real-time, bi-directional transactions, with object routing, as claimed.
> In contrast, according to the presently claimed invention, if a Web Merchant decides to offer a POSvc Application that allows access to checking and savings accounts, **the object identities** according to the claimed invention refer to the individual checking and savings

<u>accounts</u>, not to… POSvc Application Web page. Each account is an individual network addressed object that is accessible on the network. Thus, <u>each account is **an object identity associated with information entries and attributes**, and the object identity represents a **networked object**</u>. The object identity (the account) is associated with a unique network address, and the unique network address is utilized to identify and route the object identity on the Web/network. This type of an object routing system is not taught or suggested by Davison. As such Applicant respectfully submits that the claimed invention is patentable over Davison." (A-179-183, 319-320; '178/'500 file histories)**]**

DDC's ruling that "VAN switch" is indefinite must be reversed. The correct construction for "<u>VAN switch</u>" is "<u>an OSI application layer switch that includes POSvc Applications displayed on a Web page and boundary, switching and management components</u>." PTAB construed it similarly.

 "**<u>VAN SYSTEM</u>**" contains the common term "VAN" and is construable, consistent with DDC's construction of "VAN service provider" as a "provider of POSvc Application."    "VAN system" is a "system that includes a POSvc Application displayed on a Web page in an OSI application layer network" and enables real-time Web transactions from POSvc Applications displayed on a Web page. Claim 35 in '500 patent and the title spell out what a VAN system is and each of those means-plus-function claims are construable, ***not*** indefinite, as shown below. DDC's ruling must be reversed.

**3)** "**<u>SWITCHING</u>**":  Specification defines this term:

"Configurable <u>value-added network switching</u>" (A-16 '500:3:30-32)

"<u>Switching to a transactional application</u> in response to a user specification from a World Wide Web Application" (A-15 '500:2:37-40)

"<u>OSI application layer routing of user connections</u> to a remote VAN switch;" (A-18 '500:8:44-47)

"…the present invention is implemented to function as a **<u>routing switch in application layer 307</u>**. Application layer routing creates an open channel for the management, and the selective flow of data from remote databases on a network." (A-17 '500:5:10-14)

"**<u>A user can connect</u>** to a local application, namely one accessible via a local VAN switch, **<u>or be routed or "switched" to an application</u>** <u>accessible via a remote VAN switch</u>." (A-18 '500:8:40-43)

"Switching service 702 is an **OSI application layer** switch. Switching service 702… represents the core of the VAN switch. It performs a number of tasks including…**routing of user connections** to remote VAN switches, described in… paragraph above…" (A-18 '500:8:44-47)

The term "switching" is *not* indefinite, DDC's incorrect conclusion *must be reversed*. "**Switching**" is simply "<u>**OSI application layer routing to an**</u> <u>**application**</u>." Routing is "<u>OSI application layer routing of user connections to an</u> <u>application</u>." Metes and bounds of this claim term are clearly specified  as OSI application layer switching and routing, distinguished  away from OSI network layer switching and network layer routing  (A-16, 17 '500:4:45-5:14; Fig.3). The claim itself lends support to what "switching" is. "<u>Switching to a transactional</u> <u>application</u> in response to a user specification <u>from a network application</u>."  The

network referenced in "network application" is the Web and hence "network application" is "Web Application."

**4)** "**POINT-OF-SERVICE (POSvc) APPLICATION**": DDC (A589-590) incorrectly construed "POSvc Application" as "a software program that transmits a user's request for a service," not in accord with the specification. *CR9* [DDC erred by misapplying "broadest reasonable interpretation" ("…not a rule of claim construction," per Judge Newman **TOA16**) to arrive at a legally incorrect interpretation, without exploring the metes and bounds to which Plaintiff is entitled, particularly as this term was coined by inventor and can only take on the meaning ascribed to it by inventor in specification and filehistory.] DDC missed specification discloses: a POSvc Application is a transactional application, from which a Web user **100** transacts and ***must*** be displayed on a Web page; POSvc Application is an **application that executes** the type of **transaction** that the user may be interested in performing.

> "POSvc Applications 510 are **transactional applications**, namely applications that are designed to incorporate and take advantage of… capabilities provided by the present invention…switching, object routing, application and service management functions." (A-17 '500:6:11-14)

> "…**POSvc Application** is an application that can **execute the type of transaction that the user may be interested in performing**. …POSvc list is **displayed via**… **graphical user interface component**. One embodiment of the present invention supports HyperText Markup Language as the graphical user interface component..." (A-17 '500:6:30-36)

DDC failed to give credence to the very next sentence in the Patent, which characterizes the application as "displayed via the graphical user interface component." Nor did DDC address the fact that such an application is a "transactional application[] . . .designed to incorporate and take advantage of the capabilities provided by the present invention," including "switching, object routing, application and service management functions." (A-17 '500:6:11-13). So, the POSvc Application is a transactional application that displays an individual networked object identity with information entries and attributes (Fig. 5D), designed to incorporate object routing. DDC's construction also disregards the ability of a POSvc Application to "perform . . . robust, real-time transactions from a Web client is a significant aspect of the present invention. (A-17 '500:6:66-7:12). Such functionality is better captured in Plaintiff-Appellants' construction, "a POSvc Application is a transactional application displayed on a Web page or Web browser and including an individual networked object with information entries and attributes (with which the Web user interacts and transacts from) and that executes a real-time Web transaction a user wants to perform." DDC does not offer the broadest reasonable construction in light of specification as would be read by a person of ordinary skill in the art. Figs. 4B, 5B-D, 6A illustrate a POSvc Application being displayed on a Web page. Specification (A-19 '500:9:2-4), too, clearly states that "[a]pplication service 704 includes POSvc Applications such as

Bank POSvc described above, and illustrated in Fig. 6A," which corresponds to

VAN service 704. *CR10* [Fig. 5D shows POSvc Application displayed on a Web

page including object identity with information entries and attributes ("NAME,"

"PASSWORD") displayed on Web page. A-17 '500:6:66-7:12 also details

information entries, such as, user **100**, checking, savings account #s, $500 for

attributes, name of user, checking, savings accounts, amount transferred, in

checking account object identity, which is an individual networked object that

uniquely identifies a specific instantiation of the object. (A-18 '500:7:65-8:3).] *See*

*CR7*, *CR8*, A-179-183, 319-320, '178/'500 file histories.

While A-17 '500:6:30-34 describes "POSvc Application" as "an application that

can execute the type of transaction that the user may be interested in performing,"

DDC's construction fails to reflect even this aspect of the patent. For example,

there is no discussion of 'transmits the user's request for a service." DDC

overlooked the goal of the patent is for a Web user to perform a real-time Web

transaction from a POSvc Application displayed on a Web page and that this

capability did not exist for a Web user prior to the present invention. See A-17

'500:5:27-42; *CR2*.

DDC's construction is so broad as to encompass a CGI program or even a

Web browser. Specification distinguishes away:

> ""Web browser" as used in the context of the present specification
> includes conventional Web browsers...The present invention is

- 27 -

independent of…Web browser being utilized and… user can use any Web browser, without modifications to…Web browser." (A-72 '492:3)

DDC ignored specification (A-73 '492:6) states: "Exchange 501 processes the consumer's request and displays an exchange Web page 505 that includes a list of POSvc Applications 510 accessible by exchange 501."  In Patents-in-suit, POSvc Application displayed on a Web page is a Web client displayed on a Web browser or Web page and is the front-end client program Web user **100** utilizes to run the application to perform two-way real-time transactions from the Web Merchant Web Application.  Specification states: "If user **100** desires to perform… banking transactions, and selects the Bank application, a Bank POSvc Application will be activated and presented to user **100**, as illustrated in FIG.5D…", Web user **100**:

> "will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository 575 in the Bank "Back-office."…As illustrated in FIG.5D, once the connection is made between Bank POSvc Application **510**(1), for example, and Bank services, an operator agent on Web server **104** may be activated to ensure… availability of distributed functions and capabilities." (A-73 '492:6:65-7:9).

Figs.5C, 5D and specification show that POSvc Application has and displays networked objects with both attributes and information entries:



Figure 5C

Figure 5D

One skilled in the art would look at <u>all</u> disclosures in the patent, file history and

extrinsic evidence.  Such examination demonstrates that the construction provided

by Plaintiff-Appellant derives entirely from actual definitions of the term in

specification, drawings, text and file history.

**5)** "**<u>TRANSACTIONAL APPLICATION ("TA")</u>**," "**<u>BACK-END TA</u>**,"
"**<u>SELECTED BACK-END TA</u>**", "**<u>COMPUTER SYSTEM EXECUTING THE
BACK-END  TA FOR PROCESSING THE TRANSACTION REQUEST IN
REAL-TIME</u>**":

See **CR9**, **CR4**. DDC misapplied "broadest reasonable interpretation" ("an examination expedient, not a rule of claim construction," per Judge Newman, **TOA16**) resulting in a legally incorrect interpretation, without exploring the metes and bounds to which DrA is entitled. DDC failed to <u>consistently construe</u> these terms. **TOA3**. "same claim term…carries…same construed meaning."

DDC's constructions (A-591-592) of these terms contradict one another. DDC construed "transactional application" as "a software program that <u>transmits</u> a user's request for a service." Applying this construction, "back-end TA," would then be "a back-end software program that <u>transmits</u> a user's request for a service." However, DDC construed "back-end TA" as "a software program that <u>executes</u> a user's request for a service." DDC incorrectly ruled the fourth term indefinite, "Computer System Executing the Back-End TA for Processing the Transaction Request in Real-Time" that includes the common term "TA." Four contradictory, inconsistent constructions involving the common term "TA." *See* **TOA3**.

DDC incorrectly states (A-593): "Fig.4B represents an embodiment of the invention and depicts a "back-office" with an operating system and applications." DrA did ***not*** invent the back-office applications that have existed for eons of years. Fig.4A is the "back-office." Fig.5D shows that the "back-office" is behind the dotted line in Fig.5D. Figs.4B, 5D show the invention in front of the dotted line in

Fig.5D.  Fig.5D shows <u>the transactional application running on computer system</u> <u>200</u>, which is the back-end, not in the front-end. The specification states:

> "…exchange 501 in Fig.5D is shown as running on a different computer system (Web server 104) from the <u>computer systems of the</u> <u>Web Merchants running POSvc Applications (computer system 200)</u>. Exchange 501 may, however, also be on the same computer system as one or more of the computer systems of the Web Merchants." (A-17 '500:6:48-53)

So, the term "<u>back-end</u>" and "<u>computer system executing the back-end</u> <u>transactional application</u>" refers to <u>computer system "200"</u> in Fig. 5D, which represents <u>a computer system  of the Web Merchant running the (POSvc</u> <u>Application) or transactional application, but not at a Web browser nor Web page</u>. DDC failed to construe "back-end" in light of claim as a whole, in light of specification and construed it in a vacuum.

 "**<u>Transactional application</u>**" is "**<u>an application that performs a transaction</u>**" is the <u>correct construction</u>, supported by the specification:

> "If <u>user</u> **100** desires <u>to perform</u>…banking <u>transactions,</u> and <u>selects</u>… Bank application…FIG.5D…Bank POSvc Application **510** …activated, <u>user</u> **100** will be able to connect to Bank services and **<u>utilize the application to perform banking transactions</u>**..." (A-17 '500:6:44-47; 6:54-56).

DDC's constructions are not in accord with the specification, which discloses  in Fig. 5D and A-17 '500:6:50-51 that "the computer systems of the Web Merchants running POSvc Applications (computer system 200)" are *not* behind dotted line shown in Fig.5D, behind dotted line is Back-office of a Web Merchant or other

VAN service provider. Computer system 200 is not at front-end of a Web server. Computer system 200 is at back-end running the TA, but this back-end TA is not beyond dotted line in Fig.5D.  So "back-end TA" is an "application that performs a transaction and running on a computer *not* at the front-end on a Web page or Web server."  In Fig.5D, claim term "back-end TA" is shown running on computer system 200.   "Selected back-end TA" is construed likewise.

DDC blindly copied JPMC/Spielman, missing the whole point of the invention and erroneously stated: (A-608) "the specification offers no details about…back-office computer system or its "applications"… specification does not discuss how the applications would process the transaction requests." Dr. Bardash and DrA, skilled in the art, stated and specification discloses that the invention in this patent is *not* the Back-office or applications in the Back-office which have existed for eons of years. These applications were local to the Back-office. DrA's inventions are about the Web, see specification (A-15 '500:1:11-12), "relates to the area of Internet communications," *not* about Back-office.  DDC erroneously concluded that the term "computer system executing the back-end TA for processing the transaction request in real-time" is governed by §112, paragraph 6. It is a matter of law that if the structure is already provided in the claim, then this is *not* governed by §112, paragraph 6. Per MPEP 2173.05(G), functional language may also be employed to limit claims without using means-plus-function format.

**TOA17**. Unlike means-plus-function claim language that applies only to purely

functional limitations, **TOA1** ("Means-plus-function claiming applies only to

purely functional limitations that do not provide the structure that performs the

recited function."), <u>functional claiming often involves the recitation of some</u>

<u>structure followed by its function</u>. **TOA18** the claims were directed to a conical

spout (the structure) that "allow[ed] several kernels of popped popcorn to pass

through at the same time" (the function). As noted by the court in **TOA18**, "[a]

patent applicant is free to recite features of an apparatus either structurally or

functionally." *Id.*" <u>DDC erroneously concluded that this term is guided by §112,</u>

<u>paragraph 6, but the above discussion shows that it is not</u>.   The Court must reverse

this incorrect ruling.  Like in **TOA19,** this claim term "computer system executing

the back-end TA for processing the transaction request in real-time" connotes

sufficiently definite structure. All evidence intrinsic to the patent (*see* "computer

system 200 in Fig.5D and A-17 '500:6:48-53, provisional application and any

relevant extrinsic evidence (Dr. Bardash's Declaration and DrA's statement in her

deposition and old Back-office systems and prior art) point to the fact that there is

clear structure for this term:

"Computer system executing the back-end TA for processing the transaction

request in real-time" is **computer system 200**, as shown in Fig. 5D, <u>computer</u>

<u>systems of the Web Merchants running POSvc Applications (computer system</u>

200), not at the front-end. Metes and bounds of this structure have been clearly

delineated in specification and diagrams, Figs.5D, 4A, 4B. "Back-end TA" is an

application that performs a transaction and runs on a computer system **not** at the

front-end in a Web page. This term is construable, **not** indefinite. DDC itself has

construed the term "TA" and "back-end TA."

The claim recites said "computer system executing the back-end TA," delineates

the components that said computer system is connected to, describes how said

computer system interacts with those components, and describes the processing

that said computer system performs. The written descriptions show that the said

computer system conveys structure to skilled artisans. Dr. Bardash opined already

that he and other skilled artisans  are taught by the specification that  said computer

system  conveys  sufficiently definite structure and also that claims and

specification recited connections made by said computer system, and detailed how

said system performed its function  of  "processing the transaction request in real-

time," (A-17-19 '500:6:66-7:12; 9:1-16; Exchange 6:7-65; Fig.5B, VAN switch

A-18-19, 8:33-9:16; 7:64-8:4; 8:19-31; '500 file history) the components include

POSvc Applications on a Web page that this computer system connects to,

utilizing object identity with information entries and attributes… This Court would

find like in **TOA19**, that the limitation  connoted sufficiently definite structure

based upon a reading of claim 1 of '492 patent, written description, diagrams and file history.

Language in the claims is not ambiguous because there is a clear cut indication of scope of subject matter covered by the claim; language sets forth well-defined boundaries of the invention; and one of ordinary skill in the art would know from the claim terms what structure or steps are encompassed by the claim, as the specification details (A-17 '500:6:44-47; 6:48-56). Upon primary inquiry, language of claim and claim term leaves no room for ambiguity and **boundaries are clear and precise**. DrA demonstrated that specification provides a formula for calculating a property along with examples that meet claim limitation and examples that do not. She demonstrated that Back-office applications is not what DrA invented but she invented Web Applications, POSvc Applications on a Web page. **TOA6.** DrA demonstrated that specification provides a general guideline and examples (Web banking application, HR POSvc, Fig.5D and more examples '500:6:40-7:40) sufficient to teach a person skilled in the art when the claim limitation was satisfied. (**TOA7**). DDC failed to note that claims particularly point out and distinctly claim the invention, as required by MPEP 2173. Claim language defines clearly metes and bounds of what the structure is. DDC missed what Dr. Bardash correctly pointed out to DDC that one skilled in the art would understand the specification including the drawings as showing the structures of the claimed

invention. <u>If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite</u>. **TOA16.** DDC blindly copied JPMC/Spielman. MPEP§2173.02 states: "Some latitude in the manner of expression and the aptness of terms should be permitted even though the claim language is not as precise as the examiner might desire." …for a person skilled in field of the invention would understand claim when viewed in context of specification.

 "Computer system executing the Back-end TA for processing the transaction request in real-time" is, thus, **not** subject to 112 paragraph 6 and is **not** indefinite. '492 patent claim 1 is valid. One skilled in the field of the invention would understand the claim when viewed in  context of specification. These terms, particularly, "computer system executing the back-end TA for processing the transaction request in real-time," are construable**, not** indefinite. Ruling must be reversed.

| "Back-End" | computer systems of the Web Merchants running POSvc Applications (computer system 200) |
|---|---|
| "Back-End TA;"  "The selected Back-end TA" | An application that performs a transaction running on computer systems of the Web |

| | Merchants running POSvc Applications (computer system 200) |
|---|---|
| "Computer system executing the Back-end TA for processing the transaction request in real-time" | A-17 '500:6:48-53 Computer system 200 as shown in Fig. 5D or computer systems of the Web Merchants running POSvc Applications (computer system 200), and not Web server. |

**6)** "**Web Application**" and "**network application**": DDC incorrectly construed "Web Application" as "a software program running on a facilities network" (A-590-591), not in accord with specification, intrinsic or extrinsic record or in view of claim as a whole. DDC misapplied "broadest reasonable interpretation" **TOA16, CR9**, to reach a legally incorrect interpretation, without exploring metes and bounds to which DrA is entitled. Illustrative are these excerpts from '500 specification:

> "Thus, unlike his prior access to his account, user **100** now has… capability to…more than browse his bank account. The ability to perform these types of robust, <u>real-time</u> transactions <u>from a Web client</u> is a significant aspect of the present invention." (A-18 '500:7:8-12)

"The <u>present invention is independent of… Web browser being utilized</u>…without modifications to… Web browser."(A-16 '500:3:34-37)

"<u>Web browsers are software interfaces that run on Web clients to allow access to Web servers via a simple user interface. A Web user's capabilities today from a Web browser…extremely limited</u>… <u>user can perform one-way, browse-only interactions</u>." (A-15 '500:1:21-27)

These excerpts support the construction "Web Application" is a "transactional application that is a Web client displayed on a Web page or Web browser that executes a real-time Web transaction and displays an object identity with information entries and attributes." *See* discussion on POSvc Application (II.4 above) for support for including object identity with information entries and attributes. Claim language requires Web Application to be a POSvc Application displayed on a Web page. Plaintiff's construction that a Web Application is the same as a POSvc Application displayed on a Web page or Web browser is in accord with the specification, title and claim language. The Web client application displayed on a Web browser is distinct from the Web browser, even though the Web browser is itself a Web client. *See **CR8*** '500 file history above, which states POSvc Application is distinctly different from a URL or HTML form. Claim 1 in the '492 patent recites that POSvc Application is displayed on a Web page, and so does the specification, column 6. Cols 1, 5, 7 clearly distinguish the present invention from hyperlinking.

> "POSvc Applications **510** are transactional applications … displayed via the graphical user interface component. One embodiment of the present invention supports HyperText Markup Language as the graphical user interface component. (A-17 '500:6:11-13; 6:30-39).

DrA's patents disclose that Web browser serves as user interface on which a Web Application is displayed and hence as user interface for the Web Application.

> "…Web browsers are software interfaces that run on Web clients to allow access to Web servers via a simple user interface." (A-15 '500:1)

The 'client' as used in a client-server application refers to the program an end user uses to run the application. eg, in a database application, end user enters information using 'client' application, and 'server' application is used to store the information in a database.

A Web Application is "an application that is a Web client <u>displayed</u> in a Web browser," and this is "<u>a significant aspect of the present invention.</u>" Construction for "Web Application" and "network application" is same as POSvc Application.

7)    "**MEANS FOR SWITCHING TO A TRANSACTIONAL APPLICATION IN RESPONSE TO A USER SPECIFICATION FROM A NETWORK APPLICATION**"

DDC's ruling this indefinite is at odds with specification (A-18 '500:8:44-55) and file history of the patent and related patents in the priority chain of this patent, in which the PTO and inventor agreed and established that "means for switching" is "switching service 702" "that is an OSI application layer switch" in distinguishing

- 39 -

from the then cited prior art, Focsaneanu, related to a network layer switch, for the

patent to issue. PTAB construed this term in IPR of '500 patent to mean "switching

service 702," and simply expanded out what the specification states the switching

service 702 is (A-716-717).  Prosecution history estoppel prevents inventor or PTO

or court to change the claim construction adopted during prosecution for issuance.

**TOA12**. "In that instance the prosecution history has established that the inventor

turned his attention to the subject matter in question, knew the words for both the

broader and narrower claim, and affirmatively chose the latter." *Id*. 734-735.

("Prosecution history may rebut the inference that a thing not described was

indescribable."). "The patent applicant who narrows his claims has thus

acknowledged "an inability to claim the broader subject matter" and has

presumptively limited his patent application to the literal terms of its claims. *Id*.

737. **TOA20**.

Disclosure of steps for performing the function here, true for other means-

plus-function elements discussed below, is no less an algorithm than that which

was found sufficient in **TOA21.**

DDC failed to observe that the description of the invention provides the foundation

for scope and content of the claims, and serves to demonstrate that DrA was indeed

in possession of the invention claimed, **TOA16**, *CR9*, and that DrA employed

"such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention," **TOA22.** *See* Figs.7, 3, 6A, 5B, file histories.

> "<u>Switching service 702 is an OSI application layer switch</u>. <u>Switching service 702 thus represents the core of the VAN switch</u>. It performs a number of tasks including the <u>routing of user connections to remote VAN switches</u>…multiplexing and prioritization of requests… flow control. Switching service 702 also facilitates open systems' connectivity with both the Internet…and private networks…, such as banking networks. <u>Interconnected application layer switches form the application network backbone. These switches are one significant aspect of the present invention</u>." (A-18 '500:8:44-55)

DDC erroneously concluded that all means-plus-function terms and claims in '500 patent are indefinite.

"A functional limitation must be evaluated and considered, just like any other limitation of the claim, for <u>what it fairly conveys to a person of ordinary skill in the pertinent art in the context in which it is used</u>. **TOA23**.

DDC  failed to note that specification (A-72 '492:4:58-5:27) discloses OSI application layer switch is distinctly different from a network layer switch (eg, a Cisco network layer switch.) Specification also states that switching service 702 is an OSI application layer switch and describes switching service 702 (A-72-74, '492:8:52-63; 4:62-64; 5:23-27). The limitation used to define switching service 702, although functional, set definite boundaries on the patent protection sought and is perfectly permissible function language and serves to precisely define present structural attributes of claimed VAN switch and means-plus-function

claim. **TOA13** it was held that <u>the limitation used to define a radical on a chemical</u> <u>compound</u> as "incapable of forming a dye with said oxidizing developing agent" <u>although functional</u>, <u>was perfectly acceptable because it set definite boundaries on</u> <u>the patent protection sought</u>.  In a claim that was directed to a kit of component parts capable of being assembled, the Court held that limitations such as "members adapted to be positioned" and "portions . . . being resiliently dilatable whereby said housing may be slidably positioned" serve to precisely define present structural attributes of interrelated component parts of the claimed assembly. **TOA14.**

DDC failed to note there is *no* ambiguity about OSI application layer switch, the definition in the specification of the term "means for switching…" or "switching service 702" is defined by what it is, an OSI application layer switch, *not* a network layer switch.  DDC *should* hold claim and claim term definite because patentee provided a general guideline and examples sufficient to enable one of ordinary skill in the art to determine whether claim calls for use of OSI application layer switch to perform the function. "When a claim limitation employs functional language, the examiner's determination of whether the limitation is sufficiently definite will be highly dependent on context (e.g., the disclosure in the specification and the knowledge of a person of ordinary skill in the art)." *See* *CR11*.

Language in Patentee's claims is ***not*** ambiguous because there is a clear cut

indication of scope of subject matter covered by claim; language sets forth well-

defined boundaries of the invention that switching service 702 is an OSI

application layer switch, that is clearly distinguished in patent specification from a

network layer switch; one of ordinary skill in the art would know from the claim

terms what structure or steps are encompassed by the claim, as specification

discloses (A-74 '492:8:52-63).  Upon such primary inquiry by the court, language

of claim and claim term "means for switching…" where the structure, switching

service 702 which is an OSI application layer switch, is itself now part of the claim

term, leaves no room for ambiguity and <u>boundaries are clear and precise</u>.

During prosecution, patentee resolved ambiguities of a functional limitation by (1)

using a quantitative metric (e.g., numeric limitation as to a physical property)

rather than a qualitative functional feature, namely, that the claim term is an OSI

application layer switch distinguished from a network layer switch;  (2)

demonstrated that "specification provide[s] a formula for calculating a property

along with examples that meet the claim limitation and examples that do not,"

**TOA6** (3) provides a general guideline and examples sufficient to teach a person

skilled in the art when the claim limitation was satisfied (**TOA7**); and  (4)

applicant wrote claims to recite the particular structure that accomplishes the

function. DDC failed to note that the claims particularly point out and distinctly

claim the invention, as required by MPEP 2173. OSI application layer switch

versus network layer switch in the "means for switching…" as switching service

702 <u>defines clearly the metes and bounds of what the structure is, not what it does</u>.

One skilled in the art would understand the specification including the drawings as

showing the structures of the claimed invention. DDC missed what Dr. Bardash

correctly pointed out that one skilled in the art would understand the specification

including the drawings as showing the structures of the claimed invention. This

claim term is ***NOT*** indefinite. Ruling must be reversed.

JPMC's argument about algorithm is unfounded, distracting DDC's attention from

what the specification discloses, that make these terms definite.

**8)** Claim 2 is ***not*** indefinite. It includes 3 means plus function terms:

**8a)** "**MEANS FOR RECEIVING SAID USER SPECIFICATION**":

Specification states: "When Web server 104 receives user 100's indication that he

desires to perform real-time transactions,… request is handed over to an exchange

component."(A-73 '492:6:8-11) DDC could have unambiguously construed

"means for receiving said user specification" as a Web server, as this <u>defines</u>

<u>clearly the metes and bounds of what the structure is</u>. This term is construable***, not***

indefinite. Ruling must be reversed.

**8b)** "**MEANS FOR ENABLING A SWITCH TO SAID TRANSACTIONAL APPLICATION**":

DDC failed to note "means for enabling a switch to a transactional application" is clearly spelled out as boundary service 701 of the VAN switch, as the boundary service 701 <u>enables a user to be</u> "<u>routed or "switched" to an application accessible via a remote VAN switch</u>," as disclosed in specification:

> "<u>boundary service 701 provides… interfaces between VAN switch 520,… Internet and… Web, and multi-media end user devices...</u> interface to…on-line service provider. <u>A user can</u> connect to a local application, namely one accessible via a local VAN switch, or <u>be routed or "switched" to an application accessible via a remote VAN switch</u>." (A-18 '500:8:36-43)

The "means for enabling a switch to said transactional application" as boundary service 701 <u>defines clearly the metes and bounds of what the structure is, not what it does</u>. This term is construable, **_not_** indefinite. Ruling must be reversed.

**8c)** "**MEANS FOR ACTIVATING SAID TRANSACTIONAL APPLICATION**"

PTAB and DrA construed this term as "the selected POSvc Application." This term is unambiguously construable, as per specification, hence **_not_** indefinite.

> "…example of…POSvc Application list…illustrated in FIG.5C. User 100 can thus select from POSvc Applications Bank 510(1), Car Dealer 510(2)...<u>If user 100</u>…<u>selects</u>… <u>Bank application, a Bank POSvc Application will be activated and presented to user 100</u>, as…in FIG. 5D." (A-17 '500:6:40-47)

Ruling must be reversed.

**9)** "**MEANS FOR CREATING A TRANSACTION LINK BETWEEN SAID NETWORK APPLICATION AND SAID TA**"

Clearly defined structure in specification (A-18 '500:8:1-3) is : "individual networked objects with information entries and attributes." Pazuniak construed this term as "object data structure with information entries and attributes." Specification and '500 file history give examples, e.g. checking account object in POSvc Application 510 on Web page, Fig.5D, (A-17, 18 '500:6:66-7:12; 7:65-8:3); **CR3**, **CR10**. This term is construable, Claim 3 is **_not_** indefinite. Ruling must be reversed.

**10a)** "**MEANS FOR PRESENTING SAID USER WITH A LIST OF TA[S], EACH OF SAID  TA[S] BEING ASSOCIATED WITH A PARTICULAR VALUE-ADDED NETWORK SERVICE PROVIDER**"

"Means for presenting…" is "Web page or Web browser or graphical user interface component displaying a list of...," as per specification:

> "…displays…exchange Web page 505 that includes a list of POSvc Applications 510…POSvc Application…is displayed via…graphical user interface component. One embodiment of the present invention supports HyperText Markup Language as…graphical user interface component…example of…POSvc Application list…illustrated in FIG. 5C…If user **100** …selects…Bank application…Bank POSvc Application…activated and presented to user **100**, as…in FIG.5D." (A-17 '500:6:29-35; 6:40-47).

Claim 4 is **_not_** indefinite. Ruling must be reversed.

**10b)** "**MEANS FOR SUBMITTING SAID USER SPECIFICATION ACCORDING TO A USER'S SELECTION OF SAID TA FROM SAID LIST OF TA[S]**"

Specification and '500 file history support "means for submitting…" is

"information entries and attributes in POSvc Application displayed on Web page,"

the interactive data structure with which Web user interacts to perform Web

transaction. An individual networked object or object identity with information

entries and attributes is the means by which a user specifies and instantiates Web

transaction. *See* A-17, 18 '500:6:54-56; 6:66-7:12; 8:1-3; *CR8*. Claim term and

Claim 4 are *not* indefinite. Ruling must be reversed.

**11)** "**MEANS FOR TRANSMITTING A TRANSACTION REQUEST FROM SAID TA**"

DDC missed specification supports "means for transmitting…" is "Exchange."

> "…Web server 104 receives user 100's indication that he desires to
> perform real-time transactions, the <u>request is handed over
> to…exchange component</u>. Thus, from Web page 105, for example,
> user 100 can select button 500, entitled "Transactions" and Web
> server 104 hands user **100**'s request over to…exchange
> component…Once Bank POSvc Application…activated, <u>user
> **100**</u>…able to connect to Bank services and <u>utilize the application</u> to
> perform banking transactions…This <u>connection between user **100** and
> Bank services is managed by exchange 501</u>. As illustrated in FIG.5D,
> once the connection is made between Bank POSvc Application
> 510(1), for example, and Bank services..." (A-17 '500:6)

*See* '500 file history excerpts in discussion on "VAN switch." DDC failed to note

Exchange manages the connection between Web user **100** and Web Merchant

services. Algorithm and structure in Fig. 5B and specification (A-17 '500:6:7-27)

consists of Exchange Web page, POSvc Applications, switching service 702,

object router, service management component, creating and providing distributed

control of a service network, operating within the boundaries of IP-based facilities

network and manages the transaction flow from user to Web Merchant services. It

is the means for transmitting said transaction request from said TA. Claim term is

construable, Claim1 is *not* indefinite. Ruling must be reversed.

## 12)    "**MEANS FOR PROCESSING SAID TRANSACTION REQUEST**"

DDC missed specification discloses:

> "**Exchange 501 processes the consumer's request** and displays an exchange Web page 505 that includes a list of POSvc Applications 510 accessible by exchange 501." A-17 '500:6:28-30

Claim term and Claim 1 are *not* indefinite. Ruling must be reversed.

## 13)    "**MEANS FOR COUPLING SAID MEANS FOR TRANSMITTING TO A HOST MEANS**"

DDC missed the point of the invention that the host means for processing in this

patent refers *not* to back-office processing, but to computer system 200 in Fig. 5D.

PTAB's construction for "means for coupling said means for transmitting to a host

means" is "an interface through which a user selects a transactional application."

(A-723). Claim term and Claim 5 are *not* indefinite. Ruling must be reversed.

## 14)    "**MEANS FOR ACTIVATING AN AGENT TO CREATE A TRANSACTION LINK BETWEEN SAID USER APPLICATION AND SAID TA**"

PTAB construed this as "an interface through which a user selects a transactional

application."  DDC, misled by JPMC, missed specification:

> "…user **100**… selects… Bank application… Bank POSvc Application will be activated and presented to user 100…illustrated in FIG.5D…Once Bank POSvc Application…activated, user 100…able to connect to Bank services and utilize the application to perform

banking transactions…This <u>connection between user 100 and Bank services is managed by exchange 501.</u>" A-17 '500:6:44-47

Claim term and Claim 35 are ***not*** indefinite. Ruling must be reversed. The structure is "individual networked object with information entries and attributes in POSvc Application on Web page."  User instantiates an object and a Web transaction, utilizing "individual networked object with information entries and attributes."

**15)**  "**OBJECT ROUTING**": DDC, misled by JPMC, missed specification   (A-18 '500:8:1-3) and '500 file history, *see **CR8***.

> "…<u>object identities according to the presently claimed invention are distinctly different from…HTML page with URL links…the object identity represents a networked object…This type of an "object" is significantly different from an HTML page that is accessed via a URL…HTML page described in Davison is simply an entry form and does not provide any type of object routing capability</u>, as presently claimed. <u>Davison describes how to create a standard HTML Web page that contains HTML forms. These forms are non-interactive Web pages that do not allow a user to perform live, real-time, bi-directional transactions,…</u>
> In contrast, according to the presently claimed invention, if a Web Merchant decides to offer a POSvc Application that allows access to checking and savings accounts, **the object identities according to the claimed invention refer to the individual checking and savings accounts**, not to the POSvc Application Web page…Thus, <u>each account is an **object identity associated with information entries and attributes, and the object identity represents a networked object**. The object identity (the account) …**route the object identity on the Web**. This type of an **object routing** system is not taught or suggested by Davison.</u>.." (A-179-183, 319-320; '178/'500 file histories)(***CR8***)

Specification and '178/'500 file histories support construction of "object routing" as "OSI application layer  routing of individual networked objects from a selected

POSvc Application displayed <u>on a Web page</u> to a Web Merchant's services." The construction for "individual networked objects" is "the information entries and attributes in a DOLSIB." "DOLSIB is a virtual information store optimized for networking." *See* A-74 '492:8:7-12. DDC missed even that "object routing" is <u>routing of objects</u>.

> "…<u>perform object routing. DOLSIBs are virtual information stores optimized for networking. All information entries and attributes in a DOLSIB virtual information store are associated with a networked object identity. The networked object identity</u> identifies the information entries and attributes in the DOLSIB as <u>individual networked objects</u>…" (A-74 '492:8:7-12)

This term is not tied to any protocol (*see* specification (A-74 '492:7, 8): "multi-protocol object routing"), proprietary or otherwise, as JPMC misled DDC. Specification (A-74 '492:8:7-12) and '178/'500 file histories disclose algorithm, contrary to JPMC/Spielman.

The priority Provisional Application 60/006,634 discloses "uniquely identify, retrieve and <u>route dynamically changing information elements that have to be accessed remotely, using multi - media, object routing</u>." (A-484-485)

There is no intrinsic evidence that limits "object routing" to a system using TMP. Specification does not restrict "object routing" to TMP and does not require a unique IP address to be hierarchically assigned to each object. These are embodiments of the invention. **TOA24:**

> "[T]his court has expressly rejected the contention that if a patent describes only a single embodiment,…claims of…patent must be construed as being limited to that embodiment…[e]ven when…specification describes only a single embodiment… claims of …patent will not be read restrictively unless… patentee has demonstrated a clear intention to limit …claim scope using 'words or expressions of manifest exclusion or restriction."

Court noted that claim terms may be limited to specific description in specification only when specification or file history includes language such as "the present invention requires ..." or "the present invention is ..." or "all embodiments of the present invention are...." *Id*. The patents do not describe the invention as limited to TMP. There is no disclosure that the present invention "is," "includes," or "refers to" TMP or unique IP address being hierarchically assigned to each object. Nor is there language of limitation or restriction. Nothing in specification or file history supports the conclusion that the invention is limited to use of TMP or unique IP address to be hierarchically assigned to each object. Absent such language, courts cannot inject limitations into claim term or the claims. *Id*. Hence, no basis to narrow "object routing" to a particular protocol–TMP–or require a unique IP address to be hierarchically assigned to each object. DDC/JPMC's construction has no basis.

Neither specification nor file history gives reason to limit the term to a particular form of communication protocol.

OSI application layer routing of individual networked objects—information entries and attributes in a DOLSIB, a virtual information store ("VIS") optimized for networking —*from* a POSvc Application displayed on a Web page or in a Web browser is used to complete the transfer of funds in a real-time Web transaction in a funds transfer Web Application/POSvc Application displayed on a Web page, as claimed in '158 patent. A VIS is a "transient information store in which information entries and attributes are associated with a networked object identity." VIS in the patents is virtual, not real; "virtual" is construed as "temporary" or "transient," whereas a database is a real information store, *not* a virtual information store.  A "networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects"—information entries and attributes, which are values of the characteristics of an object and characteristics of an object.  (A-49 '158:8:13-15).  "Application layer routing creates an open channel for the management, and the selective flow of data from remote databases on a network."  (A-48 '158:5:27-29).  "[T]he present invention is implemented to function as a routing switch in [the] application layer."(A-48 '158:5:25-26).  The present phrase differs, however, in that the OSI application layer routing occurs 'from a POSvc Application displayed on a Web page or Web browser.'

VIS in the '158 patent includes both information entries and attributes, all alleged prior art only contain one or the other, but not both. *See* eg, A-46

'158:2:52-54: "The method for enabling object routing comprises the steps of creating a virtual information store containing…"  If this were a permanent store, eg, physical memory or database, it would not be created as part of a process for practicing the invention. Construction of "virtual" as something that is transient and temporarily created, is consistent with standard terminology in the computer field.  eg, one computer dictionary defines "virtual" as "not real."   DDC erred in construing claim term. Ruling must be reversed.

**16)    "A ROUTED TRANSACTIONAL DATA STRUCTURE THAT IS BOTH COMPLETE AND NON-DEFERRED,  IN ADDITION TO BEING SPECIFIC TO THE POSVCAPPLICATION"**

DDC's construction, "back-end real-time response to a user's request for a service," is not in accord with specification, '500 file history or claim language. DDC acknowledges Dr. Bardash opined the invention in this patent is not about back-office or Fig. 4A.  DDC was misled by JPMC. The invention in this patent solves the problem that existed in 1995:

> "…today…user 100 walking into a bank…driving up to a teller machine…interacting with a live bank teller…automated teller machine (ATM)... dialing into the bank via a modem line. **If user 100 is a Web user, however, there is no current mechanism for performing a robust, real-time transaction with the bank, as illustrated in FIG. 4A**…" (A-17 '500:5:27-42)

In 1995, applications were local to the back-office and were islands not connecting to the front-end on a Web page. Merchant services interfaced with front-end applications at live teller, ATM machine or call center agent, but POSvc Web

banking applications on a Web page were non-existent, until DrA's inventions. The patents are unrelated to Fig. 4A or Back-Office, which existed prior to DrA's inventions. An enterprise does not allow access to Back-Office applications for security reasons. This is why Web Merchant has provided Web user with POSvc Applications at front-end on Web page or Web browser.  Web user **100** interacts with POSvc Application on Web page and interactive data structure in POSvc Application with information entries and attributes (which is a complete, encapsulated whole) to make a transaction request and perform a real-time transaction as he would with live teller or ATM machine. ("A patent specification is not a catalog of all known technologies." MPEP2161.01; A patent need not teach, and preferably omits, what is well-known in the art, **TOA25**, and need not specify what one of ordinary skill in the art knows already, for example, an object or data structure. This complete data structure with information entries and attributes is specific to POSvc Application from which Web user transacts (A-17 '500:6:66-7:12) and instantiated by Web user and then this complete data structure with information entries and attributes is routed to complete a real-time (or non-deferred) Web transaction.

User inputs the values of the attributes in the live POSvc Web Application displayed on Web page or Web browser in order to perform a real-time Web transaction.  This data structure, called object identity with information entries and

attributes, is interactive and this interactive object data structure is what makes the

data structure transactional. These information entries and attributes are routed in

OSI application layer as a structured whole over the service network on the Web

from POSvc Application displayed on Web page. This is the networked object

between the POSvc Application on a Web page and Web Merchant services. This

is the crux of the invention: <u>this structured whole, object identity with information</u>

<u>entries and attributes, makes it "complete" and is routed non-deferred from POSvc</u>

<u>Application on Web page to Web Merchant services.</u> Claim 1 in '158 patent is

patentable under 101 and 112, 2nd paragraph, this term is construable with ample

support in specification. DDC failed to construe claim term in view of whole

claim.

> "transferring funds from… checking…to…savings account in real-time, utilizing a routed transactional data structure that is both complete and non-deferred, in addition to being specific to …POSvc Application, the routing occurring in response to the subsequent signals."(A-50 '158 claim1)

> '178/'500 file histories state that the individual data structure in the '500

patent "is significantly different from an HTML page that is accessed via a URL."

(A-319-320).  The individual data structure—like that in Fig.5D —in the example

of a Web banking application,  refer to individual checking and savings accounts;

"each account is an individual" data structure—"object identity— associated with

information entries and attributes" that "represents a networked object."(A-319-

320).  Such construction is consistent with specification that "[t]he networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects"—information entries and attributes, which are values of the characteristics of an individual data structure and characteristics of an individual data structure. (A-49 '158:8:13-15).

JPMC offers no construction for this central concept of '158 patent, as to acknowledge a proper construction would be to admit to the novelty and validity of claimed invention.  '158 patent relates to application layer routing of an individual data structure with information entries and attributes from a POSvc Application on a Web page.  "Application layer routing," in turn, "creates an open channel for the management, and the selective flow of data from remote databases on a network."(A-48 '158:5:27-29). "[T]he present invention is implemented to function as a routing switch in [the] application layer."(A-48 '158:5:25-26).  DrA's construction of 'utilizing OSI application layer routing of an individual data structure (as a whole and in real-time, not deferred) with the values of the characteristics of an individual data structure and characteristics of an individual data structure—specific to a POSvc Application displayed on a Web page—from the POSvc Application displayed on a Web page" is correct and is a key feature that distinguishes the inventions in '158 and its priority patents from any of the cited art. In contrast, ***in CGI, the fields*** in an HTML form are ***not sent as a***

*whole*—rather individually field-by-field as standard I/O from Web page to back-end application, local to back-end— nor are they sent in a non-deferred fashion. Claim term and Claim 1 of '158 patent are *not* indefinite. Ruling must be reversed.

**17)**    "**KEEPING THE TRANSACTION FLOW CAPTIVE**" '500 file history (***CR8***), provisional application (A-482), specification (A-17 '500:5:12-14; 6:19-61; Figs8, 5D) support correct construction: "maintaining control at the Network Entry Point over the flow of a transaction."

**B.I        DDC ERRED IN RULING CLAIMS INDEFINITE**

Indefiniteness is a question of law reviewed de novo.  **TOA26, TOA27, TOA28, TOA29, TOA12**. The "certainty which the law requires in patents is not greater than is reasonable, having regard to their subject-matter." **TOA27**. New standard remains consistent with this Court's pronouncements: "Absolute clarity is not required to find a claim term definite…[A] claim term may be definite even when discerning…meaning is a 'formidable [task] and…conclusion may be one over which reasonable persons will disagree.'" **TOA30** "If...claims, read in light of…specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if… language is as precise as… subject matter permits, …courts can demand no more." **TOA31**.  Plaintiff-Appellants' claim construction discussion shows claim terms and claims are *not* indefinite, DDC's ruling *must* be reversed. Fig.4B shows the invention lies in the Exchange (Web

page plus POSvc Application) that connects to Web Merchant services, not <u>in</u> the legacy systems. DDC held that inventor had to provide an algorithm for each and every unique transaction that could be handled by each and every conventional legacy system of each merchant. But that does not implement the invention, but defeats it, when the point of the invention is not the legacy system or Back-office shown in the green box, but the "front-end" (shown in front of and outside the green box) for the purpose of connecting to Web Merchant services.



## B.II    DDC ERRED IN RULING CLAIMS INVALID FOR LACK OF WRITTEN DESCRIPTION

"To satisfy …written description requirement, …specification must 'reasonably convey[ ] to *those skilled in the art* that …inventor had possession of …claimed subject matter as of …filing date.'" **TOA32, TOA33**. The "level of detail required...varies, depending on… nature and scope of…claims and on…complexity and predictability of the relevant technology," and "requires an objective inquiry into the four corners of…specification from…perspective of a person of ordinary skill in the art." *Id*.

DDC ignored completely Dr. Bardash's response to Spielman's arguments.

Dr. Bardash stated in his sworn responsive report:

> A person of ordinary skill in the art, in November 1995, and having read the specification of…patents-in-suit, would discern the bounds of what is meant by the term "VAN switch." Contrary to Ms. Spielman's assertions, there are no contradictory or irreconcilable descriptions of the VAN switch. (A-641)

He refuted each of Spielman's contentions on which DDC relied. DDC ignored Dr. Bardash's specific response that the specification provided a written description of eg, "Boundary Service" and "Switching Service."(A-639-654; A-589-593).  There is no known precedent for "written description" requiring that specification provide a detailed analysis of each and every component of each structure in a patent claim, as Spielman demands.  The algorithm has been spelled out in specification/file history–routing networked object with information entries and attributes from POSvc Application on Web page –a key construct.

DDC relied on Spielman's opinion that VAN switch was dependent on "TMP Protocol."  The critical facts of record are Dr. Bardash's explanation that, regardless of what was meant by TMP, the specification enables those skilled in the art to practice the invention (A-612-672).

JPMC misled: "specification describes POSvc Applications "by block diagrams denoting 'Bank 510(1), Car Dealer 510(2) or Pizzeria 510(3),' but offers no further description," citing Fig. 5C, A-73 '492:6:51-55, and "specification lacks

any details as to "how the VAN switch would accomplish allowing a user to connect to a point-of-service application." PTAB Judges, presumed skilled in the art, construed VAN switch, based on written description. Dr. Bardash and USPTO original and re-examination Examiners, did not deem claims or claim terms invalid for lack of written description. '178/'500 file histories show that the original examiner was convinced that inventor had possession of claimed subject matter as of filing date in 1995, there was no lack of written description and allowed the claims to issue. "POSvc application" was explicitly explained in specification and prosecution histories.  DDC ignored specification and Dr. Bardash's Report/Declaration (A-612-672), which specifically address DDC's issues.  Fig. 5D shows POSvc Applications (510) are part of Exchange, and utilize a networked object with information entries and attributes to connect with Web Merchant services.  DDC stated: "…specification only offers… block diagram of…'back-office,' generally identifying a system and applications. (*Id*., Fig. 4B)," DDC/Spielman contend: "[n]owhere in…specification does…inventor indicate that she had possession of such a system or …applications that process the user's [real-time] request." The inventor did not invent "legacy system" applications in the back-office.  See discussion in Section II.4 above. "The usage of the disputed claim terms in the context of the claims as a whole … informs the proper construction of the terms." **TOA34, TOA35.** ("A claim construction that gives

meaning to all the terms of the claim is preferred over one that does not do so.")

Dr. Bardash demonstrated in great detail why the claims are supported by the

written description. (A639-655). Thus, there is at least a genuine dispute of

material fact. Judgment of invalidity for lack of written description must be

reversed.

## B.III        DDC  ERRED IN RULING CLAIMS INVALID FOR LACK OF ENABLEMENT

DDC, misled by Spielman, incorrectly stated:

> "Spielman describes as an example that "TMP is described as incorporating, <u>in the alternative</u>, s-HTTP, JavaTM, the WinSock API or ORB with DOLSIBs to perform object routing," which "is counterintuitive," and the specification does not offer any examples of how this can be accomplished." (A-646-651)

> "…specification offers no explanation or information on any software programs.  Fig 8, which Bardash contends provides an "algorithm," only discloses, as explained by Spielman, a flowchart with boxes listing functions.  (A-595)  As…discussed in…claim construction order…means-plus-function  limitations  and…"computer  system" limitation require algorithms or other analogous structure, which the specification does not provide." (A-594)

Despite citing Spielman, **DDC ignored Dr. Bardash's direct, comprehensive**

**response** (A-612-672).  DDC erred on the law.  Enablement does not require that a

specification provide an "explanation or information on [a] software program."

Specification provides the end-to-end solution, steps and algorithm, eg, col. 8 gives

examples of how DOLSIBs are used to perform object routing, via use of

individual networked objects with information entries and attributes. See Section

II.15, 2, 4 and 6 above. USPTO Examiners, skilled in the art, found no lack of

enablement, during original prosecution and re-examination.

Enablement requirement

> "is met when at …time of filing …application one skilled in the art,
> having read …specification, could practice the invention without
> "undue experimentation." Whether undue experimentation is required
> "is not a single, simple factual determination, but rather is a
> conclusion reached by weighing many factual considerations"

such as quantity of experimentation necessary, amount of direction or guidance

presented, presence or absence of working examples, nature of invention, state of

prior art, relative skill of those in the art, predictability or unpredictability of the

art, and breadth of claims. A reasonable amount of routine experimentation

required to practice a claimed invention does not violate enablement requirement.

**TOA36, TOA37**. To prevail on lack of enablement, JPMC must prove by clear

and convincing evidence. **TOA38.**

 "…specification need not explicitly teach those in the art to make and use

the invention; …requirement is satisfied if, given what they already know,

…specification teaches those in the art enough that they can make and use the

invention without 'undue experimentation.'" **TOA39**, **TOA40**. ("[A] patent need

not teach, and preferably omits, what is well known in the art.").

**B.IV  DDC ERRED IN RULING THAT CLAIMS ARE NOT INFRINGED**

DDC erroneously granted summary judgment of non-infringement by incorrectly ruling claim terms indefinite and erroneous claim constructions.

## CONCLUSION AND STATEMENT OF RELIEF SOUGHT

DDC's rulings are erroneous, as shown above. Plaintiff respectfully requests CAFC to reverse claim construction rulings, vacate summary judgment of non-infringement and invalidity, and remand to DDC for further proceedings. Oral hearing is requested.

April 8, 2015                                            Respectfully submitted,

                                                         */s/William Weidner*

Dr. Lakshmi Arunachalam      and                  William J. Weidner
222 Stanford Avenue,                              Bell Law Firm, P.C.
Menlo Park, CA 94025                              29100 SW Town Ctr Loop W, #200
Tel: 650.690.0995                                 Wilsonville, Oregon 97070
Email: laks22002@yahoo.com                        Telephone: (503) 682-8840
                                                  Facsimile: (503) 682-9895
                                                  Email: Bill@blf-pc.com
*Pro Se Plaintiff-Appellant*,
*Dr. Lakshmi Arunachalam*                          *Attorney for Plaintiff-Appellant*
                                                   *Pi-Net International, Inc.*

# UNITED STATES COURT OF APPEALS
### FOR THE FEDERAL CIRCUIT
### Pi-Net International, Inc. and Dr. Lakshmi Arunachalam
### v.
### JPMorgan Chase & Co.
### No. 14-1495

## CERTIFICATE OF SERVICE

I, William Weidner, certify that on April __, 2015, I electronically filed the

foregoing **Plaintiff-Appellants' Corrected Brief** with the Clerk of the Court using

the CM/ECF System, which will serve via e-mail notice of such filing to any of the

following counsel registered as CM/ECF users and we, William Weidner and Dr.

Lakshmi Arunachalam each, caused to be served on counsel of record by

Electronic Means (by email):

| | |
|---|---|
| Robert S. Saunders | rob.saunders@skadden.com |
| Jessica Raatz Kunz | jessica.kunz@skadden.com |
| Daniel A. DeVito | Daniel.DeVito@skadden.com |
| Douglas R. Nemec | Douglas.Nemec@skadden.com |
| Edward L. Tulin | Edward.Tulin@skadden.com |
| Andrew D. Gish | Andrew.Gish@skadden.com |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | |
| 920 N. King Street, 7th Floor | Four Times Square |
| Wilmington, Delaware 19801 | New York, New York 10036 |
| Tel.: (302) 651-3000 | Tel.: (212) 735-3000. |

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via overnight delivery, within the time provided in the Court's rules.

April __, 2015                                        Respectfully submitted,

                                                     */s/William Weidner*
                                                     William J. Weidner

*Lakshmi Arunachalam*

Dr. Lakshmi Arunachalam,        and          Bell Law Firm, P.C.
222 Stanford Avenue,                          29100 SW Town Ctr Loop W, #200
Menlo Park, CA 94025                          Wilsonville, Oregon 97070
Tel: 650.690.0995                             Telephone: (503) 682-8840
                                              Facsimile: (503) 682-9895

*Pro Se Plaintiff-Appellant*,
*Dr. Lakshmi Arunachalam*                     *Attorney for Plaintiff-Appellant*
                                              *Pi-Net International, Inc.*

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)(7)(B)

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B).

1.     The brief contains 13,851 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     The brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

April 8, 2015                                    Respectfully submitted,

*Lakshmi Arunachalam*

                                                */s/William Weidner*

Dr. Lakshmi Arunachalam        and          William J. Weidner
222 Stanford Avenue,                         Bell Law Firm, P.C.
Menlo Park, CA 94025                         29100 SW Town Ctr Loop W, #200
Tel: 650.690.0995                            Wilsonville, Oregon 97070
Email: laks22002@yahoo.com                   Telephone: (503) 682-8840
                                             Facsimile: (503) 682-9895
                                             Email: Bill@blf-pc.com
*Pro Se Plaintiff-Appellant*,
*Dr. Lakshmi Arunachalam*                     *Attorney for Plaintiff-Appellant*
                                             *Pi-Net International, Inc.*

**ADDENDUM  FOR THE APPEAL BRIEF PURSUANT TO**

**FED. CIR. R. 28(a)(12)**

## LIST OF DOCUMENTS IN ADDENDUM

U.S. Patent No. 5,987,500……… …………………………………………....A

U.S. Patent No. 8,037,158……… ……………………………………………B

U.S. Patent No. 8,108,492……… …………………………………………C

Memorandum Opinion on Claim Construction by

Judge Sue L. Robinson: DI-163…………………………………………D

Order by Judge Sue L. Robinson, DI - 164………………………………E

Memorandum Opinion  by Judge Sue L. Robinson, DI - 165……………....……F

Order by Judge Sue L. Robinson, DI - 166………………………………G

# Exhibit A

US005987500A

# United States Patent [19]

## Arunachalam

[11] **Patent Number:** **5,987,500**

[45] **Date of Patent:** *\*Nov. 16, 1999*

[54] **VALUE-ADDED NETWORK SYSTEM FOR ENABLING REAL-TIME, BY-DIRECTIONAL TRANSACTIONS ON A NETWORK**

[75] Inventor: **Lakshmi Arunachalam**, Menlo Park, Calif.

[73] Assignee: **Pi-Net International, Inc.**, Menlo Park, Calif.

[ * ] Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

[21] Appl. No.: **08/879,958**

[22] Filed: **Jun. 20, 1997**

### Related U.S. Application Data

[62] Division of application No. 08/700,726, Aug. 5, 1996, Pat. No. 5,778,178

[60] Provisional application No. 60/006,634, Nov. 13, 1995.

[51] **Int. Cl.[6]** .................................................. **G06F 13/00**

[52] **U.S. Cl.** ......................................................... **709/203**

[58] **Field of Search** ........................ 364/DIG. 1, DIG. 2; 395/762, 200.3, 200.31, 200.32, 200.43, 681, 682, 683, 684, 685, 689; 709/200, 201, 202, 203, 213, 301, 302, 303, 304, 305; 710/200

[56] **References Cited**

PUBLICATIONS

"Coding with HTML forms: HTML goes interactive", Andrew Davidson, Dr. Dobb's Journal, V20, N6, Jun. 1995, p. 16.

*Primary Examiner*—Robert B. Harrell
*Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

[57] **ABSTRACT**

The present invention provides a method and apparatus for providing real-time, two-way transactional capabilities on the Web. Specifically, one embodiment of the present invention discloses a configurable value-added network switch for enabling real-time transactions on the World Wide Web. The configurable value added network switch comprises a system for switching to a transactional application in response to a user specification from a World Wide Web application, a system means for transmitting a transaction request from the transactional application, and a system for processing the transaction request. Additionally, a method for enabling object routing is disclosed, comprising the steps of creating a virtual information store containing information entries and attributes associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities. Finally, a method is disclosed for enabling service management of the value-added network service, to perform OAM&P functions on the services network.

**35 Claims, 13 Drawing Sheets**



BEGIN

USER CONNECTS TO WEB SERVER RUNNING AN EXCHANGE — 802

USER ISSUES REQUEST FOR TRANSACTIONAL APPLICATION — 804

WEB SERVER HANDS OFF REQUEST TO EXCHANGE — 806

EXCHANGE ACTIVATES GRAPHICAL USER INTERFACE TO PRESENT USER WITH LAST OF POS$_{VC}$ APPLICATION OPTIONS — 808

USER MAKES REQUEST FROM POS$_{VC}$ APPLICATION LIST — 810

SWITCHING COMPONENT IN EXCHANGE SWITCHES USER TO SELECTED POS$_{VC}$ APPLICATION — 812

OBJECT ROUTING COMPONENT EXECUTES USER'S REQUEST — 814

DATA RETRIEVED FROM DATA REPOSITORY VIA TMP — 816

USER CONTINUES TRANSACTION (OPTIONAL) OR ENDS TRANSACTION — 818

END



**FIG. 1A** (PRIOR ART)



**FIG. 1B** (PRIOR ART)

Case: 14-1495    Document: 73    Page: 92    Filed: 04/08/2015



**FIG. 2**



OSI MODEL
300

| APPLICATION |
|:---:|
| 307 |
| PRESENTATION |
| 306 |
| SESSION |
| 305 |
| TRANSPORT |
| 304 |
| NETWORK |
| 303 |
| DATA LINK |
| 302 |
| PHYSICAL |
| 301 |

# FIG. 3





# FIG. 5A



# FIG. 5B



**FIG. 5C**



FIG. 5D



# FIG. 5E



**FIG. 6A**



# FIG. 6B



FIG. 7



BEGIN

USER CONNECTS TO WEB SERVER
RUNNING AN EXCHANGE — 802

USER ISSUES REQUEST FOR
TRANSACTIONAL APPLICATION — 804

WEB SERVER HANDS OFF
REQUEST TO EXCHANGE — 806

EXCHANGE ACTIVATES GRAPHICAL USER
INTERFACE TO PRESENT USER WITH LAST
OF POS$_{VC}$ APPLICATION OPTIONS — 808

USER MAKES REQUEST FROM
POS$_{VC}$ APPLICATION LIST — 810

SWITCHING COMPONENT IN EXCHANGE
SWITCHES USER TO
SELECTED POS$_{VC}$ APPLICATION — 812

OBJECT ROUTING COMPONENT
EXECUTES USER'S REQUEST — 814

DATA RETRIEVED FROM DATA
REPOSITORY VIA TMP — 816

USER CONTINUES TRANSACTION
(OPTIONAL) OR ENDS TRANSACTION — 818

END

FIG. 8

5,987,500

1

# VALUE-ADDED NETWORK SYSTEM FOR ENABLING REAL-TIME, BY-DIRECTIONAL TRANSACTIONS ON A NETWORK

## RELATED APPLICATIONS

This is a divisional of application Ser. No. 08/700,726, filed Aug. 5, 1996, now U.S. Pat. No. 5,778,178.

## FIELD OF THE INVENTION

The present invention relates to the area of Internet communications. Specifically, the present invention relates to a method and apparatus for configurable value-added network switching and object routing.

## BACKGROUND OF THE INVENTION

With the Internet and the World Wide Web ("the Web") evolving rapidly as a viable consumer medium for electronic commerce, new on-line services are emerging to fill the needs of on-line users. An Internet user today can browse on the Web via the use of a Web browser. Web browsers are software interfaces that run on Web clients to allow access to Web servers via a simple user interface. A Web user's capabilities today from a Web browser are, however, extremely limited. The user can perform one-way, browse-only interactions. Additionally, the user has limited "deferred" transactional capabilities, namely electronic mail (e-mail) capabilities. E-mail capabilities are referred to as "deferred transactions" because the consumer's request is not processed until the e-mail is received, read, and the person or system reading the e-mail executes the transaction. This transaction is thus not performed in real-time.

FIG. 1A illustrates typical user interactions on the Web today. User 100 sends out a request from Web browser 102 in the form of a universal resource locator (URL) 101 in the following manner: http://www.car.com. URL 101 is processed by Web browser 102 that determines the URL corresponds to car dealer Web page 105, on car dealer Web server 104. Web browser 102 then establishes browse link 103 to car dealer Web page 105. User 100 can browse Web page 105 and select "hot links" to jump to other locations in Web page 105, or to move to other Web pages on the Web. This interaction is typically a browse-only interaction. Under limited circumstances, the user may be able to fill out a form on car dealer Web page 105, and e-mail the form to car dealer Web server 104. This interaction is still strictly a one-way browse mode communications link, with the e-mail providing limited, deferred transactional capabilities.

Under limited circumstances, a user may have access to two-way services on the Web via Common Gateway Interface (CGI) applications. CGI is a standard interface for running external programs on a Web server. It allows Web servers to create documents dynamically when the server receives a request from the Web browser. When the Web server receives a request for a document, the Web server dynamically executes the appropriate CGI script and transmits the output of the execution back to the requesting Web browser. This interaction can thus be termed a "two-way" transaction. It is a severely limited transaction, however, because each CGI application is customized for a particular type of application or service.

For example, as illustrated in FIG. 1B, user 100 may access bank 150's Web server and attempt to perform transactions on checking account 152 and to make a payment on loan account 154. In order for user 100 to access checking account 152 and loan account 154 on the Web, CGI

2

application scripts must be created for each account, as illustrated in FIG. 1B. The bank thus has to create individual scripts for each of its services to offer users access to these services. User 100 can then interact in a limited fashion with these individual applications. Creating and managing individual CGI scripts for each service is not a viable solution for merchants with a large number of services.

As the Web expands and electronic commerce becomes more desirable, the need increases for robust, real-time, bi-directional transactional capabilities on the Web. A true real-time, bi-directional transaction would allow a user to connect to a variety of services on the Web, and perform real-time transactions on those services. For example, although user 100 can browse car dealer Web page 105 today, the user cannot purchase the car, negotiate a car loan or perform other types of real-time, two-way transactions that he can perform with a live salesperson at the car dealership. Ideally, user 100 in FIG. 1A would be able to access car dealer Web page 105, select specific transactions that he desires to perform, such as purchase a car, and perform the purchase in real-time, with two-way interaction capabilities. CGI applications provide user 100 with a limited ability for two-way interaction with car dealer Web page 105, but due to the lack of interaction and management between the car dealer and the bank, he will not be able to obtain a loan and complete the purchase of the car via a CGI application. The ability to complete robust real-time, two-way transactions is thus not truly available on the Web today.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a method and apparatus for providing real-time, two-way transactional capabilities on the Web. Specifically, one embodiment of the present invention discloses a configurable value-added network switch for enabling real-time transactions on the World Wide Web. The configurable value added network switch comprises means for switching to a transactional application in response to a user specification from a World Wide Web application, means for transmitting a transaction request from the transactional application, and means for processing the transaction request.

According to another aspect of the present invention, a method and apparatus for enabling object routing on the World Wide Web is disclosed. The method for enabling object routing comprises the steps of creating a virtual information store containing information entries and attributes, associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities.

Other objects, features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description.

## BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description of the present invention as set forth below.

FIG. 1A is an illustration of a current user's browse capabilities on the Web via a Web browser.

FIG. 1B is an illustration of a current user's capabilities to perform limited transactions on the Web via CGI applications.

FIG. 2 illustrates a typical computer system on which the present invention may be utilized.

5,987,500

3

FIG. 3 illustrates the Open Systems Interconnection (OSI) Model.

FIG. 4A illustrates conceptually the user value chain as it exists today.

FIG. 4B illustrates one embodiment of the present invention.

FIG. 5A illustrates a user accessing a Web server including one embodiment of the present invention.

FIG. 5B illustrates the exchange component according to one embodiment of the present invention.

FIG. 5C illustrates an example of a point-of-service (POSvc) application list.

FIG. 5D illustrates a user selecting a bank POSvc application from the POSvc application list.

FIG. 5E illustrates a three-way transaction according to one embodiment of the present invention.

FIG. 6A illustrates a value-added network (VAN) switch.

FIG. 6B illustrates the hierarchical addressing tree structure of the networked objects in DOLSIBs.

FIG. 7 illustrates conceptually the layered architecture of a VAN switch.

FIG. 8 is a flow diagram illustrating one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention relates to a method and apparatus for configurable value-added network switching and object routing and management. "Web browser" as used in the context of the present specification includes conventional Web browsers such as NCSA Mosaic™ from NCSA and Netscape Mosaic™ from Netscape™. The present invention is independent of the Web browser being utilized and the user can use any Web browser, without modifications to the Web browser. In the following detailed description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent to one of ordinary skill in the art, however, that these specific details need not be used to practice the present invention. In other instances, well-known structures, interfaces and processes have not been shown in detail in order not to unnecessarily obscure the present invention.

FIG. 2 illustrates a typical computer system 200 in which the present invention operates. The preferred embodiment of the present invention is implemented on an IBM™ Personal Computer manufactured by IBM Corporation of Armonk, N.Y. Alternate embodiments may be implemented on a Macintosh™ computer manufactured by Apple™ Computer, Incorporated of Cupertino, Calif. It will be apparent to those of ordinary skill in the art that other alternative computer system architectures may also be employed.

In general, such computer systems as illustrated by FIG. 2 comprise a bus 201 for communicating information, a processor 202 coupled with the bus 201 for processing information, main memory 203 coupled with the bus 201 for storing information and instructions for the processor 202, a read-only memory 204 coupled with the bus 201 for storing static information and instructions for the processor 202, a display device 205 coupled with the bus 201 for displaying information for a computer user, an input device 206 coupled with the bus 201 for communicating information and command selections to the processor 202, and a mass storage device 207, such as a magnetic disk and associated disk drive, coupled with the bus 201 for storing information

4

and instructions. A data storage medium 208 containing digital information is configured to operate with mass storage device 207 to allow processor 202 access to the digital information on data storage medium 208 via bus 201.

Processor 202 may be any of a wide variety of general purpose processors or microprocessors such as the Pentium™ microprocessor manufactured by Intel™ Corporation or the Motorola™ 68040 or Power PC™ brand microprocessor manufactured by manufactured by Motorola™ Corporation. It will be apparent to those of ordinary skill in the art, however, that other varieties of processors may also be used in a particular computer system. Display device 205 may be a liquid crystal device, cathode ray tube (CRT), or other suitable display device. Mass storage device 207 may be a conventional hard disk drive, floppy disk drive, CD-ROM drive, or other magnetic or optical data storage device for reading and writing information stored on a hard disk, a floppy disk, a CD-ROM a magnetic tape, or other magnetic or optical data storage medium. Data storage medium 208 may be a hard disk, a floppy disk, a CD-ROM, a magnetic tape, or other magnetic or optical data storage medium.

In general, processor 202 retrieves processing instructions and data from a data storage medium 208 using mass storage device 207 and downloads this information into random access memory 203 for execution. Processor 202, then executes an instruction stream from random access memory 203 or read-only memory 204. Command selections and information input at input device 206 are used to direct the flow of instructions executed by processor 202. Equivalent input device 206 may also be a pointing device such as a conventional mouse or trackball device. The results of this processing execution are then displayed on display device 205.

The preferred embodiment of the present invention is implemented as a software module, which may be executed on a computer system such as computer system 200 in a conventional manner. Using well known techniques, the application software of the preferred embodiment is stored on data storage medium 208 and subsequently loaded into and executed within computer system 200. Once initiated, the software of the preferred embodiment operates in the manner described below.

FIG. 3 illustrates the Open Systems Interconnection (OSI) reference model. OSI Model 300 is an international standard that provides a common basis for the coordination of standards development, for the purpose of systems interconnection. The present invention is implemented to function as a routing switch within the "application layer" of the OSI model. The model defines seven layers, with each layer communicating with its peer layer in another node through the use of a protocol. Physical layer 301 is the lowest layer, with responsibility to transmit unstructured bits across a link. Data link layer 302 is the next layer above physical layer 301. Data link layer 302 transmits chunks across the link and deals with problems like checksumming to detect data corruption, orderly coordination of the use of shared media and addressing when multiple systems are reachable. Network bridges operate within data link layer 302.

Network layer 303 enables any pair of systems in the network to communicate with each other. Network layer 303 contains hardware units such as routers, that handle routing, packet fragmentation and reassembly of packets. Transport layer 304 establishes a reliable communication stream between a pair of systems, dealing with errors such as lost packets, duplicate packets, packet reordering and fragmen-

5,987,500

5

tation. Session layer **305** offers services above the simple communication stream provided by transport layer **304**. These services include dialog control and chaining. Presentation layer **306** provides a means by which OSI compliant applications can agree on representations for data. Finally, application layer **307** includes services such as file transfer, access and management services (FTAM), electronic mail and virtual terminal (VT) services. Application layer **307** provides a means for application programs to access the OSI environment. As described above, the present invention is implemented to function as a routing switch in application layer **307**. Application layer routing creates an open channel for the management, and the selective flow of data from remote databases on a network.

A. Overview

FIG. **4A** illustrates conceptually the user value chain as it exists today. The user value chain in FIG. **4A** depicts the types of transactions that are performed today, and the channels through which the transactions are performed. A "transaction" for the purposes of the present invention includes any type of commercial or other type of interaction that a user may want to perform. Examples of transactions include a deposit into a bank account, a request for a loan from a bank, a purchase of a car from a car dealership or a purchase of a car with financing from a bank. A large variety of other transactions are also possible.

A typical user transaction today may involve user **100** walking into a bank or driving up to a teller machine, and interacting with a live bank teller, or automated teller machine (ATM) software applications. Alternatively, user **100** can perform the same transaction by using a personal computer (PC), activating application software on his PC to access his bank account, and dialing into the bank via a modem line. If user **100** is a Web user, however, there is no current mechanism for performing a robust, real-time transaction with the bank, as illustrated in FIG. **4A**. CGI scripts provide only limited two-way capabilities, as described above. Thus, due to this lack of a robust mechanism by which real-time Web transactions can be performed, the bank is unable to be a true "Web merchant," namely a merchant capable of providing complete transactional services on the Web.

According to one embodiment of the present invention, as illustrated in FIG. **4B**, each merchant that desires to be a Web merchant can provide real-time transactional capabilities to users who desire to access the merchants' services via the Web. This embodiment includes a service network running on top of a facilities network, namely the Internet, the Web or e-mail networks. For the purposes of this application, users are described as utilizing PC's to access the Web via Web server "switching" sites. (Switching is described in more detail below). Users may also utilize other personal devices such as network computers or cellular devices to access the merchants' services via appropriate switching sites. These switching sites include non-Web network computer sites and cellular provider sites. Five components interact to provide this service network functionality, namely an exchange, an operator agent, a management agent, a management manager and a graphical user interface. All five components are described in more detail below.

As illustrated in FIG. **5A**, user **100** accesses Web server **104**. Having accessed Web server **104**, user **100** can decide that he desires to perform real-time transactions. When Web server **104** receives user **100**'s indication that he desires to perform real-time transactions, the request is handed over to an exchange component. Thus, from Web page **105**, for

6

example, user **100** can select button **500**, entitled "Transactions" and Web server **104** hands user **100**'s request over to the exchange component. The button and the title can be replaced by any mechanism that can instruct a Web server to hand over the consumer's request to the exchange component.

FIG. **5B** illustrates exchange **501**. Exchange **501** comprises Web page **505** and point-of-service (POSvc) applications **510**. Exchange **501** also conceptually includes a switching component and an object routing component (described in more detail below). POSvc applications **510** are transactional applications, namely applications that are designed to incorporate and take advantage of the capabilities provided by the present invention. Although exchange **501** is depicted as residing on Web server **104**, the exchange can also reside on a separate computer system that resides on the Internet and has an Internet address. Exchange **501** may also include operator agent **503** that interacts with a management manager (described in more detail below). Exchange **501** creates and allows for the management (or distributed control) of a service network, operating within the boundaries of an IP-based facilities network. Thus, exchange **501** and a management agent component, described in more detail below, under the headings "VAN Switch and Object Routing," together perform the switching, object routing, application and service management functions according to one embodiment of the present invention.

Exchange **501** processes the consumer's request and displays an exchange Web page **505** that includes a list of POSvc applications **510** accessible by exchange **501**. A POSvc application is an application that can execute the type of transaction that the user may be interested in performing. The POSvc list is displayed via the graphical user interface component. One embodiment of the present invention supports HyperText Markup Language as the graphical user interface component. Virtual Reality Markup Language and Java™ are also supported by this embodiment. A variety of other graphical user interface standards can also be utilized to implement the graphical user interface.

An example of a POSvc application list is illustrated in FIG. **5C**. User **100** can thus select from POSvc applications Bank **510(1)**, Car Dealer **510(2)** or Pizzeria **510(3)**. Numerous other POSvc applications can also be included in this selection. If user **100** desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user **100**, as illustrated in FIG. **5D**. For the purposes of illustration, exchange **501** in FIG. **5D** is shown as running on a different computer system (Web server **104**) from the computer systems of the Web merchants running POSvc applications (computer system **200**). Exchange **501** may, however, also be on the same computer system as one or more of the computer systems of the Web merchants.

Once Bank POSvc application **510** has been activated, user **100** will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository **575** in the Bank "Back Office." The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data. This connection between user **100** and Bank services is managed by exchange **501**. As illustrated in FIG. **5D**, once the connection is made between Bank POSvc application **510(1)**, for example, and Bank services, an operator agent on Web server **104** may be activated to ensure the availability of distributed functions and capabilities.

Each Web merchant may choose the types of services that it would like to offer its clients. In this example, if Bank

5,987,500

7

decided to include in their POSvc application access to checking and savings accounts, user **100** will be able to perform real-time transactions against his checking and savings accounts. Thus, if user **100** moves $500 from his checking account into his savings account, the transaction will be performed in real-time, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine. Therefore, unlike his prior access to his account, user **100** now has the capability to do more than browse his bank account. The ability to perform these types of robust, real-time transactions from a Web client is a significant aspect of the present invention.

Bank can also decide to provide other types of services in POSvc application **510**(1). For example, Bank may agree with Car dealership to allow Bank customers to purchase a car from that dealer, request a car loan from Bank, and have the entire transaction performed on the Web, as illustrated in FIG. **5E**. In this instance, the transactions are not merely two-way, between the user and Bank, but three-way, amongst the consumer, Bank and Car dealership. According to one aspect of the present invention, this three-way transaction can be expanded to n-way transactions, where n represents a predetermined number of merchants or other service providers who have agreed to cooperate to provide services to users. The present invention therefore allows for "any-to-any" communication and transactions on the Web, thus facilitating a large, flexible variety of robust, real-time transactions on the Web.

Finally, Bank may also decide to provide intra-merchant or intra-bank services, together with the inter-merchant services described above. For example, if Bank creates a POSvc application for use by the Bank Payroll department, Bank may provide its own employees with a means for submitting timecards for payroll processing by the Bank's Human Resources (HR) Department. An employee selects the Bank HR POSvc application, and submits his timecard. The employee's timecard is processed by accessing the employee's payroll information, stored in the Bank's Back Office. The transaction is thus processed in real-time, and the employee receives his paycheck immediately.

B. Van Switching and Object Routing

As described above, exchange **501** and management agent **601**, illustrated in FIG. **6A**, together constitute a value-added network (VAN) switch. These two elements may take on different roles as necessary, including peer-to-peer, client-server or master-slave roles. Management manager **603** is illustrated as residing on a separate computer system on the Internet. Management manager **603** can, however, also reside on the same machine as exchange **501**. Management manager **603** interacts with the operator agent **503** residing on exchange **501**.

VAN switch **520** provides multi-protocol object routing, depending upon the specific VAN services chosen. This multi-protocol object routing is provided via a proprietary protocol, TransWeb™ Management Protocol (TMP). TMP incorporates the same security features as the traditional Simple Network Management Protocol, SNMP. It also allows for the integration of other traditional security mechanisms, including RSA security mechanisms.

One embodiment of the present invention utilizes TMP and distributed on-line service information bases (DOLSIBs) to perform object routing. Alternatively, TMP can incorporate s-HTTP, Java™, the WinSock API or ORB with DOLSIBs to perform object routing. DOLSIBs are virtual information stores optimized for networking. All information entries and attributes in a DOLSIB virtual information store are associated with a networked object

8

identity. The networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects, and each networked object is assigned an Internet address. The Internet address is assigned based on the IP address of the node at which the networked object resides.

For example, in FIG. **5A**, Web server **104** is a node on the Internet, with an IP address. All networked object associated with Web server **104** will therefore be assigned an Internet address based on the Web server **104**'s IP address. These networked objects thus "branch" from the node, creating a hierarchical tree structure. The Internet address for each networked object in the tree essentially establishes the individual object as an "IP-reachable" or accessible node on the Internet. TMP utilizes this Internet address to uniquely identify and access the object from the DOLSIB. FIG. **6B** illustrates an example of this hierarchical addressing tree structure.

Each object in the DOLSIB has a name, a syntax and an encoding. The name is an administratively assigned object ID specifying an object type. The object type together with the object instance serves to uniquely identify a specific instantiation of the object. For example, if object **610** is information about models of cars, then one instance of that object would provide user **100** with information about a specific model of the car while another instance would provide information about a different model of the car. The syntax of an object type defines the abstract data structure corresponding to that object type. Encoding of objects defines how the object is represented by the object type syntax while being transmitted over the network.

C. Management and Administration

As described above, exchange **501** and management agent **601** together constitute a VAN switch. FIG. **7** illustrates conceptually the layered architecture of VAN switch **520**. Specifically, boundary service **701** provides the interfaces between VAN switch **520**, the Internet and the Web, and multi-media end user devices such as PCs, televisions or telephones. Boundary service **701** also provides the interface to the on-line service provider. A user can connect to a local application, namely one accessible via a local VAN switch, or be routed or "switched" to an application accessible via a remote VAN switch.

Switching service **702** is an OSI application layer switch. Switching service **702** thus represents the core of the VAN switch. It performs a number of tasks including the routing of user connections to remote VAN switches, described in the paragraph above, multiplexing and prioritization of requests, and flow control. Switching service **702** also facilitates open systems' connectivity with the Internet (a public switched network) and private networks including back office networks, such as banking networks. Interconnected application layer switches form the application network backbone. These switches are one significant aspect of the present invention.

Management service **703** contains tools such as Information Management Services (IMS) and application Network Management Services (NMS). These tools are used by the end users to manage network resources, including VAN switches. Management service **703** also provides applications that perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions. These OAM&P functions include security management, fault management, configuration management, performance management and billing management. Providing OAM&P functions for applications in this manner is another significant aspect of the present invention.

5,987,500

**9**

Finally, application service **704** contains application programs that deliver customer services. Application service **704** includes POSvc applications such as Bank POSvc described above, and illustrated in FIG. 6A. Other examples of VAN services include multi-media messaging, archival/retrieval management, directory services, data staging, conferencing, financial services, home banking, risk management and a variety of other vertical services. Each VAN service is designed to meet a particular set of requirements related to performance, reliability, maintenance and ability to handle expected traffic volume. Depending on the type of service, the characteristics of the network elements will differ. VAN service **704** provides a number of functions including communications services for both management and end users of the network and control for the user over the user's environment.

FIG. 8 is a flow diagram illustrating one embodiment of the present invention. A user connects to a Web server running an exchange component in step **802**. In step **804**, the user issues a request for a transactional application, and the web server hands off the request to an exchange in step **806**. The exchange activates a graphical user interface to present user with a list of POSvc application options in step **808**. In step **810**, the user makes a selection from the POSvc application list. In step **812**, the switching component in the exchange switches the user to the selected POSvc application, and in step **814**, the object routing component executes the user's request. Data is retrieved from the appropriate data repository via TMP in step **816**, and finally, the user may optionally continue the transaction in step **818** or end the transaction.

Thus, a configurable value-added network switching and object routing method and apparatus is disclosed. These specific arrangements and methods described herein are merely illustrative of the principles of the present invention. Numerous modifications in form and detail may be made by those of ordinary skill in the art without departing from the scope of the present invention. Although this invention has been shown in relation to a particular preferred embodiment, it should not be considered so limited. Rather, the present invention is limited only by the scope of the appended claims.

We claim:

1. A configurable value-added network switch for enabling real-time transactions on a network, said configurable value-added network switch compromising:

means for switching to a transactional application in response to a user specification from a network application, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

means for transmitting a transaction request from said transactional application; and

means for processing said transaction request.

2. The configurable value-added network switch as claimed in claim 1 wherein said means for switching to a transactional application further comprises:

means for receiving said user specification;

means for enabling a switch to said transactional application; and

means for activating said transactional application.

3. The configurable value-added network switch as claimed in claim 2 wherein said means for activating said

**10**

transactional application further includes means for creating a transaction link between said network application and said transactional application.

4. The configurable value-added network switch as claimed in claim 2 wherein said means for receiving said user specification further comprises:

means for presenting said user with a list of transactional applications, each of said transactional application being associated with a particular value-added network service provider; and

means for submitting said user specification according to a user's selection of said transactional application from said list of transactional applications.

5. The configurable value-added network switch as claimed in claim 1 wherein said means for processing said transaction request further comprises means for coupling said means for transmitting to a host means.

6. The configurable value-added network switch as claimed in claim 5 wherein said host means contains data corresponding to said transaction request.

7. The configurable value-added network switch as claimed in claim 1 wherein said value-added network service providers cooperating to provide said plurality of transactional services to users.

8. The configurable value-added network switch as claimed in claim 1 further comprising means for controlling and prioritizing multiple transaction requests initiated by various users.

9. The configurable value-added network switch as claimed in claim 1 further comprising means for providing security management, fault management, configuration management, performance management and billing management.

10. A method for configuring a value-added network switch for enabling real-time transactions on a network, said method for configuring said value-added network switch compromising the steps of:

switching to a transactional application in response to a user specification from a network application, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

transmitting a transaction request from said transactional application; and processing said transaction request.

11. The method for configuring said value-added network switch as claimed in claim 10 wherein said step of switching to a transactional application further comprises the steps of:

receiving said user specification;

enabling a switch to said transactional application; and

activating said transactional application.

12. The method for configuring said value-added network switch as claimed in claim 11 wherein said step of activating said transactional application further includes a step of creating a transaction link between said network application and said transactional application.

13. The method for configuring said value-added network switch as claimed in claim 11 further comprising the steps of:

controlling security;

performing fault management;

providing configuration management;

managing performance; and

5,987,500

11

enabling billing management.

14. The method for configuring said value-added network switch as claimed in claim 11 wherein said step of receiving said user specification further comprises steps of:

presenting said user with a list of transactional applications, each of said transactional application being associated with a particular Internet service provider; and

submitting said user specification according to a user's selection of said transactional application from said list of transactional applications.

15. The method for configuring said value-added network switch as claimed in claim 10 wherein said step of processing said transaction request further comprises the step of transmitting said transaction request to a host means.

16. The method for configuring said value-added network switch as claimed in claim 15 wherein said host means contains data corresponding to said transaction request.

17. The method for configuring said value-added network switch as claimed in claim 10 wherein said value-added network service providers cooperate to provide said plurality of transactional services to said user.

18. The method for configuring said value-added network switch as claimed in claim 10 further comprising the step of controlling and prioritizing multiple transaction requests initiated by various users.

19. A method for enabling object routing on a network, said method for enabling object routing comprising the steps of:

associating an object identity with information entries and attributes, wherein the object identity represents a networked object;

storing said information entries and said attributes in a virtual information store; and

assigning a unique network address to said object identity.

20. The method in claim 19 wherein said step of associating said object identity with said information entries and said attributes in said virtual information store further includes the step of associating a name, a syntax and an encoding for said object identity.

21. The method in claim 20 wherein said name associated with said object identity specifies an object type.

22. The method in claim 21 wherein said object type and an object instance uniquely identify an instantiation of said object type.

23. The method in claim 22 wherein said syntax defines a data structure for said object type.

24. The method in claim 19 further comprising the step of utilizing said unique network address to identify and route said object identity on the network.

25. The method in claim 19 further comprising the step of utilizing said unique network address to identify and route said object identity on the Internet.

26. The method in claim 19 further comprising the step of utilizing said unique network address of said object identity

12

to perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions.

27. An object router on a network, said object router comprising:

means for associating an object identity with information entries and attributes, wherein the object identity represents a networked object;

means for storing said information entries and said attributes in a virtual information store; and

means for assigning a unique network address to said object identity.

28. The object router in claim 27 wherein said means for associating said object identity with said information entries and said attributes in said virtual information store further includes means for associating a name, a syntax and an encoding for said object identity.

29. The object router in claim 28 wherein said name of said object identity specifies an object type.

30. The object router in claim 29 wherein said object type and an object instance uniquely identify an instantiation of said object type.

31. The object router in claim 30 wherein said syntax defines a data structure for said object type.

32. The object router in claim 27 further comprising means for utilizing said unique network address to identify and route said object identity on the network.

33. The object router in claim 27 further comprising means for utilizing said unique network address to identify and route said object identity on the Internet.

34. The object router in claim 27 further comprising the step of utilizing said unique network address of said object identity to perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions.

35. A configurable value-added network system for enabling real-time transactions on a network, said configurable value-added network system comprising:

means for switching to a transactional application in response to a user specification from a network application, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

means for activating an agent to create a transaction link between said user application and said transactional application;

means for transmitting a transaction request from said transactional application; and

a host means for processing said transaction request and retrieving data corresponding to said transaction request.

* * * * *

# Exhibit B



US008037158B2

(12) **United States Patent**
Arunachalam

(10) **Patent No.:** **US 8,037,158 B2**
(45) **Date of Patent:** **Oct. 11, 2011**

(54) **MULTIMEDIA TRANSACTIONAL SERVICES**

(76) Inventor: **Lakshmi Arunachalam**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 184 days.

(21) Appl. No.: **11/980,185**

(22) Filed: **Oct. 30, 2007**

(65) **Prior Publication Data**

US 2008/0091801 A1    Apr. 17, 2008

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 09/792,323, filed on Feb. 23, 2001, now Pat. No. 7,340,506, which is a continuation-in-part of application No. 08/879,958, filed on Jun. 20, 1997, now Pat. No. 5,987,500, which is a division of application No. 08/700,726, filed on Aug. 5, 1996, now Pat. No. 5,778,178.

(60) Provisional application No. 60/006,634, filed on Nov. 13, 1995.

(51) **Int. Cl.**
*G06F 13/00* (2006.01)

(52) **U.S. Cl.** .......................... **709/219**; 709/225; 709/229

(58) **Field of Classification Search** .................. 709/217, 709/219, 223, 225, 227, 229, 250; 719/328, 719/329
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,829,372 A | 5/1989 | McCalley et al. |
| 4,851,988 A | 7/1989 | Trottier et al. |
| 4,984,155 A | 1/1991 | Geier et al. |

| | | | |
|---|---|---|---|
| 5,125,091 A | 6/1992 | Staas et al. |
| 5,148,474 A | 9/1992 | Haralambopoulos et al. |
| 5,159,632 A | 10/1992 | Crandall |
| 5,231,566 A | 7/1993 | Blutinger et al. |
| 5,239,662 A | 8/1993 | Danielson et al. |
| 5,285,383 A | 2/1994 | Lindsey et al. |
| 5,297,249 A | 3/1994 | Bernstein et al. |
| 5,329,589 A | 7/1994 | Fraser et al. |
| 5,329,619 A | 7/1994 | Page et al. |
| 5,347,632 A | 9/1994 | Filepp et al. |
| 5,367,635 A | 11/1994 | Bauer et al. |
| 5,383,113 A | 1/1995 | Kight et al. |
| 5,404,523 A | 4/1995 | DellaFera |
| 5,408,619 A | 4/1995 | Oran |
| 5,414,812 A | 5/1995 | Filip et al. |
| 5,428,792 A | 6/1995 | Conner et al. |
| 5,432,937 A | 7/1995 | Tevanian et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO | 97/18515 A1 | 5/1997 |

(Continued)

OTHER PUBLICATIONS

Assign Inter Partes Reexm, Jan. 10, 2009, USPTO.

(Continued)

*Primary Examiner* — Viet Vu

(57) **ABSTRACT**

The present invention provides a method and apparatus for providing real-time, two-way transactional capabilities on the Web. Specifically, one embodiment of the present invention discloses a method for enabling object routing, the method comprising the steps of creating a virtual information store containing information entries and attributes associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities. A method is also disclosed for enabling service management of the value-added network service, to perform OAM&P functions on the services network.

**11 Claims, 13 Drawing Sheets**



US 8,037,158 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,434,974 A | 7/1995 | Loucks et al. | |
| 5,440,744 A | 8/1995 | Jacobson et al. | |
| 5,442,771 A | 8/1995 | Filepp et al. | |
| 5,442,791 A | 8/1995 | Wrabetz et al. | |
| 5,444,192 A | 8/1995 | Shetye et al. | |
| 5,446,896 A | 8/1995 | Hegarty et al. | |
| 5,452,433 A | 9/1995 | Nihart et al. | |
| 5,455,903 A | 10/1995 | Jolissaint et al. | |
| 5,475,819 A | 12/1995 | Miller et al. | 709/203 |
| 5,491,800 A | 2/1996 | Goldsmith et al. | |
| 5,517,645 A | 5/1996 | Stutz et al. | |
| 5,519,868 A | 5/1996 | Allen et al. | |
| 5,537,464 A | 7/1996 | Lewis et al. | |
| 5,539,909 A | 7/1996 | Tanaka et al. | |
| 5,557,780 A | 9/1996 | Edwards et al. | |
| 5,560,005 A | 9/1996 | Hoover et al. | |
| 5,577,251 A | 11/1996 | Hamilton et al. | |
| 5,590,197 A | 12/1996 | Chen | |
| 5,592,378 A | 1/1997 | Cameron et al. | |
| 5,604,905 A | 2/1997 | Tevanian et al. | |
| 5,613,148 A | 3/1997 | Bezviner et al. | |
| 5,664,111 A | 9/1997 | Nahan et al. | |
| 5,667,708 A | 9/1997 | Glass | |
| 5,671,279 A | 9/1997 | Elgamal | |
| 5,677,708 A | 10/1997 | Mathews et al. | |
| 5,694,549 A | 12/1997 | Carlin et al. | |
| 5,703,344 A * | 12/1997 | Bezy et al. | 235/379 |
| 5,706,442 A | 1/1998 | Anderson et al. | |
| 5,708,780 A | 1/1998 | Levergood et al. | |
| 5,710,887 A | 1/1998 | Chelliah et al. | |
| 5,712,913 A | 1/1998 | Chaum | |
| 5,715,314 A | 2/1998 | Payne et al. | |
| 5,715,444 A | 2/1998 | Danish et al. | |
| 5,724,424 A | 3/1998 | Gifford | |
| 5,742,762 A | 4/1998 | Scholl et al. | |
| 5,742,768 A | 4/1998 | Gennaro | |
| 5,745,681 A | 4/1998 | Levine et al. | |
| 5,754,939 A | 5/1998 | Herz et al. | |
| 5,757,917 A | 5/1998 | Rose et al. | |
| 5,758,072 A | 5/1998 | Filepp et al. | |
| 5,758,327 A | 5/1998 | Gardner et al. | |
| 5,771,354 A | 6/1998 | Crawford | |
| 5,774,670 A * | 6/1998 | Montulli | 709/227 |
| 5,778,178 A | 7/1998 | Arunachalam | |
| 5,780,780 A | 7/1998 | Ahmed | |
| 5,781,631 A | 7/1998 | Chaum | |
| 5,793,964 A * | 8/1998 | Rogers et al. | 709/202 |
| 5,794,221 A | 8/1998 | Egendorf | |
| 5,794,234 A | 8/1998 | Church et al. | |
| 5,809,483 A | 9/1998 | Broka et al. | |
| 5,812,779 A | 9/1998 | Ciscon et al. | |
| 5,822,569 A | 10/1998 | McPartlan et al. | |
| 5,826,085 A | 10/1998 | Bennett et al. | |
| 5,826,241 A | 10/1998 | Stein et al. | |
| 5,828,666 A | 10/1998 | Focsaneanu et al. | |
| 5,835,726 A | 11/1998 | Shwed | |
| 5,845,061 A | 12/1998 | Miyamoto et al. | |
| 5,845,073 A | 12/1998 | Carlin et al. | |
| 5,845,265 A | 12/1998 | Woolston | |
| 5,856,974 A | 1/1999 | Gervais et al. | |
| 5,859,978 A | 1/1999 | Sonderegger et al. | 709/226 |
| 5,864,866 A | 1/1999 | Henckel et al. | |
| 5,870,473 A | 2/1999 | Boesch et al. | |
| 5,870,724 A | 2/1999 | Lawlor et al. | |
| 5,873,072 A | 2/1999 | Kight et al. | |
| 5,873,093 A | 2/1999 | Williamson et al. | |
| 5,878,140 A | 3/1999 | Chaum | |
| 5,878,141 A | 3/1999 | Daly et al. | |
| 5,878,403 A | 3/1999 | DeFrancesco et al. | |
| 5,884,301 A | 3/1999 | Takano | |
| 5,889,957 A | 3/1999 | Ratner et al. | |
| 5,890,137 A | 3/1999 | Koreeda | |
| 5,890,161 A | 3/1999 | Helland et al. | |
| 5,892,821 A | 4/1999 | Turner | |
| 5,893,076 A | 4/1999 | Hafner et al. | |
| 5,895,454 A | 4/1999 | Harrington | |
| 5,897,621 A | 4/1999 | Boesch et al. | |
| 5,901,228 A | 5/1999 | Crawford | |
| 5,909,492 A | 6/1999 | Payne et al. | |
| 5,910,987 A | 6/1999 | Ginter et al. | |
| 5,913,061 A | 6/1999 | Gupta et al. | |
| 5,931,967 A | 8/1999 | Shimizu et al. | |
| 5,956,400 A | 9/1999 | Chaum et al. | |
| 5,956,509 A | 9/1999 | Kevner | |
| 5,958,004 A | 9/1999 | Helland et al. | |
| 5,960,411 A | 9/1999 | Hartman et al. | |
| 5,987,500 A | 11/1999 | Arunachalam | |
| 6,003,085 A | 12/1999 | Ratner et al. | |
| 6,014,651 A | 1/2000 | Crawford | |
| 6,014,666 A | 1/2000 | Helland et al. | |
| 6,049,785 A | 4/2000 | Gifford | |
| 6,049,819 A | 4/2000 | Buckle et al. | |
| 6,055,514 A | 4/2000 | Wren | |
| 6,055,567 A | 4/2000 | Ganesan et al. | |
| 6,073,237 A | 6/2000 | Ellison | |
| 6,092,053 A | 7/2000 | Boesch et al. | |
| 6,094,673 A | 7/2000 | Dilip et al. | |
| 6,101,482 A | 8/2000 | DiAngelo et al. | |
| 6,101,527 A | 8/2000 | Lejeune et al. | |
| 6,119,152 A | 9/2000 | Carlin et al. | |
| 6,125,185 A | 9/2000 | Boesch | |
| 6,125,352 A | 9/2000 | Franklin et al. | |
| 6,128,315 A | 10/2000 | Takeuchi | |
| 6,134,594 A | 10/2000 | Helland et al. | |
| 6,135,646 A | 10/2000 | Kahn et al. | |
| 6,145,090 A | 11/2000 | Yamaguchi et al. | |
| 6,185,609 B1 | 2/2001 | Rangarajan et al. | |
| 6,192,250 B1 | 2/2001 | Buskens et al. | |
| 6,205,433 B1 | 3/2001 | Boesch et al. | |
| 6,212,556 B1 | 4/2001 | Arunachalam | |
| 6,212,634 B1 | 4/2001 | Gerr, Jr. et al. | |
| 6,249,291 B1 * | 6/2001 | Popp et al. | 345/473 |
| 6,279,001 B1 * | 8/2001 | DeBettencourt et al. | 1/1 |
| 6,289,322 B1 | 9/2001 | Kitchen et al. | |
| 6,295,522 B1 | 9/2001 | Boesch | |
| 6,301,601 B1 | 10/2001 | Helland et al. | |
| 6,327,577 B1 | 12/2001 | Garrison et al. | |
| 6,327,579 B1 | 12/2001 | Crawford | |
| 6,334,116 B1 | 12/2001 | Ganesan et al. | |
| 6,360,262 B1 | 3/2002 | Guenthner et al. | |
| 6,363,362 B1 | 3/2002 | Burfield et al. | |
| 6,411,943 B1 | 6/2002 | Crawford | |
| 6,453,426 B1 | 9/2002 | Gamache et al. | |
| 6,457,066 B1 | 9/2002 | Mein et al. | |
| 6,473,740 B2 | 10/2002 | Cockrill et al. | |
| 6,473,791 B1 | 10/2002 | Al-Ghosein et al. | |
| 6,486,895 B1 * | 11/2002 | Robertson et al. | 715/776 |
| 6,490,567 B1 | 12/2002 | Gregory | |
| 6,553,427 B1 | 4/2003 | Chang et al. | |
| 6,574,607 B1 | 6/2003 | Carter et al. | |
| 6,625,581 B1 | 9/2003 | Perkowski | |
| 6,678,664 B1 | 1/2004 | Ganesan | |
| 6,678,696 B1 | 1/2004 | Helland et al. | |
| 6,714,962 B1 | 3/2004 | Helland | |
| 6,839,677 B2 | 1/2005 | Mathur et al. | |
| 6,850,996 B2 | 2/2005 | Wagner | |
| 6,856,974 B1 | 2/2005 | Ganesan et al. | |
| 6,931,111 B1 | 8/2005 | Coffee | |
| 6,932,268 B1 | 8/2005 | McCoy et al. | |
| 6,948,063 B1 | 9/2005 | Ganesan et al. | |
| 7,076,784 B1 | 7/2006 | Russell et al. | |
| 7,080,051 B1 | 7/2006 | Crawford | |
| 7,107,244 B2 | 9/2006 | Kight et al. | |
| 7,120,602 B2 | 10/2006 | Kitchen et al. | |
| 7,146,338 B2 | 12/2006 | Kight et al. | |
| 7,175,074 B2 | 2/2007 | Mejias et al. | |
| 7,177,846 B2 | 2/2007 | Moenickheim et al. | |
| 7,213,003 B1 | 5/2007 | Kight et al. | |
| 7,240,031 B1 | 7/2007 | Kight et al. | |
| 7,251,656 B2 | 7/2007 | Keown et al. | |
| 7,296,004 B1 | 11/2007 | Garrison et al. | |
| 7,302,408 B2 | 11/2007 | Engdahl et al. | |
| 7,302,411 B2 | 11/2007 | Ganesan et al. | |
| 7,330,831 B2 | 2/2008 | Biondi et al. | |
| 7,334,128 B2 | 2/2008 | Ganesan et al. | |
| 7,340,506 B2 | 3/2008 | Arunachalam | |
| 7,366,695 B1 | 4/2008 | Ganesan et al. | |

**US 8,037,158 B2**

Page 3

| 7,366,697 | B2 | 4/2008 | Kitchen et al. |
| 7,383,226 | B2 | 6/2008 | Kight et al. |
| 7,389,514 | B2 | 6/2008 | Russell et al. |
| 7,392,223 | B1 | 6/2008 | Ganesan et al. |
| 7,395,243 | B1 | 7/2008 | Zielke et al. |
| 7,395,319 | B2 | 7/2008 | Harris et al. |
| 7,451,400 | B2 | 11/2008 | Bales |
| 7,590,550 | B2 | 9/2009 | Schoenberg |
| 7,600,027 | B2 | 10/2009 | Yan |
| 2001/0037318 | A1 | 11/2001 | Lindskog |
| 2002/0062218 | A1 | 5/2002 | Pianin |
| 2002/0152200 | A1 | 10/2002 | Krichilsky et al. |
| 2003/0069922 | A1 | 4/2003 | Arunachalam |
| 2008/0091801 | A1 | 4/2008 | Arunachalam |
| 2009/0094347 | A1 | 4/2009 | Ting |

FOREIGN PATENT DOCUMENTS

| WO | WO 97/18515 | | 5/1997 |
| WO | 00/63781 | A1 | 10/2000 |

OTHER PUBLICATIONS

Req Inter Partes Reexam, Dec. 19, 2009, Microsoft Corp.
Appendices A-C Related interpartes reexam U.S. Appl. No. 95/001,129, Dec. 19, 200.
Part of U.S. Appl. No. 08/168,519 file Ex. 5, U.S. Appl. No. 95/001,129, Dec. 16, 1993.
A Cobra Based Framework—Arshad et al 1999.
Generic Mgt Info Base Browser—Pavlou et al.
Hetro Distrib Info System—Chung et al 1995.
Agent Based System—Internet Based—Ehikioya 1999.
Broadvision 1-1 Dev. Guide—1995 Contents Only—vii.
Broadvision—PGM Ref 1995 pp. 4-5, 21, 30, 973
Broadvision—Tech Overview 1995 pp. 1-3.
Database Access Intel-Networks—Raatykainen P-1.
802.3 Repeater Devices 1992 pp. 1-3.
ERP Meets Web E-Commerce 1998 P-1.
Microsoft Transaction Server—Limprecht 1997.
Netbill—Protocol P-1 Tygar.
OBJ Oriented—Hyper G-MSWindows—Contents & p. 3.
Dialog Web—M. Hickey 1994 P-1.
Transaction Internet Protocol—Vogler et al. 1999.
RFC 1065, 1988, Network Working Group.
RFC 1318, 1992, Network Working Group.
RFC 1283, 1991, Network Working Group.
RFC 1516, 1993, Network Working Group.
Lamond, Keith, "Credit Card Transactions Real World and Online" http://www.virtualschool.edu/mon/ElectronProperty/klamond/credit_card/htm, pp. 1-16, 1996.
Cox, Benjamin et al., "Netbill Security and Transaction Protocol", Carnegie Millon University, Pittsburgh, PA 15212-3890.
"Tymnet", Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/tymnet, May 2007.
Hickey, "Shopping at Home: One Modem Line, No Waiting", Home PC, Dec. 1, 1994, p. 307, Dialog, File 647, Acc# 01038162.
Lang, "Cashing in: The Rush is on to Buy and Sell on the Internet but Conflicting Schemes Leave Marketers on Sidelines for Now", Advertising Age, Dec. 19, 1994, p. 11, Dialog File 16, Acc# 05419137.
Banks, Michael A., "America Online: A Graphics-based Success", Link-Up, Jan./Feb. 1992.
"Hot Jave", Wikipeda, the free encyclopedia, http://en.wikipedia.org/wiki/HotJava, May 2007.
Lichty, Tom, "America Online tour Guide", MacIntosh Edition, Version 2, Preface, Chapter 1, Ventanna Press, 1992.
Lichty, Tom, "America Online tour Guide", MacIntosh Edition, Version 2, Preface, Chapter 3, Ventanna Press, 1992.
Lichty, Tom, "America Online tour Guide", MacIntosh Edition, Version 2, Preface, Chapter 8, Ventanna Press, 1992.
Lichty, Tom, "America Online tour Guide", MacIntosh Edition, Version 2, Preface, Chapter 10, Ventanna Press, 1992.
Broadvision One-to-One Developer's Guide, p. vii.
Broadvision One-to-One Installation & System AdminGuide.
Broadvision One-to-One Technical Overview, pp. 1-3.
Broadvision One-to-One Dynamic Command CTR User'S Guide.

Prodigy Made East 2nd Ed.
Computer Networks—Sys Approach Peterson & Davie.
Untangling the World-Wide-Web Relihan, Cahill & Hinchey.
The Simple Book—An Intro to Internet Management.
Google Groups Comp. Doc—RFC's 1212 1213 on Concise Definitions MIB and MIB II.
Small Talk Object Model http://www.objs.com/x3h7/smalltalk.htm.
A Protocol&Server for a Distrib—Digital Tech Report Library.
Distributed Applications in a Hypermedia Setting—Bharat & Gardelli.
Dienst: Implementation Ref Manual Lagoze, Shaw, Davis & Krafft.
Object Wrapping for (www/Edwards, 1995.
Understanding DCE Chaps 1-3 DCE—The Network as Computer Etc.
Visual Obliq—JXI for Bldg Distrib Multi-User Apps by Direct Manipulation Bharat & Brown.
Using the Web as a Survey Tool Pitkow & Recker.
Compuserve for Windows Banks.
Distributed Object Technology in Financial Service Industry Sun Microsystems.
Businesswire—Open Market Releases.
Distributed Computing—A Practical Synthesis—UMAR.
Orbix—Programmer's Guide Iona Technologies Ltd.
Travel Services—Join Compuserve & See the World, 1987.
Order Granting Defendant's Motion to Dismiss—Northern District of California Feb. 17, 2009.
Microsoft Corporation's Notice of Motion and Motion for Leave to Amend (Complaint) US District Court—Northern District of California.
Dr. Gui on Components, COM, and ATL Part I: You're Gonna Do Com?, , Feb. 2, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 2: Basics of COM, Feb. 9, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 3: Getting Objects and Interfaces, Feb. 23, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 4: The Class Object and Class Factory, Mar. 2, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 5: Implementing an Object, Mar. 30, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 6: Using our COM Object in Visual Basic . . . , Apr. 27, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 7: Using our Object from Visual C++, May 29, 1998, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm, Part 8: Get Smart! Using our COM Object . . . , Jul. 30, 1998 http://msdn.microsoft.com/library/welcome/dsmsdn/msdn-drguion020298.htm.
Microsoftcom.news Dr. GUI's Gentle Guide to COM, Nov. 1, 1999, http://www.microsoft.com/news/drgui.asp.
Taking the Splash Diving into ISAPI Programming, Jan. 1997, Christian Gross http://www.microsoft.com/mind/0197/isapi.htm.
Chapter 1, NSAPI Basics, Dec. 22, 1997, http://developer.netscape.com/docs/manuals/enterprise/nsapi/svrop.htm.
The Common Gateway Interface, retrieved May 22, 2001, http://hoohoansa.uinc.edu/cgi/primer.html.
Open Market Content—Driven eBusiness Solutions, Retrieved May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+ETContentServer?pagename= FutureTense/Apps/Xcelerate/View6c=Collec....
OpenMarket Content Server, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic +FTContentServer & pagename=FutureTense/Apps/xcelerate/Render/& C=Artic ....
Open Market Content Centre, Retrieved May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer& pagename=FutureTense/Apps/xcelerate/Render/& C=Artic....
OpenMarket Integration Centre, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer & pagename=FutureTense/Apps/xcelerate/Render/& C=Artic....
OpenMarket Personalization Centre, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer & pagename=FutureTense/Apps/xcelerate/Render/& C=Artic....
OpenMarket Catalog Centre, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer & pagename=FutureTense/Apps/xcelerate/Render/&C=Artic....

OpenMarket Marketing Studio, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer & pagename=FutureTense/Apps/xcelerate/Render&C=Artic....

OpenMarket Satellite Server, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer & pagename=FutureTense/Apps/xcelerate/Render&C=Artic....

OpenMarket Commerce Products, Retrieved May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/Apologic+FTContentServer?pagename=FutureTense/Apps/xcelerate/....

OpenMarket Transact, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/Apologic+FTContentServer?pagename=FutureTense/Apps/xcelerate/....

OpenMarket Shopsite, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/Apologic+FTContentServer?pagename=FutureTense/Apps/xcelerate/....

OpenMarket Open Exchange Shopsite 5.0, May 15, 2001, http://www.openmarket.com/cgi-bin/gx.cgi/Apologic+FTContentServer?pagename=FutureTense/Apps/xcelerate/....

OpenMarket Wireless Solutions, an OpenMarket eBusiness Solution Brief, Feb. 13, 2001, http://www.openmarket.com/.

OpenMarket Portal Solutions an OpenMarket eBusiness Solution Brief, Feb. 21, 2001, http://www.openmarket.com/.

CyberCash Inc.—The E-Commerce Lender in Payment Solutions—B2B, 1996 Retrieved May 23, 2001, http://www.cybercash.com/.

CyberCash Products, May 23, 2001, http://www.cybercash.com/products/.

CyberCash Cash & Register—Online Secure Payment Service, May 23, 2001, http://www.cybercash.com/cashregister/.

Cybercash ICverify 2.5 Upgrade, May 23, 2001, http://www.cybercash.com/icverify/upgrade.html.

Cybercash Cash Register—How It Works, Retrieved May 23, 2001, http://www.cybercash.com/cashregister/howitworks/html.

Cybercash Cash Register—Industry Leading Features, May 23, 2001, http://www.cybercash.com/cashregister/features.html.

Cybercash Cash Register—Why Choose Cash Register?, May 23, 2001, http://www.cybercash.com/cashregister/why.html.

Cybercash Cash Register—Online Secure Payment Service, 2000, http://webdata.cybercash.com/demos/.

Cybercash Web Authorize—Enterprise and Hosting Payment Processing, Retrieved May 23, 2001, http://www.cybercash.com/webauthorize/.

Cybercash B2B Payment Services, Retrieved May 23, 2001, http://www.cybercash.com/b2b/.

Cybercash Fraud Patrol Service, May 23, 2001, http://www.cybercash.com/fraudpatrol/.

Cybercash PCAuthorize—Payment Software for Back-and-Mortar Merchants, May 23, 2001, http://www.cybercash.com/pcauthorize/.

Microsoft Component Services—Server Operating System—A Technology Overview, Dated Aug. 15, 1998 Retrieved May 22, 2001, http://www.microsoft.com/com/wpaper/compsvcs.asp.

iPIN Home, Retrieved May 23, 2001, http://www.ipin.com/.

iPIN Company Info, Retrieved May 23, 2001, http://www.ipin.com/01comp.html.

iPIN Products—The iPIN Approach, Retrieved May 23, 2001, http://www.ipin.com/02prod.html.

iPIN Products—Technology, Retrieved May 23, 2001, http://www.ipin.com/02prod_tech.html.

iPIN Products—Solutions, Retrieved May 23, 2001, http://www.ipin.com/02prod_solution.html.

iPIN Products—Service Options, Retrieved May 23, 2001, http://www.ipin.com/02prod_service.html.

iPIN Partners, Retrieved May 23, 2001, http://www.ipin.com/03part.html.

Cybercash Fraud Patrol How It Works, Retrieved May 23, 2001, http://www.cybercash.com/fraudpatrol/howitworks.html.

Posting of Joyce Reynolds to Comp. Doc. Usenet (Mar. 27, 1991).

Sample Book: An Intro to Internet Management pp. 14-15, pp. 379-387 (2nd ed 1994).

Managing Internetworks with SNMP Miller pp. 138-139 (1993).

"Untangling the World Wide Web" Relihan, Cahil, Hinchen (Oct. 1994).

RFC 1155, May 1990, Network Working Group.

RFC 1157, May 1990, Network Working Group.

RFC 1213, Mar. 1991, Network Working Group.

RFC 1447, Apr. 1993, Network Wroking Group.

RFC 1156, May 1990, Network Working Group.

Request for Reexamination for Patent 5,778,178, Nov. 28, 2008.

U.S. Appl. No. 60/208,057, filed May 31, 2000, Krichilsky.

Complaint for Declaratory Judgment of Patent Non/Infringement, Invalidity, and Unenforceability; (Dated Jul. 2, 2009) (219 pages).

Defendant Webxchange Inc.'S Motion to Dismiss Microsoft's Complaint With Prejudice for Lack of Subject-Matter Jurisdiction, and for Attorneys' Fees (entered Aug. 26, 2009).

Microsoft's Opposition to WebXchange, Inc.'s Motion to Dismiss Microsoft's Complaint (dated Sep. 14, 2009).

Order Dismissing Microsoft (Oct. 30, 2009) Judge Alsup.

Memorandum Opinion Microsoft (Oct. 30, 2009) Judge Farnan.

Complaint filed with Jury Demand against Allstate Corporation, Allstate Insurance Company, Allstate Life Insurance Company, Allstate Financial Services LLC, Allstate Financial LLC—. ( Filing fee $ 350, receipt No. 0311000000000419775.)—filed by WebXchange Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet)(lid) (Entered: Mar. 5, 2008).

Answer to 1 Complaint, with Jury Demand, Counterclaim against WebXchange Inc. by Allstate Corporation, Allstate Insurance Company, Allstate Life Insurance Company, Allstate Financial Services LLC, Allstate Financial LLC. (McGeever, Elizabeth) (Entered: Apr. 25, 2008).

Answer to 15 Answer to Complaint, Counterclaim Plaintiff WebXchange Inc.'s Answer to Defendant Allstate's Counterclaims by WebXchange Inc..(Heaney, Julia) (Entered: May 19, 2008).

Claim Construction Opening Brief [Defendants' Opening Brief in Support of Their Proposed Claim Constructions] filed by Allstate Insurance Company, Allstate Life Insurance Company, Allstate Financial Services LLC. (Moore, David) (Entered: Oct. 29, 2008).

Claim Construction Opening Brief filed by WebXchange Inc.. (Attachments: # 1 Exhibits A-B)(Heaney, Julia) (Entered: Oct. 29, 2008).

First Amended Answer, Affirmative Defenses, and Counterclaims to 1 Complaint by Allstate Corporation, Allstate Insurance Company, Allstate Life Insurance Company, Allstate Financial Services LLC, Allstate Financial LLC. (nms) (nms). (Entered: Jan. 14, 2009), (Three Parts).

Answer to 90 Amended Answer to Compliant, Counterclaim by WebXchange Inc..(Heaney, Julia) (Entered: Feb. 2, 2009).

Motion to Bifurcate and for Early Trial on the Issue of Inequitable Conduct—filed by FedEx Corporation, FedEx Kinko's Office & Print Services, Inc., FedEx Corporate Services Inc.. (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Notice of Motion re 107 Motion to Bifurcate and for Early Trial on the Issue of Inequitable Conduct; Request the following Motion Day: Apr. 17, 2009 (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

7.1.1 Statement re 107 Motion to Bifurcate and for Early Trial on the Issue of Inequitable Conduct by FedEx Corporation, FedEx Kinko's Office & Print Services, Inc., FedEx Corporate Services Inc.. (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Redacted Version of 110 Opening Brief in Support, , by FedEx Corporation, FedEx Kinko's Office & Print Services, Inc., FedEx Corporate Services Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Gaza, Anne) (Entered: Mar. 23, 2009), (Four Parts).

Claim Construction Opening Brief Defendants' Opening Brief in Support of Their Proposed Claim Constructions filed by Allstate Insurance Company, Allstate Life Insurance Company, Allstate Financial Services LLC. (McGeever, Elizabeth) (Entered: Mar. 23, 2009).

Claim Construction Opening Brief filed by WebXchange Inc.. (Attachments: # 1 Exhibits A-B)(Heaney, Julia) (Additional attachment(s) added on Mar. 25, 2009: # 2 Main Document) (nms). (Entered: Mar. 23, 2009), (Two Parts).

Plaintiff Webxchange Inc.'s Corrected Answering Brief in Opposition to Defendants' Motion to Bifurcate, and for Early Trial on, the Issue of Inequitable Conduct /// Certificate of Service I, the undersigned, hereby certify that on May 13, 2009, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following: /// Certificate of Service I, the undersigned, hereby certify that on May 13, 2009, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following: /// Julia Heaney.

"Declaration of Eric 3. Stieglitz in Support Ofplaintiff Webxchange Inc.'S Answering Brief in Oppositionto Defendants' Motion to Bifurcate, and for Early Trial on,the Issue of Inequitable Conduct // Redacted—Public Version / signed Apr. 27, 2009Certificate of Servicei, the undersigned, hereby certify that on May 13, 2009, I electronically filed the foregoing with the Clerk of the Court using CM/ECF, which will send notification of such filing(s) to the following: (Two Parts)" Julia Heaney.

Case 1:08-cv-00131-JJF Document 142 Filed Jun. 1, 2009 p. 1 of 19 // Reply Brief in Support of Defendants' Motion to Bifurcate, and 11011 Early Trial on, the Issue of Inequitable Conduct // Redacted Public Version /// Certificate of Service I hereby certify that on Jun. 1, 2009, I caused to be served by electronic mail the foregoing document and electronically filed the same with the Cleric of Court using CM/ECF which will send notification of such to the following: Exhibits A-W to Redacted Reply Brief.

"Case 1:08-cv-00131-JJF Document 146 Filed Jun. 18, 2009 p. 1 of 5 // Motion for Leave to Amend Answer,Affirmative Defenses, and Counterclaims // Filed: Jun. 18, 2009".

"Defendants' Opening Brief in Support of Its Motion for Leave Toamend Answer, Affirmative Defenses, and Counterclaims // Case 1:08-cv-00131-JJF, Filed Jun. 18, 2009 p. 1 of 12".

Plaintiff Webxchange Inc.'s Answering Brief in Opposition to Allstate's Second Motion for Leave to Amend its Answer, C.A. No. 08-131 (JJF).

Complaint filed with Jury Demand against Dell Inc. -. ( Filing fee $ 350, receipt No. 031100000000000419782.)—filed by WebXchange Inc.. (Attachments: # Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet)(lid) (Entered: Mar. 5, 2008).

Answer to 1 Complaint with Jury Demand, Counterclaim [Dell Inc.'s Answer, Defenses and Counterclaims to Webxchange Inc.'s Complaint for Patent Infringement] against Dell Inc. by Dell Inc.. (Horwitz, Richard) (Entered: Mar. 26, 2008).

Answer to 8 Answer to Complaint, Counterclaim Plaintiff WebXchange Inc.'s Answer to Defendant Dell's Counterclaims by WebXchange Inc..(Heaney, Julia) (Entered: Apr. 18, 2008).

Claim Construction Opening Brief [Defendants' Opening Brief in Support of Their Proposed Claim Constructions] filed by Dell Inc.. (Moore, David) (Entered: Oct. 29, 2008).

Claim Construction Opening Brief filed by WebXchange Inc.. (Attachments: # 1 Exhibits A-B)(Heaney, Julia) (Entered: Oct. 29, 2008).

Reply Brief re 37 Motion for Discovery filed by Dell Inc.. (Attachments: # 1 Exhibit A-L, # 2 Exhibit M-S)(Gaza, Anne) (Entered: Oct. 31, 2008).

Motion to Amend/Correct Answer and Counterclaims to Complaint (Unopposed)—filed by Dell Inc.. (Attachments: # 1 Notice of Motion, # 2 Text of Proposed Order, # 3 Exhibit A (First Amended Answer), # 4 Exhibit B (Blackline of First Amended Answer)(Moore, David) Modified on Jan. 13, 2009 (nms). (Entered: Jan. 12, 2009).

Order Granting 72 Defendant Dell Inc.'s Unopposed Motion to Amend its Answer and Counterclaims to Webexchange Inc's Original Complaint for Patent Infringement. Signed by Judge Joseph J. Farnan, Jr. on Jan. 13, 2009. (nms) (Entered: Jan. 14, 2009).

Dell Inc.'s First Amended Answer and Counterclaims to 1 Complaint by Dell Inc.. (nms) (Entered: Jan. 14, 2009).

Answer to 75 Amended Answer to Complaint, Counterclaim by WebXchange Inc..(Heaney, Julia) (Entered: Feb. 2, 2009).

Motion to Bifurcate and for Early Trial on, the Issue of Inequitable Conduct—filed by FedEx Corporation, FedEx Kinko's Office & Print Services, Inc., FedEx Corporate Services Inc.. (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Notice of Motion re 85 Motion to Bifurcate and for Early Trial on the Issue of Inequitable Conduct; Requesting the following Motion Day: Apr. 17, 2009 (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

7.1.1 Statement re 85 Motion to Bifurcate and for Early Trial on the Issue of Inequitable Conduct by FedEx Corporation, FedEx Kinko's Office & Print Services, Inc., FedEx Corporate Services Inc.. (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Redacted Version of 88 Opening Brief in Support, , by FedEx Corporation, FedEx Kinko's Office & Print Services, Inc., FedEx Corporate Services Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13)(Gaza, Anne) (Entered: Mar. 23, 2009), (Three Parts).

Claim Construction Opening Brief Defendants' Opening in Support of Their Proposed Claim Constructions filed by Dell Inc.. (McGeever, Elizabeth) (Entered: Mar. 23, 2009).

Claim Construction Opening Brief filed by WebXchange Inc.. (Attachments: # 1 Exhibits A-B)(Heaney, Julia) (Additional attachment(s) added on Mar. 25, 2009: # 2 Main Document) (nms). (Entered: Mar. 23, 2009), (Two Parts).

Defendant Dell Inc.'s Motion for Leave to Amend Its Answer (to file a Second Amended Answer); Jury Trial Demanded (entered Jul. 23, 2009).

Plaintiff WebXchanges Inc.'s Answering Brief in Opposition to Dell's Second Motion for Leave to Amend its Answer (entered Aug. 10, 2009).

Defendant Dell Inc.'s Opening Brief in Support of Its Motion for Leave to Amend Answer (entered Aug. 11, 2009).

Declaration of Charlotte Pontillo in Support of WebXchange Inc.'s Answering Brief in Opposition to Dell's Second Motion for Leave to Amend its Answer; (entered Aug. 12, 2009).

Defendant Dell Inc.'s Reply Brief in Support of Its Motion for Leave to Amend Answer (entered Aug. 20, 2009).

Order, Judge Stark.

Complaint filed with Jury Demand against FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc. -. ( Filing fee $ 350, receipt No. 031100000000000419793.)—filed by WebXchange Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Civil Cover Sheet)(lid) (Entered: Mar. 5, 2008).

Answer to 1 Complaint, with Jury Demand, Counterclaim against WebXchange Inc. by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc..(Gaza, Anne) (Entered: Apr. 25, 2008).

Answer to 13 Answer to Complaint, Counterclaim Plaintiff WebXchange Inc.'s Answer to Defendant FedEx's Counterclaims by WebXchange Inc..(Heaney, Julia) (Entered: May 19, 2008).

Claim Construction Opening Brief [Defendants' Opening Brief in Support of Their Proposed Claim Constructions] filed by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc.. (Moore, David) (Entered: Oct. 29, 2008).

Claim Construction Opening Brief filed by WebXchange Inc.. (Attachments: # 1 Exhibits A-B)(Heaney, Julia) (Entered: Oct. 29, 2008).

Motion to Amend/Correct 13 Answer to Complaint, Counterclaim—filed by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Gaza, Anne) (Entered: Jan. 12, 2009).

Notice of Motion by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc. re 89 Motion to Amend/Correct 13 Answer to Complaint, Counterclaim Motion to Amend/Correct 13 Answer to Complaint, Counterclaim ; Requesting the following Motion Day; Feb. 19, 2009 (Gaza, Anne) (Entered: Jan. 12, 2009).

Sealed Opening Brief in Support re 89 Motion to Amend/Correct 13 Answer to Complaint, Counterclaim Motion to Amend/Correct 13 Answer to Complaint, Counterclaim filed by FedEx Corporation,

FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc..Answering Brief/Response due date per Local Rules is Jan. 30, 2009. (Gaza, Anne) (Entered: Jan. 12, 2009).

Order Granting 89 Unopposed Motion for Leave to Amend Answer. Signed by Judge Joseph J. Faman, Jr. on Jan. 13, 2009. (nms) (Entered: Jan. 14, 2009).

First Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff re 1 Complaint, with Jury Demand by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc..(nms) (Entered: Jan. 14, 2009).

Redacted Version of 91 Opening Brief in Support, by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc.. (Attachments: # 1 Exhibit A-D)(Gaza, Anne) (Entered: Jan. 21, 2009).

Amended Answer to 97 Answer to Complaint, Counterclaim by WebXchange Inc..(Heaney, Julia) (Entered: Feb. 2, 2009).

Motion to Bifurcate and for Early Trial on, the Issue of Inequitable Conduct—filed by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc.. (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Notice of Motion re 108 Motion to Bifurcate and for Early Trial on, the Issue of Inequitable Conduct; Requesting the following Motion Day: Apr. 17, 2009 (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Statement re 108 Motion to Bifurcate and for Early Trial on, the Issue of Inequitable Conduct by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc.. (Gaza, Anne) Modified on Mar. 23, 2009 (nms). (Entered: Mar. 19, 2009).

Claim Construction Opening Brief Defendants' Opening Brief in Support of Their Proposed Claim Constructions filed by FedEx Corporation, FedEx Kinko's Office & Print Services Inc., FedEx Corporate Services Inc.. (McGeever, Elizabeth) (Entered: Mar. 23, 2009).

Claim Construction Opening Brief filed by WebXchange Inc.. (Attachments: # 1 Exhibits A-B)(Heaney, Julia) (Additional attachment(s) added on Mar. 25, 2009: # 2 Main Document) (nms). (Entered: Mar. 23, 2009), (Two parts).

Defendants' Motion for Leave to Amend Its Answer.

Defendants' Brief in Support of Its Motion for Leave to Amend Answer // C.A No. 08-133 (JJF) // Dated: Jun. 12, 2009.

UIUC , "The Common Gateway Interface", pp. 1-4, http://hoohoo. ncsa.uiuc.edu/cgi/primer.html, Retrieved on May 22, 2001.

Arnold, K et al. , "Media-Independent Interfaces in a Media-Dependent World", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995 , WBX001.

Arshad, K.M et al. , "A CORBA based framework for trusted E-Commerce Transactions", Enterprise Distributed Object Computing Conference, pp. 18-25, EDOC '99. Proceedings, 3rd International, Sep. 27, 1999 , WBX002.

Atkinson, R. , RFC 1825: "Security Architecture for the Internet Protocol", Naval Research Laboratory, Category: Standards Track, Network Working Group, Aug. 1, 1995, WBX007.

Banks, M. , "America Online: A Graphics-based Success", Link-Up, Jan./Feb. 1992 , WBX008.

Banks, M. , "Compuserve for Windows", M.I.S Press, 1994, WBX009.

Baquero, C. et al. , "Integration of Concurrency Control in a Language with Subtyping and Subclassing", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995 , WBX010.

Barron, C. and Weil, B., "Dr. Dobbs Portal: Implementing a Web Shopping Cart", Online Transactions in PERL, Sep. 1, 1996 WBX011.

Bharat, K. et al. , "Visual Obliq: A System for Building Distributed, Multi-User Applications by Direct Manipulation", SRC 130a, DEC, Oct. 31, 1995, WBX012.

Bharat, K. et al. , "Distributed Applications in a Hypermedia Setting", Proc. of the International Workshop on Hypermedia Design, Montpellier, http.www.cc.gatech. edugvupeoplePhdKrishnalWHD. html, Jun. 1, 1995, WBX013.

Birrell A. et al. , "Network Objects", SRC Research Report, Feb. 24, 1994, WBX014.

Birrell A. et al., "Implementing Remote Procedure Calls", Xerox Palo Alto Research Center, ACM Transactions, Feb. 1, 1994, WBX015.

Bowen, C. et al. , "How to Get the Most out of CompuServe" 5th Ed. 1991, Random House, Inc. 1991, WBX016.

Braden, R. et al. , RFC 1122: "Requirements for Internet Hosts—Communication Layers" Oct. 1, 1989, WBX017.

Brando, T., "Comparing DCE and CORBA", Mitre Document MP 95B-93, Mar. 1, 1995, WBX018.

Microsoft, 7,340,506—Appendix A to the Request for Inter Partes Re-examination of, Payne, Dec. 2008, WBX019.

Broadvision, "Broadvision One-to-One: On-line Marketing and Selling Application System Developers' Guide", 1995, WBX020.

Broadvision, "Broadvision One-to-One: On-Line Marketing and Selling Application System: Dynamic Command Center User's Guide", 1995, WBX021.

Broadvision, "Broadvision One-to-One: On-Line Marketing and Selling Application System: Installation and System Administration Guide" 1995, WBX022.

Broadvision, "Broadvision One-to-One: On-Line Marketing and Selling Application System: Technical Overview", 1995, WBX023.

Microsoft, 7,340,506—Appendix B to the Request for Inter Partes Re-examination of, Ginter, Dec. 2008, WBX024.

Business Wire , "Open Market releases first complete software solution" 1995, WBX025.

Business Wire, "Sunsoft delivers early access release of Distributed Objects Environment", Jun. 14, 1995, WBX026.

Case, J. et al. , "Network Management and the Design of SNMP", Connexxions (ISSN 0894-5926), vol. 3, No. 3, Mar. 1989, WBX027.

Microsoft, 7,340,506—Appendix C to the Request for Inter Partes Re-examination of, Popp, Dec. 2008, WBX028.

Chung, S. et al., "A Heterogeneous Distributed Information System", IEEE, pp. 443-447, 1993, WBX029.

Courtney, A. , "Phantom: An Interpreted Language for Distributed Programming", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX030.

Cybercash, "Affiliate Marketing Service", http://www.cybercash. com/products:affiliatemarketing.html [retrieved on May 23, 2001] 1996, WBX031.

"CyberCash B2B Payment Services", http://www.cybercash.com/ b2b pp. 1-2[retrieved May 23, 2001] 1996, WBX032.

"CyberCash B2BServices", 1996, WBX033.

"CyberCash Cash Register Internet Payment Service". Web Page [online]. CyberCash Cash Register—Online Secure Payment Service. [retrieved on May 23, 2001] Retrieved from the Internet:<URL.http://www.cybercash.com/cashregister pp. 1-2. 1996, WBX034.

"CyberCash—Cash Register—How it Works" [retrieved on May 23, 2001] Retrieved from the Internet:<URL.http://www.cybercash. com/cashregister/howitworks.html pp. 1-3. 1996, WBX035.

"CyberCash—Industry Leading Features" Web Page [online]. [retrieved on May 23, 2001] Retrieved from the Internet: <URL.http://www.cybercash.com/cashregister/features.html pp. 1-4. 1996, WBX036.

"CyberCash Cash Register—Online Secure Payment Service" CashRegister Demos. Web Page [online]. [retrieved on May 23, 2001] Retrieved from the Internet:<URL.http://www.webdata. cybercash.com/demos/ pp. 1-2. 1996, WBX038.

"CyberCash FraudPatrol.TM. Service" Web Page [online]. [retrieved on May 23, 2001] Retrieved from the Internet: <URL.http://www. cybercash.com/fraudpatrol/ pp. 1-2. 1996, WBX039.

"CyberCash FraudPatrol—How It Works" Web Page [online]. [retrieved on May 23, 2001] Retrieved from the Internet: <URL.http://www.cybercash.com/fraudpatrol/howitworks.html pp. 1-2 1996, WBX040.

"CyberCash Home", http://www.cybercash.com [retrieved on May 23, 2001] 1996, WBX041.

Microsoft, 7,340,506 Inter Partes Re-examination Exhibit 2, File History, Dec. 2008, (Two parts) WBX042.

"CyberCash ICVerify for Windows" Version 2.5 Upgrade, http:// www.cybercash.com/icverify/upgrade.html pp. 1-2 [retrieved on May 23, 2001] 1996 , WBX043.

Cybercash, "ICVerify—Features" Web Page [online] [retrieved on May 23, 2001] Retrieved from the Internet: <URL:http://www.cybercash.com/icverify/features.html, 1996, pp. 1-3, WBX044.

Cybercash, "Payment Software for Brick and Mortar Merchants" http://www.cybercash.com/pcauthorize 1996-2001, WBX046.

Delaware WebXchange Claim Construction Introductory Brief, Mar. 26, 2009, WBX047.

Cybercash, "Products" Web Page[online]. CyberCash, 1996. [retrieved on May 23, 2001]. Retrieved from the Internet:<URL:http://www.CyberCash.com/products/, 1996, pp. 1-2, WBX048.

Microsoft, 7,340,506 Inter Partes Re-examination Request, Dec. 2008, WBX049.

Cybercash, "WebAuthorize—Enterprise and Hosting Payment Processing". Web Page [online].[retrieved on May 23, 2001] Retrieved from the Internet:<URL:http://www.cybercash.com/webauthorize/, 1996, pp. 1-2, WBX050.

Davis et al., "A Protocol and Server for a Distributed Digital Technical Report Library", Apr. 25, 1994, WBX051.

Davison, A. , "Coding with HTML forms HTML goes interactive", (hypertext markup language)(Tutorial), Dr. Dobb's Journal, Jun. 6, 1995, vol. 20, No. 6, 19 pages, WBX052a.

Davison, A. , "Coding with HTML forms: HTML goes interactive", Dr. Dobb's Journal, Jun. 6, 1995, vol. 20, No. 6, pp. 70-79, WBX052b.

"Distributed Object Technology in the Financial Services Industry: Trading and Risk Management", A White Paper, Sun Microsystems, 1995, WBX053.

Deng, R.H. et al. , "Integrating Security in CORBA-based Architectures", IEEE, Jun. 1995, pp. 50-61, WBX054.

Detlefs, D. et al. , Debugging Storage Management Problems in Garbage Collected Environments, Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX055.

Dietinger, T. , Object-Oriented Implementation of a Multiprotocol Hyper-G client for MS-Windows, Diplomarbeit inTelematik, TU Graz, Jul. 1, 1995, WBX056.

Dr. Gui on Components, COM and ATL, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn_drguion020298.htm, Feb. 2, 1998, pp. 1-61 [retrieved on May 22, 2001], WBX057.

Edwards, N. , Object Wrapping (for WWW)—The Key to Integrated Services, ANSA Phase III, Apr. 25, 1995, WBX058.

Ehikioya, S.A. , "An Agent-Based System for Distributed Transactions: a Model for Internet-Based transactions", Electrical and Computer Engineering, 1999 IEEE Canadian Conference on, vol. 1, May 9, 1999, pp. 289-294, WBX059.

Microsoft DJ Order, C-08-05149 WHA "Order Granting Defendant's Motion to Dismiss", Federal Court of Northern California, Feb. 17, 2009, WBX060.

"Portal Solutions, an Open Market eBusiness Solution Brief". White Paper. Open Market, Forrester Research TechRankings, Feb. 2001, WBX061.

"Wireless Solutions, An Open Market eBusiness Solution Brief", WhitePaper. Open Market, Forrester Research TechRankings, Feb. 2001, WBX062.

Fraga, J. et al. , "A Programming Model for Real-Time Applications in Open Distributed Systems", IEEE, 1995, pp. 104-111, WBX063.

Dell, Fedex, Allstate, Delaware Claim Construction Introductory Brief_Defendants_Opening Brief in Support of Their Proposed Claim Constructions Mar. 23, 2009, Mar. 27, 2009, WBX064.

Glossbrenner, A. , "MasterGuide to Compuserve", "Chapter 15: Travel Services: Join CompuServe and See the World", Prentice Hall, 1987, WBX065.

Gross, C. , "Taking the Splash Diving into ISAPI Programming", ISAPI Programming, Microsoft Interactive Developer, <URL:http://www.Microsoft.com/mind/0197/ISAPI.htm, Jan. 1, 197, pp. 1-10 [retrieved on May 22, 2001], WBX066.

"Open Market Inc, Managing in a Turbulent Environment", Harvard Business School, 9-196-097, Aug. 29, 1996, WBX067.

Hickey, M., "Shopping at Home: One Modem Line, No Waiting", Home PC, Dec. 1, 1994, p. 307, Dialog, File 647, Acc# 01038162, WBX068A.

Lang, "Cashing in: The Rush is on to Buy and Sell on the Internet But on Sidelines for Now", Advertising Age, Dec. 19, 1994, p. 11, Dialog, File 16, Acc# 05419137, WBX068B.

Lichty, T. , "America Online Tour Guide", MacIntosh Edition, Version 2, Chapter 1, 3, 8,10, 1992, WBX068C.

Tymnet, Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/tymnet, Retrieved on May 1, 2007, WBX068D.

Cox, B. et al. , "NetBill Security and Transaction Protocol", Carnegie Millon University, Pittsburgh, PA 15212-3890, undated, WBX068E.

Lamond, K. et al. , "Credit Card Transactions Real World and OnLine", http://www.virtualschool.edu/mon/ElectronProperty/klamond/credit_card.htm, 1996, pp. 1-16, WBX068F.

"Open Market Catalog Centre", Page [online. Open Market, Inc.—Enterprise Content Managnement & Delivery. Retrieved on the Internet:<URL:http://www.openmarket.com/cgi-bin/gx.cgi/ApLogic-+FT- ContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=Arti_ZZZ, WBX069.

Business Wire, High Beam Wire, "Open Market releases first complete software solution" Oct. 16, 1995, WBX070.

McCloghrie, K. et al. , RFC 1156, "Management Information Base for Network Management of TCP/IP-based internets", May 1, 1990, WBX071.

Case, J. et al. , RFC 1157 May 1, 1990, WBX072.

Rose, M. , RFC 1283:"SNMP over OSI", Dec. 1, 1991, WBX073.

Rose, M. et al. , RFC 1155: "Structure and Identification of Management Information for TCP/IP-based internets", May 1, 1990, WBX074.

Case, J. et al. , RFC 1442: "Structure of Management Information for version 2 of the Simple Network Management Protocol (SNMPv2)", AllState 00011394 Apr. 1, 1993, WBX075.

"ORBIX Programmer's Guide", IONA Technologies, Oct. 1, 1997, WBX076.

"ORBIX Programmer's Guide", Release 1.3.1, IONA Technologies, Feb. 1, 1995, WBX077.

Ito, J. et al., "Using meta-objects to support optimization in the Apertos Operating System", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX078.

Jordan, M. et al. , "Software Configuration Management in an Object-Oriented Database", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX079.

Kane, P. , "Prodigy Made Easy", "Chapter 6, Shopping Made Easy", 2nd ed., 1993, WBX080.

Lagoze, C. et al. , "Dienst: Implementation Reference Manual", May 5, 1995, WBX081.

Open Market Commerce Products, Web Page[online]. Open Market Inc.—Enterprise Content Management Delivery. Retrieved on the Internet:<URL:http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FT:Cont-     entServer?pagename=FutureTense/Apps/Xcelerate/Render&c=A_ZZZ, WBX082.

Lange, D.B. et al., "Program Explorer: A Program Visualizer for C++", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX083.

Laufer. K. , "A Framework for Higher Order Functions in C++", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX084.

Li, G. and Bacon, J., "Supporting Distributed Real-Time Objects", IEEE Jul. 1994, pp. 138-143, WBX085.

Limprecht, R. , "Microsoft Transaction Server", IEEE, Compcon '97 Proceedings, 1997, pp. 14-18, WBX086.

Maffeis, S. , "Adding Group Communication and Fault-Tolerance to CORBA", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey,CA, Jun. 1995 , WBX087.

Mahindra, A. et al. , "Dynamic Insertion of Object Services", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey,CA, Jun. 1995, WBX088.

McCloghrie, K. et al. , RFC 1213, "Management Information Base for Network Management of TCP/IP-based internets: MIB-II", SNMP Working Group, Mar. 1, 1991, WBX089.

McCloghrie, K. et al, RFC 1447, "Party MIB for version 2 of the SIMPLE Network Management Protocol", SNMP Security Working Group, Apr. 1, 1993, WBX090.

McKie, S., "ERP Meets Web E-Commerce", DBMS, Jul. 1, 1998, WBX091.

McMaster D. et al., RFC 1516: "802.3 Repeater devices—Definition of Managed Objects", Feb. 9, 1992, WBX092.

"Allstate Connects with Countrywide Producer Network in Seven Months Using Microsoft Visual Studio .NET and the NET Framework", Microsoft .NET Customer Solution, Jan. 2003, WBX093.

O'Brien Jones , U.S. Appl. No. 90/010,346 Application which is the 5,778,178 Re-exam doc, Exhibits Part 1-WBX101, Exhibits Part 2-WBX102, Nov. 21, 2008 Third Party Requests, WBX094.

"Microsoft Component Services, Server Operating System, A Technology Overview", http://www.microsoft.com/ntserver/appservice/compsvcs.asp, Aug. 15, 1998, [retrieved on May 22, 2001], WBX095.

*Microsoft* vs *WebXchange* Complaint CV 085149, Nov. 12, 2008, WBX096.

*Microsoft* vs *WebXchange* First Amended Complaint CV 085149, Mar. 3, 2009, WBX097.

Allstate Uses Web Services to Quickly Create Insurance Policy Management Solution, Microsoft .NET Customer Solution Case Study, Jan. 2005, WBX098.

Mitchell et al., "An Overview of the Spring System", Sun Microsystems, WBX099.

Muckelbauer, P. and Russo, V., "Lingua Franca: An IDL for Structured Subtyping Distributed Object Systems" Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA., WBX100.

O'Brien Jones , 5,778,178 Request for Ex Parte Re-exam with Exhibits Part 1, Nov. 21, 2008, WBX101.

Reynolds, J. Posting to comp.doc USENET group, http://nyurl.com/53a95p, RFC 1212, 1213- Google groups on concise definitions MIB and MIBII, Exhibit G, Mar. 27, 1991, WBX045.

Relihan, L. et al., "Untangling the World-Wide Web." Proceedings of the 12th Annual International Conference on Systems Documentation, Oct. 1, 1994, pp. 17-24, published by the Association of Computing Machinery, WBX102A.

O'Brien Jones , 5,778,178 Request for Ex Parte Re-exam with Exhibits Part 2, Nov. 21, 2008 , WBX102B.

Rose, M. T., "The Simple Book: An Introduction to Internet Management", 1994, pp. 14-15, 379-387 (2nd ed.) Exhibit F, WBX102C.

"Open Market Enterprise Content Management and Delivery: Content Server", <URL:http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=Artic.., retrieved on May 15, 2001, pp. 1-4, WBX103.

"Open Market Enterprise Content Management and Delivery: Content Center", <URL:http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=Artic., retrieved on May 15, 2001, WBX104.

"Open Market Enterprise Content Management and Delivery: Content-Driven eBusiness Solutions", Web site [retrieved on May 15, 2001]  <URL:http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=Artic..re, WBX105.

"Open Market ShopSite 5.0", Web Page[online]. [retrieved on May 15, 2001]. Retrieved on the Internet:<URL:http://www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FTContentServer?pagename=FutureTense/Apps/, retrieved on May 15, 2001, WBX112.

Orfali, R. et al., "Essential Client/Server Survival Guide"-John Wiley and Sons—Set 1, 1994, WBX114.

Orfali, R. et al., "Essential Client/Server Survival Guide"-John Wiley and Sons—Set 2, 1994, WBX115.

WBX116 Orfali, R.; Harkey, D.; Edwards, J., "Essential Client/Server Survival Guide" John Wiley and Sons, Sets 1-4, Jun. 16, 2005, WBX116.

Orfali, R. et al., "Essential Client/Server Survival Guide"-John Wiley and Sons—Set 4, 1994, WBX117.

Pavlou, G. et al. , "A Generic Management Information Base Browser", WBX119.

Peterson, L. et al. , "Computer Networks, A Systems Approach", Morgan Kaufmann Publishers, Inc., 1996, pp. 472-507, WBX120.

Pitkow, J. et al. , "Using the Web as a Survey Tool: Results from the Second WWW User Survey", conducted on Oct. 15 and Nov. 1994, presented at the Third International World-Wide-Web Conference in Darmstadt, Germany, Apr. 10-14, 1995 , WBX121.

Netscape Unveils New Versions of Commercial Applications for Enhanced Integration with Corporate Databases, NetScape Press Release, May 13, 1996, WBX122.

Raatikainen, K. , "Database Access in Intelligent Networks", Proceedings of IFIP TC6 Workshop on Intelligent Networks, pp. 163-183, WBX123.

Radia, S. R. et al. , "The Spring Object Model", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX124.

Rosenberry, et al. , "OSF Distributed Computing Environment—Understanding DCE"—O'Reilly & Associates, Jun. 1993, WBX126.

Rubin, C. "Wired: In the Bag", Jun. 1997, WBX127.

Schepp et al. , "The Complete Guide to CompuServe: Chapter 12: Travel Services: See the World Today the Compuserve Way", 1990, pp. 409-437, McGraw Hill, WBX128.

Schmidt, D. et al. , "Object-Oriented Components for High-Speed Network Programming", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX129.

Siegel, J., "Common Object Services Specification vol. 1, Rev 1, First Edition", OMG Doc 94-1-1, Mar. 1, 1994, WBX130.

"Common Desktop Environment: Product Glossary", SunSoft, 1994-1995, WBX131.

"Common Desktop Environment: Applications Builder User's Guide", SunSoft, 1994-1995, WBX132.

"OpenStep Development Tools", SunSoft, 1996, WBX133.

Porting NextStep 3.2/3.3 Applications to OpenStep on Solaris, Sunsoft, 1996, WBX134.

"Solstice X.500 Programming Reference", SunSoft, 1996 , WBX135.

Tatters, W. , "Navigating the Internet with Compuserve: Chapter 17: Business on the Net", 1995, pp. 352-374, Sams Publishing, WBX136.

Technical Staff , "The Conductor Financial Services Framework": Distributed Objects on the Internet, A Block Financial Corporation White Paper, BFC Technology Center, Oct. 17, 1995, WBX137.

US Patent 5,778,178, Re-exam Order Granted, Jan. 23, 2009, WBX142.

US Patent 7,340,506, Re-exam Order Mar. 6, 2009, WBX143.

Vogler, H. et al.. , "The Transaction Internet Protocol in Practice: Reliability for WWW Applications", IEEE 1999 Internet Workshop IWS99, (ISSN-0-7803-5925-9), Feb. 18, 1999, WBX146.

7,340,506 Inter Partes Re-examination Exhibit 3-WebXchange Claim Construction Introductory Brief, In the US District Court for the District of Delaware, C.A. No. 08-131 (JJF), C. A. 08-132 (JJF), No. 08-133 (JJF), Microsoft, Oct. 29, 2008, WBX148.

Microsoft , 7,340,506 Inter Partes Re-examination Exhibit 5-08-168,519 FH—'519 Application Final, WBX149.

Weich, C. , "Generic Containers for a Distributed Object Store", Proceedings of the USENIX Conference (Jun. 1995) on Object-Oriented Technologies, Monterey, CA, May 18, 1995 , WBX150.

WBX151, "SmallTalk" Wikipedia SmallTalk http://www.objs.com/x3h7/smalltalk.htm and http://en.wikipedia.org/wiki/Smalltalk WBX151.

Wollrath, A. et al. , "Simple Activation for Distributed Objects", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX152.

USENIX , "Agenda of Proceedings of the USENIX Conference on Object-Oriented Technologies", Monterey, CA, Jun. 1995, WBX153.

"Common Desktop Environment: Desktop Kornshell User's Guide", Sun Microsystems, 1994-1995 , WBX154.

"Common Desktop Environment: Help System Author's and Programmer's Guide", Sun Microsystems, 1994-1995, (Three parts) WBX155.

"Common Desktop Environment: Internationalization Programmer's Guide", Sun Microsystems, 1994-1995, WBX156.

"Common Desktop Environment: Tooltalk Messaging Overview", Sun Microsystems, 1994-1995 , WBX157.

"Common Desktop Environment: Common StyleGuide and Certification CheckList", SunSoft, 1994-1995 , WBX158.

"Common Desktop Environment: Programmer's Overview", SunSoft, 1994-1995 , WBX159.

Developer's Guide to Internationalization, Sun Microsystems, 1994, WBX160.

"Dr. Gui's Gentle Guide to COM", http://www.microsoft.com/Com/news/drgui.asp [retrieved on May 22, 2001], Nov. 1, 1999, WBX161.

"iPIN Company Info", http://www.ipin.com/01comp.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX162.

"iPIN Home", http://www.ipin.com [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX163.

"iPIN Service Options", http://www.ipin.com/02prod_service.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX164.

"iPIN Solutions", http://www.ipin.com/02prod_solution.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX165.

"iPIN Partners", http://www.ipin.com/03part.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX166.

"iPIN Technology", http://www.ipin.com/02prod_tech.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX167.

NetScape Products: Open and Secure Internet Software, 1995, WBX168A.

NetScape Merchant System, Data Sheet 1995, WBX168B.

NetScape Internet Applications, Customer Showcase 1995, WBX168C.

NetScape Server API, 1995, WBX 168D.

NetScape Object-Oriented Pradigm of Server Configuration, 1995, WBX168E.

RSA: Verisign Redirection Information, Important Announcement 1995, WBX168F.

RSA: Verisign to Provide Digital IDs for Open Market's Secure WebServer, 1995, WBX168G.

Verisign Adds the Missing Component to Online Security Solutions 1995, WBX168H.

Hickman, K.E.B.; Netscape, "The SSL Protocol", 1995, WBX168I. NetScape iStore DataSheet, 1995, WBX168J.

Choudhury, A.K. et al. , "Copyright Protection for Electronic Publishing over Computer Networks", 1995 IEEE Network, 9, May/June, vol. 3 pp. 12-20 (1995) WBX168L.

NSAPI Basics, (Chapter 1) http://developer.netscape.com/docs/manuals/enterprise/nsapi/svrop.htm [retrieved on May 22, 2001], 1997, WBX174.

"OpenStep User Interface Guidelines", SunSoft, 1996, WBX175.

"OpenStep Programming Reference", SunSoft, 1996 , (12 parts) WBX176.

"QuickStart to Using the Open Step Desktop", SunSoft, 1996, WBX177.

Rose, M. et al. , "RFC 1065:Structure and Identification of Management Informationfor TCP/IP-based internets",Aug. 1, 1988, WBX178.

Stewart, B. , RFC 1318: "Definition of Managed Objects for Parallel-printer-like Hardware Devices", Apr. 1, 1992 , WBX179.

Kane, P. , "Prodigy Made Easy", "Chapter 6, Shopping Made Easy", 2nd ed., 1993, WBX080.

Lagoze, C. et al. , "Dienst: Implementation Reference Manual", May 5, 1995, WBX081.

Rivest, R., "RFC 1321: The MD5 Message-Digest Algorithm", 1997, WBX180.

Solaris Common Desktop Environment: MOTIF Transition Guide, Sun Microsystems, 1997, WBX181.

"Solaris Common Desktop Environment: Programmer's Guide", Sun Microsystems, 1994-1995, WBX182.

"The iPin Approach", http://www.ipin.com/02prod.html, 2000, [retrieved on May 23, 2001], Interactive Transaction Services, Inc., WBX183.

USPTO , 7,340,506—Notice of assignment of inter partes reexamination request, Jan. 1, 2009, WBX200.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part1-1, John Wiley and Sons, 1996, WBX201.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part1-2, John Wiley and Sons, 1996 , WBX202.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part1-3, John Wiley and Sons, 1996, WBX203.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part2-1, John Wiley and Sons, 1996, WBX204.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part2-2, John Wiley and Sons, 1996 , WBX205.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part2-3, John Wiley and Sons, 1996, WBX206.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part3-1, John Wiley and Sons, 1996 , WBX207.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part3-2, John Wiley and Sons, 1996 , WBX208.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part3-3, John Wiley and Sons, 1996, WBX209.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part4-1, John Wiley and Sons, 1996, WBX210.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part4-2, John Wiley and Sons, 1996, WBX211.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part4-3, John Wiley and Sons, 1996, WBX212.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"—Part4-4, John Wiley and Sons, 1996 , WBX213.

Broadvision , "Broadvision One-to-One: Programmer's Reference, Part 1" 1995 , WBX214.

Broadvision , "Broadvision One-to-One: Programmer's Reference, Part 2" 1995 , WBX215.

OMG , "The Common Object Request Broker: Architecture and Specification", CORBA v2.0_(NYC-#1655390-v1), Jul. 1995-1996, WBX216.

NYC-#1579692-v1-WebXchange_—_March_3_DELL_Complaint.Doc, Mar. 3, 2008, WBX217.

NYC-#1579751-v1-WebXchange_—_March_3_Allstate_Complaint.Doc, Mar. 3, 2008, WBX218.

NYC-#1579947-v1-WebXchange_—_March_3_FedEx_Complaint.Doc, Mar. 3, 2008, WBX219.

The Open Group , "Inter-domain Management: Specification Translation", 1997, WBX222.

The Open Group , "Inter-domain Management_Summary of Similarities and Differences", 1997, WBX223.

The Open Group , "Inter-domain Management_object models comparison", 1997, WBX224.

Miller, M. , "Managing Internetworks with SNMP", 1993, pp. 138-139, M&T Books., '506 Inter Partes Re-examination Exhibit 12, Dec. 2008, WBX225.

Umar, A. , "Distributed Computing: A Practical Synthesis", "Appendix B: Tutorial on TCP/IP Protocol Suite", (BellCore), 1993, WBX226.

Umar, A. , "Distributed Computing: A Practical Synthesis", "Chapter 5: Client-Server Systems and Application—Interconnectivity", (BellCore), 1993, WBX227.

Spero , "Binary Gateway Interface—An API for Dynamically Extensible http Servers", Jul. 1, 1994, Retrieved on Apr. 5, 2009 from http://www.ibiblio.org/mdma-release/BGI-spec.txt , WBX228.

"Point, Click and Shop' Never So Easy;The CheckFree Wallet(TM) Allows Consumers and Merchants to Conduct Simple, Safe Internet Transactions" NewsHound, San Jose Mercury News, PRNewswire, Apr. 10, 1995, Retrieved on Apr. 5, 2009 from http://besser.tsoa.nyu.ed_ZZZ, WBX229.

"DEC ObjectBroker Service", Comp.Object FAQ Version 1.0.9 (Apr. 2002) Part 3/13, Apr. 3, 1996, Retrieved on Apr. 5, 2009 from http://209.85.173.132/search?q=cache:c3iJxZca3aUJ:www.faqs.org/faqs/object-faq/part3/+DEC%27s   +ObjectBroker+Service&cd=9&hl=en& ct=clnk&g_ZZZ, WBX230.

"Easel Corporation Introduces Comprehensive Program for Expanding Object Technology Expertise", Mar. 13, 1995, Business Wire, Retrieved on Apr. 5, 2009 from http://209.85.173.132/search?q=cache:McscjZC2srEJ:findarticles.com/p/articles/mi_m0EIN/ is_1995_Marc_ZZZ, WBX231.

"Internet Information Commerce: The First Virtual (TM) Approach", Jul. 1995, Proceedings of the First USENIX Workshop on Electronic Commerce, New York, New York, Retrieved on Apr. 5, 2009 from http://www.usenix.org/publications/library/proceedings/ec95/f_ZZZ, WBX232.

"O'Reilly Releases Website (TM) Web Server for Windows NT", WebView, EIT (Enterprise Integration Technologies), May 12, 1995, vol. 7 : Issue 41, ISSN 1004-042X, Computer underground Digest, Retrieved on Apr. 5, 2009 from http://cu-digest.org/CUDS7/cud74_ZZZ, WBX233.

"RSA and EIT Joint Venture Will Make Internet Transactions Secure", Terisa Systems, EIT and RSA: Secure HTTP, Jun. 4, 1994, Retrieved on Apr. 5, 2009 from http://1997.webhistory.org/www.lists/www-talk.1994q2/0980.html, WBX234.

"CommerceNet The First Large-Scale Market Trial of Electronic Commerce on the Internet" EIT: CommerceNet, Aug. 3, 1994, Proceedings of the May 1994, Ties That Bind: Building Community Networks conference, Retrieved on Apr. 5, 2009 from http://internet.eser_ZZZ, WBX235.

Rubin, A., "IETF—Stockholm meeting" NetCheck: E-signatures, Aug. 5, 1995, pp. 1-2, CIPHER, Newsletter of the IEEE Computer Society's TC on Security and PrivacyElectronic, Issue 8, Retrieved on Apr. 5, 2009 from http://www.ieee-security.org/Cipher/PastIssu_ZZZ, WBX236.

Open Market, "FastCGI:A High-Performance Web Server Interface", Apr. 1996, Retrieved on Apr. 5, 2009 from http://www.fastcgi.com/devkit/doc/fastcgi-whitepaper/fastcgi.htm, WBX237.

Sun Microsystems, "HotJava", Wikipedia, the free encyclopedia, Jun. 1995, Retrieved on Apr. 5, 2009 from http://en.wikipedia.org/wiki/HotJave, WBX238.

W3C Status Codes, HTRESP_html_w3_org, 1992 WBX239.

Hewlett Packard, "HP Odapter/OpenODB", Jul. 1994, Retrieved on Apr. 5, 2009 from http://web.bilkent.edu.tr/Online/oofaq/oo-faq-S-8.13.0.5.html, WBX240.

Internet Shopping Network_ISN Business Newswire (1995) WBX241.

NCR Co-operative Frameworks 3, (1993) WBX242.

Distributed Objects Everywhere, NEO, Wikipedia (1996) WBX243.

NetMarket (1996) WBX244.

Enterprise Object Netorks, Wikipedia (1996) WBX245.

OMG Document No. 91_12_1 Revision 1_1 (1997) WBX246.

DigiCash Smartcards (1997) WBX247.

IBM System Object Model_SOM (1998) WBX248.

IBM System Object Model_SOM,DSOM (1998) WBX249.

Open Market StoreBuilder (1995) WBX250.

WebXpress Web StoreFront (1996) WBX251.

PNC, Industry.Net do eCommerce (1996) WBX252.

10KPowerShip,PowerPartner (1996) WBX253.

T. Berners Lee Hypertext Mark up Language RFC1866(1995) WBX254.

E. Nebel RFC1867 (1995) WEBX255.

RFC1942 (1996) WEBX256.

J. Seidman RFC1980 (1996) WBX257.

HTML—Wikipedia, the free encyclopedia—Notepad (1998) WBX258.

Berners-Lee, T., RFC 1630, "Universal Resource Identifiers in WWW", Network Working Group, CERN, Jun. 1994 WBX259.

Object Broker Service Middleware Sourcebook (1995) WBX260.

Inter Parte Re-Examination U.S. Appl. No. 95/001,129 (2008) WBX261.

6,212,556 Re-exam file history U.S. Appl. No. 90/010,417 filed (2009) WBX262.

U.S. Appl. No. 11/980,185 prosecution history filed 2008, prosecution history as of Mar. 12, 2009 WBX263.

WebX Opening Brief District of Delaware Mar. 23, 2009 WBX264.

U.S. Patent 5,778,178 Re_Examination of 90010346_178 prosecution history through Aug. 20, 2009 WBX267.

WBXexecsummary4809new2bizplan[1] (2009) WBX268.

Kramer, Douglas Java Whitepaper May 1996, WBX500.

09863704 Response to Non-Final Office Action Jun. 6, 2006, WBX501.

09863704 Response to Non-Final Office Action Jul. 23, 2008 and Examiner Interview Summaries dated Jul. 2, 2008 and Jul. 16, 2008, WBX502.

09863704 Response to Non-Final Office Action Aug. 21, 2007, WBX503.

09863704 Response to Non-Final Office Action Nov. 28, 2008, WBX504.

09863704 Final Office Action Apr. 20, 2005, WBX505.

09863704 Final Office Action Sep. 8, 2006, WBX506.

09863704 Final Office Action Oct. 31, 2007, WBX507.

09863704 Non-Final Office Action Feb. 14, 2004, WBX508.

09863704 Non-Final Office Action Feb. 23, 2007, WBX509.

09863704 Non-Final Office Action Apr. 14, 2008, WBX510.

09863704 Non-Final Office Action Sep. 18, 2009, WBX511.

09863704 Non-Final Office Action Dec. 6, 2005, WBX512.

09863704 RCE Feb. 1, 2008, WBX513.

09863704 RCE Jun. 30, 2009, WBX514.

09863704 RCE Sep. 22, 2005, WBX515.

09863704 RCE Dec. 8, 2006, WBX516.

11980185 Restriction Requirement Oct. 19, 2009, WBX517.

90010417 Determination Re-exam Ordered May 20, 2009, WBX518.

File History of U.S. Patent 5,778,178, WBX519.

File History of U.S. Patent 5,987,500, WBX520.

File History of U.S. Patent 6,212,556, WBX521.

File History of U.S. Patent 7,340,506, WBX522.

Settlement with Allstateby WebXchange (2009), WBX523.

Arunachalam, U.S. Appl. No. 09/863,704_2nd_rule56_disclosure.pdf, Mar. 4, 2009 , WBX006.

Arunachalam , U.S. Appl. No. 11/980,185_Duty of Candor Rule 56 Disclosure, Feb. 11, 2009, WBX220.

Arunachalam , U.S. Appl. No. 11/980,185_Duty of Candor Rule 56 Disclosure, Mar. 4, 2009, WBX221.

U.S. Appl. No. 12/628,060, filed Nov. 30, 2009, Arunachalam.

U.S. Appl. No. 12/628,066, filed Nov. 30, 2009, Arunachalam.

U.S. Appl. No. 12/628,056, filed Nov. 30, 2009, Arunachalam.

U.S. Appl. No. 12/628,069, filed Nov. 30, 2009, Arunachalam.

Order, Motion to Bifurcate and for early trial on the Issue of Inequitable Conduct, on Mar. 19, 2009, Dismissal with Prejudice, order dated Dec. 30, 2009, Denied as Moot, Order Granted, signed by JJF, C.A. No. 08-131 (JJF).

Order, Motion to Bifurcate and for early trial on the Issue of Inequitable Conduct, on Mar. 19, 2009, Dismissal with Prejudice, order dated Dec. 30, 2009, Denied as Moot, C.A. No. 08-132 (JJF) and C.A. No. 08-133 (JJF) , signed by JJF, Order, Motion to Bifurcate and for early trial on the Issue of Inequitable Conduct, on Mar. 19, 2009, Dismissal with Prejudice, order dated Dec. 30, 2009, Denied as Moot, C.A. No. 08-132 (JJF) and C.A. No. 08-133 (JJF).

Plaintiff WebXChange Inc.'s Surreply in Opposition to Defendants' Motion to Bifurcate, and for Early Trial on, the Issue of Inequitable Conduct (C.A. No. 08-132 (JJF) and C.A. No. 08-133 (JJF) , is Granted Plaintiff's Surreply in Opposition to Defendant's Motion to Bifurcate and for Early Trail on, The Issue on Inequitable Conduct is deemed filed (Entered Dec. 30, 2009).

Dell Inc.'s Second Amended Answer and Counterclaims to WebxChange Inc.'s Original Complaint for Patent Infringement (Entered: Jan. 20, 2010).

Plaintiff WebxChange Inc.'s Surreply in Opposition to Defendants' Motion to Bifurcate, and for Early Trial on, The Issue of Inequitable Conduct (Entered Dec. 30, 2009).

Memorandum Opinion C.A. 08-133-JJF, and C.A. 08-132-JJF (Entered Dec. 30, 2009).

Defendant's Fedex Corporation, Fedex Kinko's Office & Print Services, Inc., and Fedex Corporate Services, Inc.'s Second Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff WebXchange, Inc.'s Complaint (Entered Jan. 20, 2010).

International Search Report, PCT/US9618165, Feb. 14, 1997.

Ramanathan, S. et al. , 'Architectures for Personalized Multi-Media', 1994 IEEE MultiMedia, Spring #1, Los Alamitos, CA, 1994, pp. 37-46, RexdFax Selected Papers, WBX168.

'Solaris Common Desktop Envinment: Programmer's Guide', Sun Microsystems, 1994-1995 , WBX182.

Business Wire 'Internet Shopping Network (ISN)', Apr. 11, 1995, NewsHound, San Jose Mercury News, Retrieved on Apr. 5, 2009 from http://bessertsoa.nyu.edu/impact/w95/RN/apr14news/Mercnews-isn.html, WBX241.

NEO, Sun Microsystems, 1995, VVikipedia, Retrieved on Apr. 5, 2009 from http://en.wikipedia.org/wiki/ Distributed_Objects_Everywhere WBX243.

Belisle, D., IBM System Object Model, SOM technologies developed by IBM, 1992, National Committee for Information Technology Standards, Technical Committee H7 Object Model Features Matrix Doc. No. X3H7-93-007v12b, [Retrieved on Apr. 5, 2009 from http://www.omg.org/docs/1991/91-12-01.pdf]WBX248.

CNET Staff Writer, "PNC, Industry.Net do e-commerce", Sep. 25, 1996, CNET News Retrieved on Apr. 5, 2009.

1996 Fedex 10K Report, PowerShip, PowerPartner, FedEx, Aug. 9, 1996, BuckMaster, Retrieved on Apr. 5, 2009 from http://buck.com/10k?tenkyear=968jcbc=F&co=FDX&nam=DEMO&pw=DEMOWBX253.

Digial Press, 'The Middleware Souce Book', Colonna, Romano and Sprite, Boston 1995 pp. 454-537. WBX254.

Request for Ex Parte Re-examination of U.S. Patent No. 7,340,506 filed Dec. 19, 2008. Now control U.S. Appl. No. 95/001,129.

Request for Ex Parte Re-examination of U.S. Patent No. 6,212,556 filed Feb. 23, Now control U.S. Appl. No. 90/010,417.

Digital E-Meter Project—Sources #1 DE-1.

WWWX03 Network Working Group RFC 1122, R. Brandon, "Requirements for Internet Hosts—Communications Layers", 1989.

WWWX06 DEC Systems Research Center Report #115, Andrew Birrell et al., "Network Objects".

WWWX07 PCT Application, Lakshmi Arunachalam, PCT/US96/18165.

Annachalam , 60-006634 60-006634 Provisional Patent__506 Inter Panes Re-examination Exhibit 13, Nov. 13, 1995 , WBX005.

'CyberCash-Why Choose CashRegister?' Web Page[online]. [retrieved on May 23, 2001] Retrieved from the Internet: <URL:http://www.cybercash.com/cashregister/why.html 1996 , WBX037.

'Open Market Commerce Products', Web Page[online]. Open Market Inc.Enterprise Content Management Delivery. Retrieved on the Internet<URL:http://www.openmarket.com/cgi-bin/gx.cgi/
AppLogic+FTCont-          entServer?pagename=FutureTense/Apps/
Xcelerate/Render&c=Artic ...retrieved on May 15, 2001, pp. 1-2, WBX082.

'Open Market Enterprise Content Management and Delivery: Personalization Center', <URL:http://www.openmarket. com/cgi-bin/gx.cgi/AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render&c=Artic., retrieved on May 15, 2001, WBX108.

"Open Market Enterprise Content Management and Delivery: Satellite Server", <URL:http://www.openmarket.com/cgi-bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render&c=Artic.., retrieved on May 15, 2001, pp. 1-4, WBX109.

Reynolds, J.Posting to comp doc USENET group, http://nyurl.conV53a95p, RFC 1212, 1213- Google groups on concise definitions MIB and MIBII, Exhibit G, Mar. 27, 1991 WBX102.

K. McCoughrie and J. Galvin. Request. For Comments 1447, Party MIB. for version 2 of the Simple Network Management Protocol, published by the SNMP Security Working Group (Apr. 1993).

Computer Dictionary "The Comprehensive Standard for Business, School, Library, and Home" 1993, Microsoft Press, Second Edition, p. 344.

iPIN Partners Web Page[online]. iPIN Interactive Transaction Services, Inc. 2000. [retrieved on May 23, 2001] Retrieved from the Internet<URL:http://www.ipin.com/03part.html pp.

Server Operating System a Technology Overview, Microsoft Component Services. White Paper [online] MicrosoftCOM. [retrieved on May 22, 2001]. Retrieved form the Intemet<URL:http://www.microsoft.com/com/wpaper/compsyscs.asp pp. 1-8.

Christian Gross. Taking the Splash Diving into ISAPI Programming. White Paper [online].ISAPI Programming, Microsoft InteractiveDeveloper, Jan. 1997.[retrieved on May 22, 2001]. Retrieved from the Internet :<URL:http://www.Microsoft.com/mind/0197/isapi.htm pp. 1-10.

The Common Gateway Interface.Web Page [online]. [retrieved on May 22, 2001]. Retrieved from the Internet:<URL:http://hoohoo.ncsa.uiuc.edu/cgi/primer.htmlpp. 1-4.

Open Market Content-Driven eBusiness Solutions.Web Page[online]. Open Market [retrieved on May 15, 2001] Retrieved on the Internet<URL:http://www.openmarket.com/cgi-bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render& c=Articpp.1-3.

Open Market Content Server. Web Page[online]. Open Market. [retrieved on May 15, 2001] Retrieved on the Internet:<URL:http://www.openmarket.com/cgi-bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render& c=Artic....pp. 1-4.

Open Market Integration Centre. Web Page[online]. Open Market, Inc.—Enterprise Content Management & Delivery. [retrieved on May 15, 2001]. Retrieved on the Internet<URL:http://www.openmarket.com/cgi                    bin:http://www.
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render& c=Artic.

Open Market Marketing Studio. Web Page [online]. Open Market Inc.—Enterprise Content Management Delivery. [retrieved on May 15, 2001]. Retrieved on the Internet<URL:http://www.openmarkelcom/cgi                    bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render& c=Articpp. 1-4.

Open Market ShopSite 5.0. Web Page [online]. [retrieved on May 15, 2001]. Retrieved on the Internet:<URL:http://www.openmarket.com/cgi-bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/.

B2B Payment Services. Web Page[online]. CyberCash, 1996. [retrieved on May 23, 2001]. Retrieved from the Internet:<URL:http://www.cybercash.com pp. 1-2.

CVERIFY for Windows.2.5 Upgrade. Web Page[online]. CyberCash ICVERIFY 2.5 Upgrade,1996. [retrieved on May 23, 2001] Retrieved from the Internet<URL:http://www.Cybercash.com/icverify/upgrade.html pp. 1-2.

CyberCash Corporate Information, CyberCash B2B Payment Services. Web Page [online].[retrieved on May 23, 2001] Retrieved from the Internet<URL:http://www.cybercash.com/b2b/ pp. 1-2.
RFC1630.

Orfali, R.; Harkey, D.; Edwards, J., 'Essencial Client/Server Survival Guide' John Wiley and Sons, Sets 1-4, Jun. 16, 2005 WBX114, WBX115, WBX116, WBX117.

Orfali, R.; Harkey, D.; Edwards, J., 'The Essential Distributed Objects', Parts 1-1, 1-2, 1-3, 2-1, 2-2, 2-3, 3-1, 3-2, 3-3, 4-1, 4-2, 4-3 & 4-4 WBX201, WBX202, WBX203, WBX204, WBX205, WBX206, WBX207, WBX208, WBX209, WBX210, WBX211, WBX212, WBX213.

Rosenberry, W. et al., "OSF Distributed Computing Environment—Understanding DCE", O'Reilly and Associates, Jun. 1993WBX238.
Common Desktop Environment: Help System Authors and Programmers Guide, Sun Microsystems WBX155.

Raggett, D., RFC 1942, "HTML Tables", May 1996, WBX 256.

CyberCash Payment Software for Brick and Mortal merchants, http://www.cybercash.com/pcauthorize, CyberCash, 1996-2001 WBX046.

The E-Commerce Leader in Payment Processing PC Authorize, http://www.cybercash.com/pcauthorize, CyberCash, 1996-2001VVBX047.

Dr. Gui's Gentle Guide to COM, Jun. 21, 1995, http://www.microsoft,com/Com/news/drgui.asp [retrieved on May 22, 2001],WBX161.

Open Market Enterprise Content Management and Delivery: Content Center.        ,URL:http://www.openmarket.com/cgi        bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerat/Render&c=Artic.. WBX104.

Open Market Enterprise Content Management and Delivery: Shopsite        <URL:http://www.openmarket.com/cgi-bin/gx.cgi/
AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render&c=Artic..pp. 1-2 VVBX110OpenMarket Enterprise Content Management and Delivery: Transact <URL:http://www.openmarket.com/cgi-bin/gx.                    cgi/

US 8,037,158 B2

Page 12

AppLogic+FTContentServer?pagename=FutureTense/Apps/
Xcelerate/Render&c=Artic..pp. 1-2 VVBX111Open Market.
Wikipedia, 'A Version History of the Standard: HTMS Version
Timeline', http://en.wikipedia.org/wiki/ HTML#Version__history__
of__the__standard, downloaded on Jun. 17, 2009 WBX258.
Weich, C., "Generic Containers for a Distributed Object Store",
Proceedings of the USENIX Conference on ObjectOriented Tech-
nologies, Monterey, CA, Jun. 1995WBX150.
Verisign Online Security Solutions, ReedFax Selected Papers, Jun.
22, 1995WBX168.
Verisign Redirection Information, ReedFax Selected Papers,
1995WBX168.
RFC 1065 1988 Network Working Group.
RFC 1318 1992 Network Working Group.
RFC 1516 1993 Network Working Group.
RFC 1155 May 1990 Network Working Group.
RFC 1157 May 1990 Network Working Group.
RFC 1213 Mar. 1991 Network Working Group.
RFC 1156 May 1990 Network Working Group.
Request for Reexamination for Patent 5,778,178.
Tymnet, Wikipedia, the free encyclopedia, http://en.wikipedia.org/
wiki/tymnet, Oct. 2006.
Cyberman Business Plan: Product Description and Technical
Approach, Aug. 26, 1995, Exhibit A.
Cyberman Business Plan: Product Description and Technical
Approach, Aug. 26, 1995, Exhibit B.
Cyberman Business Plan: Product Description and Technical
Approach, Sep. 1, 2995, Exhibit C.
Cyberman Business Plan: Product Description and Approach, Sep. 1,
1995, Exhibit D.
Cyberman Business Plan: Product Description and Approach, Sep. 1,
1995, Exhibit E.
Cyberman Business Plan: Product Description and Approach, Sep. 1,
1995, Exhibit F.

* cited by examiner



**FIG. 1A** (PRIOR ART)



FIG. 1B (PRIOR ART)



**FIG. 2**



OSI MODEL
**300**

| APPLICATION |
| --- |
| **307** |
| PRESENTATION |
| **306** |
| SESSION |
| **305** |
| TRANSPORT |
| **304** |
| NETWORK |
| **303** |
| DATA LINK |
| **302** |
| PHYSICAL |
| **301** |

# FIG. 3



FIG. 4A

FIG. 4B



# FIG. 5A



# FIG. 5B



POINT-OF-SERVICE APPLICATIONS

• BANK (1)
• CAR DEALER (2)
• PIZZERIA (3)

510

WEB PAGE 505

EXCHANGE 501

WEB SERVER 104

# FIG. 5C



FIG. 5D



# FIG. 5E



FIG. 6A



# FIG. 6B



FIG. 7



**FIG. 8**

US 8,037,158 B2

1

# MULTIMEDIA TRANSACTIONAL SERVICES

This application is a continuation-in-part of application Ser. No. 09/792,323, filed Feb. 23, 2001, now U.S. Pat. No. 7,340,506, which was a divisional of U.S. patent application Ser. No. 09/296,207 filed Apr. 21, 1999, now U.S. Pat. No. 6,212,556, which was a continuation-in-part of application Ser. No. 08/879,958 filed Jun. 20, 1997, now U.S. Pat. No. 5,987,500, which was a divisional of application Ser. No. 08/700,726 filed Aug. 5, 1996, now U.S. Pat. No. 5,778,178, which was related to and claimed priority from provisional application No. 60/006,634 filed Nov. 13, 1995. This application also claims benefit under 35 U.S.C. 119(e) to U.S. Provisional application Ser. No. 60/006,634 filed Nov. 13. 1995.

The following are related applications: application Ser. No. 09/863,704 filed May 23, 2001 and provisional application 60/206,422 filed May 23, 2000.

## BACKGROUND

### 1. Field of the Invention

The present invention relates to the area of Internet communications. Specifically, the present invention relates to a method and apparatus for configurable value-added network switching and object routing.

### 2. Background of the Invention

With the Internet and the World Wide Web ("the Web") evolving rapidly as a viable consumer medium for electronic commerce, new on-line services are emerging to fill the needs of on-line users. An Internet user today can browse on the Web via the use of a Web browser. Web browsers are software interfaces that run on Web clients to allow access to Web servers via a simple user interface. A Web user's capabilities today from a Web browser are, however, extremely limited. The user can perform one-way, browse-only interactions. Additionally, the user has limited "deferred" transactional capabilities, namely electronic mail (e-mail) capabilities. E-mail capabilities are referred to as "deferred transactions" because the consumer's request is not processed until the e-mail is received, read, and the person or system reading the e-mail executes the transaction. This transaction is thus not performed in real-time.

FIG. 1A illustrates typical user interactions on the Web today. User 100 sends out a request from Web browser 102 in the form of a universal resource locator (URL) 101 in the following manner: http://www.car.com. URL 101 is processed by Web browser 102 that determines the URL corresponds to car dealer Web page 105, on car dealer Web server 104. Web browser 102 then establishes browse link 103 to car dealer Web page 105. User 100 can browse Web page 105 and select "hot links" to jump to other locations in Web page 105, or to move to other Web pages on the Web. This interaction is typically a browse-only interaction. Under limited circumstances, the user may be able to fill out a form on car dealer Web page 105, and e-mail the form to car dealer Web server 104. This interaction is still strictly a one-way browse mode communications link, with the e-mail providing limited, deferred transactional capabilities.

Under limited circumstances, a user may have access to two-way services on the Web via Common Gateway Interface (CGI) applications. CGI is a standard interface for running external programs on a Web server. It allows Web servers to create documents dynamically when the server receives a request from the Web browser. When the Web server receives a request for a document, the Web server dynamically executes the appropriate CGI script and transmits the output

2

of the execution back to the requesting Web browser. This interaction can thus be termed a "two-way" transaction. It is a severely limited transaction, however, because each CGI application is customized for a particular type of application or service.

For example, as illustrated in FIG. 1B, user 100 may access bank 150's Web server and attempt to perform transactions on checking account 152 and to make a payment on loan account 154. In order for user 100 to access checking account 152 and loan account 154 on the Web, CGI application scripts must be created for each account, as illustrated in FIG. 1B. The bank thus has to create individual scripts for each of its services to offer users access to these services. User 100 can then interact in a limited fashion with these individual applications. Creating and managing individual CGI scripts for each service is not a viable solution for merchants with a large number of services.

As the Web expands and electronic commerce becomes more desirable, the need increases for robust, real-time, bi-directional transactional capabilities on the Web. A true real-time, bi-directional transaction would allow a user to connect to a variety of services on the Web, and perform real-time transactions on those services. For example, although user 100 can browse car dealer Web page 105 today, the user cannot purchase the car, negotiate a car loan or perform other types of real-time, two-way transactions that he can perform with a live salesperson at the car dealership. Ideally, user 100 in FIG. 1A would be able to access car dealer Web page 105, select specific transactions that he desires to perform, such as purchase a car, and perform the purchase in real-time, with two-way interaction capabilities. CGI applications provide user 100 with a limited ability for two-way interaction with car dealer Web page 105, but due to the lack of interaction and management between the car dealer and the bank, he will not be able to obtain a loan and complete the purchase of the car via a CGI application. The ability to complete robust real-time, two-way transactions is thus not truly available on the Web today.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a method and apparatus for providing real-time, two-way transactional capabilities on the Web. Specifically, one embodiment of the present invention discloses a configurable value-added network switch for enabling real-time transactions on the World Wide Web. The configurable value added network switch comprises means for switching to a transactional application in response to a user specification from a World Wide Web application, means for transmitting a transaction request from the transactional application, and means for processing the transaction request.

According to another aspect of the present invention, a method and apparatus for enabling object routing on the World Wide Web is disclosed. The method for enabling object routing comprises the steps of creating a virtual information store containing information entries and attributes, associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities.

Other objects, features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description.

## BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description of the present invention as set forth below.

US 8,037,158 B2

3

FIG. **1A** is an illustration of a current user's browse capabilities on the Web via a Web browser.

FIG. **1B** is an illustration of a current user's capabilities to perform limited transactions on the Web via CGI applications.

FIG. **2** illustrates a typical computer system on which the present invention may be utilized.

FIG. **3** illustrates the Open Systems Interconnection (OSI) Model.

FIG. **4A** illustrates conceptually the user value chain as it exists today.

FIG. **4B** illustrates one embodiment of the present invention.

FIG. **5A** illustrates a user accessing a Web server including one embodiment of the present invention.

FIG. **5B** illustrates the exchange component according to one embodiment of the present invention.

FIG. **5C** illustrates an example of a point-of-service (POSvc) application list.

FIG. **5D** illustrates a user selecting a bank POSvc application from the POSvc application list.

FIG. **5E** illustrates a three-way transaction according to one embodiment of the present invention.

FIG. **6A** illustrates a value-added network (VAN) switch.

FIG. **6B** illustrates the hierarchical addressing tree structure of the networked objects in DOLSIBs.

FIG. **7** illustrates conceptually the layered architecture of a VAN switch.

FIG. **8** is a flow diagram illustrating one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

The present invention relates to a method and apparatus for configurable value-added network switching and object routing and management. "Web browser" as used in the context of the present specification includes conventional Web browsers such as NCSA Mosaic™ from NCSA and Netscape Mosaic™ from Netscape™. The present invention is independent of the Web being utilized and the user can use any Web browser, without modifications to the Web browser. In the following detailed description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent to one of ordinary skill in the art, however, that these specific details need not be used to practice the present invention. In other instances, well-known structures, interfaces and processes have not been shown in detail in order not to unnecessarily obscure the present invention.

FIG. **2** illustrates a typical computer system **200** in which the present invention operates. \The preferred embodiment of the present invention is implemented on an IBM™ Personal Computer manufactured by IBM Corporation of Armonk, N.Y. Alternate embodiments may be implemented on a Macintosh™ computer manufactured by Apple™ Computer, Incorporated of Cupertino, Calif. It will be apparent to those of ordinary skill in the art that other alternative computer system architectures may also be employed.

In general, such computer systems as illustrated by FIG. **2** comprise a bus **201** for communicating information, a processor **202** coupled with the bus **201** for processing information, main memory **203** coupled with the bus **201** for storing information and instructions for the processor **202**, a read-only memory **204** coupled with the bus **201** for storing static information and instructions for the processor **202**, a display device **205** coupled with the bus **201** for displaying informa-

4

tion for a computer user, an input device **206** coupled with the bus **201** for communicating information and command selections to the processor **202**, and a mass storage device **207**, such as a magnetic disk and associated disk drive, coupled with the bus **201** for storing information and instructions. A data storage medium **208** containing digital information is configured to operate with mass storage device **207** to allow processor **202** access to the digital information on data storage medium **208** via bus **201**.

Processor **202** may be any of a wide variety of general purpose processors or microprocessors such as the Pentium™ microprocessor manufactured by Intel™ Corporation or the Motorola™ 68040 or Power PC™ brand microprocessor manufactured by manufactured by Motorola™ Corporation. It will be apparent to those of ordinary skill in the art, however, that other varieties of processors may also be used in a particular computer system. Display device **205** may be a liquid crystal device, cathode ray tube (CRT), or other suitable display device. Mass storage device **207** may be a conventional hard disk drive, floppy disk drive, CD-ROM drive, or other magnetic or optical data storage device for reading and writing information stored on a hard disk, a floppy disk, a CD-ROM a magnetic tape, or other magnetic or optical data storage medium. Data storage medium **208** may be a hard disk, a floppy disk, a CD-ROM, a magnetic tape, or other magnetic or optical data storage medium.

In general, processor **202** retrieves processing instructions and data from a data storage medium **208** using mass storage device **207** and downloads this information into random access memory **203** for execution. Processor **202**, then executes an instruction stream from random access memory **203** or read-only memory **204**. Command selections and information input at input device **206** are used to direct the flow of instructions executed by processor **202**. Equivalent input device **206** may also be a pointing device such as a conventional mouse or trackball device. The results of this processing execution are then displayed on display device **205**.

The preferred embodiment of the present invention is implemented as a software module, which may be executed on a computer system such as computer system **200** in a conventional manner. Using well known techniques, the application software of the preferred embodiment is stored on data storage medium **208** and subsequently loaded into and executed within computer system **200**. Once initiated, the software of the preferred embodiment operates in the manner described below.

FIG. **3** illustrates the Open Systems Interconnection (OSI) reference model. OSI Model **300** is an international standard that provides a common basis for the coordination of standards development, for the purpose of systems interconnection. The present invention is implemented to function as a routing switch within the "application layer" of the OSI model. The model defines seven layers, with each layer communicating with its peer layer in another node through the use of a protocol. Physical layer **301** is the lowest layer, with responsibility to transmit unstructured bits across a link. Data link layer **302** is the next layer above physical layer **301**. Data link layer **302** transmits chunks across the link and deals with problems like checksumming to detect data corruption, orderly coordination of the use of shared media and addressing when multiple systems are reachable. Network bridges operate within data link layer **302**.

Network layer **303** enables any pair of systems in the network to communicate with each other. Network layer **303** contains hardware units such as routers, that handle routing, packet fragmentation and reassembly of packets. Transport

layer **304** establishes a reliable communication stream between a pair of systems, dealing with errors such as lost packets, duplicate packets, packet reordering and fragmentation. Session layer **305** offers services above the simple communication stream provided by transport layer **304**. These services include dialog control and chaining. Presentation layer **306** provides a means by which OSI compliant applications can agree on representations for data. Finally, application layer **307** includes services such as file transfer, access and management services (FTAM), electronic mail and virtual terminal (VT) services. Application layer **307** provides a means for application programs to access the OSI environment. As described above, the present invention is implemented to function as a routing switch in application layer **307**. Application layer routing creates an open channel for the management, and the selective flow of data from remote databases on a network.

A. Overview

FIG. **4A** illustrates conceptually the user value chain as it exists today. The user value chain in FIG. **4A** depicts the types of transactions that are performed today, and the channels through which the transactions are performed. A "transaction" for the purposes of the present invention includes any type of commercial or other type of interaction that a user may want to perform. Examples of transactions include a deposit into a bank account, a request for a loan from a bank, a purchase of a car from a car dealership or a purchase of a car with financing from a bank. A large variety of other transactions are also possible.

A typical user transaction today may involve user **100** walking into a bank or driving up to a teller machine, and interacting with a live bank teller, or automated teller machine (ATM) software applications. Alternatively, user **100** can perform the same transaction by using a personal computer (PC), activating application software on his PC to access his bank account, and dialing into the bank via a modem line. If user **100** is a Web user, however, there is no current mechanism for performing a robust, real-time transaction with the bank, as illustrated in FIG. **4A**. CGI scripts provide only limited two-way capabilities, as described above. Thus, due to this lack of a robust mechanism by which real-time Web transactions can be performed, the bank is unable to be a true "Web merchant," namely a merchant capable of providing complete transactional services on the Web.

According to one embodiment of the present invention, as illustrated in FIG. **4B**, each merchant that desires to be a Web merchant can provide real-time transactional capabilities to users who desire to access the merchants' services via the Web. This embodiment includes a service network running on top of a facilities network, namely the Internet, the Web or e-mail networks. For the purposes of this application, users are described as utilizing PC's to access the Web via Web server "switching" sites. (Switching is described in more detail below). Users may also utilize other personal devices such as network computers or cellular devices to access the merchants' services via appropriate switching sites. These switching sites include non-Web network computer sites and cellular provider sites. Five components interact to provide this service network functionality, namely an exchange, an operator agent, a management agent, a management manager and a graphical user interface. All five components are described in more detail below.

As illustrated in FIG. **5A**, user **100** accesses Web server **104**. Having accessed Web server **104**, user **100** can decide that he desires to perform real-time transactions. When Web server **104** receives user **100**'s indication that he desires to perform real-time transactions, the request is handed over to

an exchange component. Thus, from Web page **105**, for example, user **100** can select button **500**, entitled "Transactions" and Web server **104** hands user **100**'s request over to the exchange component. The button and the title can be replaced by any mechanism that can instruct a Web server to hand over the consumer's request to the exchange component.

FIG. **5B** illustrates exchange **501**. Exchange **501** comprises Web page **505** and point-of-service (POSvc) applications **510**. Exchange **501** also conceptually includes a switching component and an object routing component (described in more detail below). POSvc applications **510** are transactional applications, namely applications that are designed to incorporate and take advantage of the capabilities provided by the present invention. Although exchange **501** is depicted as residing on Web server **104**, the exchange can also reside on a separate computer system that resides on the Internet and has an Internet address. Exchange **501** may also include operator agent **503** that interacts with a management manager (described in more detail below). Exchange **501** creates and allows for the management (or distributed control) of a service network, operating within the boundaries of an IP-based facilities network. Thus, exchange **501** and a management agent component, described in more detail below, under the headings "VAN Switch and Object Routing," together perform the switching, object routing, application and service management functions according to one embodiment of the present invention.

Exchange **501** processes the consumer's request and displays an exchange Web page **505** that includes a list of POSvc applications **510** accessible by exchange **501**. A POSvc application is an application that can execute the type of transaction that the user may be interested in performing. The POSvc list is displayed via the graphical user interface component. One embodiment of the present invention supports Hyper-Text Markup Language as the graphical user interface component. Virtual Reality Markup Language and Java™ are also supported by this embodiment. A variety of other graphical user interface standards can also be utilized to implement the graphical user interface.

An example of a POSvc application list is illustrated in FIG. **5C**. User **100** can thus select from POSvc applications Bank **510(1)**, Car Dealer **510(2)** or Pizzeria **510(3)**. Numerous other POSvc applications can also be included in this selection. If user **100** desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user **100**, as illustrated in FIG. **5D**. For the purposes of illustration, exchange **501** in FIG. **5D** is shown as running on a different computer system (Web server **104**) from the computer systems of the Web merchants running POSvc applications (computer system **200**). Exchange **501** may, however, also be on the same computer system as one or more of the computer systems of the Web merchants.

Once Bank POSvc application **510** has been activated, user **100** will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository **575** in the Bank "Back Office." The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data. This connection between user **100** and Bank services is managed by exchange **501**. As illustrated in FIG. **5D**, once the connection is made between Bank POSvc application **510(1)**, for example, and Bank services, an operator agent on Web server **104** may be activated to ensure the availability of distributed functions and capabilities.

US 8,037,158 B2

7

8

Each Web merchant may choose the types of services that it would like to offer its clients. In this example, if Bank decided to include in their POSvc application access to checking and savings accounts, user **100** will be able to perform real-time transactions against his checking and savings accounts. Thus, if user **100** moves $500 from his checking account into his savings account, the transaction will be performed in real-time, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine. Therefore, unlike his prior access to his account, user **100** now has the capability to do more than browse his bank account. The ability to perform these types of robust, real-time transactions from a Web client is a significant aspect of the present invention.

Bank can also decide to provide other types of services in POSvc application **510**(**1**). For example, Bank may agree with Car dealership to allow Bank customers to purchase a car from that dealer, request a car loan from Bank, and have the entire transaction performed on the Web, as illustrated in FIG. **5**E. In this instance, the transactions are not merely two-way, between the user and Bank, but three-way, amongst the consumer, Bank and Car dealership. According to one aspect of the present invention, this three-way transaction can be expanded to n-way transactions, where n represents a predetermined number of merchants or other service providers who have agreed to cooperate to provide services to users. The present invention therefore allows for "any-to-any" communication and transactions on the Web, thus facilitating a large, flexible variety of robust, real-time transactions on the Web.

Finally, Bank may also decide to provide intra-merchant or intra-bank services, together with the inter-merchant services described above. For example, if Bank creates a POSvc application for use by the Bank Payroll department, Bank may provide its own employees with a means for submitting timecards for payroll processing by the Bank's Human Resources (HR) Department. An employee selects the Bank HR POSvc application, and submits his timecard. The employee's timecard is processed by accessing the employee's payroll information, stored in the Bank's Back Office. The transaction is thus processed in real-time, and the employee receives his paycheck immediately.

B. Van Switching and Object Routing

As described above, exchange **501** and management agent **601**, illustrated in FIG. **6**A, together constitute a value-added network (VAN) switch. These two elements may take on different roles as necessary, including peer-to-peer, client-server or master-slave roles. Management manager **603** is illustrated as residing on a separate computer system on the Internet. Management manager **603** can, however, also reside on the same machine as exchange **501**. Management manager **603** interacts with the operator agent **503** residing on exchange **501**.

VAN switch **520** provides multi-protocol object routing, depending upon the specific VAN services chosen. This multi-protocol object routing is provided via a proprietary protocol, TransWeb™ Management Protocol (TMP). TMP incorporates the same security features as the traditional Simple Network Management Protocol, SNMP. It also allows for the integration of other traditional security mechanisms, including RSA security mechanisms.

One embodiment of the present invention utilizes TMP and distributed on-line service information bases (DOLSIBs) to perform object routing. Alternatively, TMP can incorporate s-HTTP, Java™, the WinSock API or ORB with DOLSIBs to perform object routing. DOLSIBs are virtual information stores optimized for networking. All information entries and attributes in a DOLSIB virtual information store are associated with a networked object identity. The networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects, and each networked object is assigned an Internet address. The Internet address is assigned based on the IP address of the node at which the networked object resides.

For example, in FIG. **5**A, Web server **104** is a node on the Internet, with an IP address. All networked object associated with Web server **104** will therefore be assigned an Internet address based on the Web server **104**'s IP address. These networked objects thus "branch" from the node, creating a hierarchical tree structure. The Internet address for each networked object in the tree essentially establishes the individual object as an "IP-reachable" or accessible node on the Internet. TMP utilizes this Internet address to uniquely identify and access the object from the DOLSIB. FIG. **6**B illustrates an example of this hierarchical addressing tree structure.

Each object in the DOLSIB has a name, a syntax and an encoding. The name is an administratively assigned object ID specifying an object type. The object type together with the object instance serves to uniquely identify a specific instantiation of the object. For example, if object **610** is information about models of cars, then one instance of that object would provide user **100** with information about a specific model of the car while another instance would provide information about a different model of the car. The syntax of an object type defines the abstract data structure corresponding to that object type. Encoding of objects defines how the object is represented by the object type syntax while being transmitted over the network.

C. Management and Administration

As described above, exchange **501** and management agent **601** together constitute a VAN switch. FIG. **7** illustrates conceptually the layered architecture of VAN switch **520**. Specifically, boundary service **701** provides the interfaces between VAN switch **520**, the Internet and the Web, and multi-media end user devices such as PCs, televisions or telephones. Boundary service **701** also provides the interface to the on-line service provider. A user can connect to a local application, namely one accessible via a local VAN switch, or be routed or "switched" to an application accessible via a remote VAN switch.

Switching service **702** is an OSI application layer switch. Switching service **702** thus represents the core of the VAN switch. It performs a number of tasks including the routing of user connections to remote VAN switches, described in the paragraph above, multiplexing and prioritization of requests, and flow control. Switching service **702** also facilitates open systems' connectivity with both the Internet (a public switched network) and private networks including back office networks, such as banking networks. Interconnected application layer switches form the application network backbone. These switches are one significant aspect of the present invention.

Management service **703** contains tools such as Information Management Services (IMS) and application Network Management Services (NMS). These tools are used by the end users to manage network resources, including VAN switches. Management service **703** also provides applications that perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions. These OAM&P functions include security management, fault management, configuration management, performance management and billing management. Providing OAM&P functions for applications in this manner is another significant aspect of the present invention.

**9**

Finally, application service **704** contains application programs that deliver customer services. Application service **704** includes POSvc applications such as Bank POSvc described above, and illustrated in FIG. **6**A. Other examples of VAN services include multi-media messaging, archival/retrieval management, directory services, data staging, conferencing, financial services, home banking, risk management and a variety of other vertical services. Each VAN service is designed to meet a particular set of requirements related to performance, reliability, maintenance and ability to handle expected traffic volume. Depending on the type of service, the characteristics of the network elements will differ. VAN service **704** provides a number of functions including communications services for both management and end users of the network and control for the user over the user's environment.

FIG. **8** is a flow diagram illustrating one embodiment of the present invention. A user connects to a Web server running an exchange component in step **802**. In step **804**, the user issues a request for a transactional application, and the web server hands off the request to an exchange in step **806**. The exchange activates a graphical user interface to present user with a list of POSvc application options in step **808**. In step **810**, the user makes a selection from the POSvc application list. In step **812**, the switching component in the exchange switches the user to the selected POSvc application, and in step **814**, the object routing component executes the user's request. Data is retrieved from the appropriate data repository via TMP in step **816**, and finally, the user may optionally continue the transaction in step **818** or end the transaction.

Thus, a configurable value-added network switching and object routing method and apparatus is disclosed. These specific arrangements and methods described herein are merely illustrative of the principles of the present invention. Numerous modifications in form and detail may be made by those of ordinary skill in the art without departing from the scope of the present invention. Although this invention has been shown in relation to a particular preferred embodiment, it should not be considered so limited. Rather, the present invention is limited only by the scope of the appended claims.

The invention claimed is:

**1**. A method for performing a real time Web transaction from a Web application over a digital network atop the Web, the method comprising:

providing a Web page for display on a computer system coupled to an input device;

**10**

providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;

accepting a first signal from the Web user input device to select the point-of-service application;

accepting subsequent signals from the Web user input device; and

transferring funds from the checking account to the savings account in real-time utilizing a routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals.

**2**. The method of claim **1**, wherein an exchange over the Web is used to complete the transfer of funds in a Web application.

**3**. The method of claim **1**, wherein a management agent is used to complete the transfer of funds in a Web application.

**4**. The method of claim **1**, wherein object routing is used to complete the transfer of funds in a Web application.

**5**. The method of claim **4**, wherein the object routing includes the use of a distributed on-line service information bases.

**6**. The method of claim **1**, wherein a virtual information store is used to complete the transfer of funds.

**7**. The method of claim **6**, wherein the virtual information store includes a networked object specific to a Web application in a Web transaction.

**8**. The method of claim **7**, wherein the networked object is the object identity in a Web transaction connecting from a Web application on a Web page to a transactional application executing anywhere across the Web.

**9**. The method of claim **1**, wherein the Web transaction is a loan requested from a lender across the Web from a Web application.

**10**. The method of claim **1**, wherein the Web transaction is a vehicle purchased with bank financing across the Web from a Web application.

**11**. The method of claim **1**, wherein the Web transaction is accessing an account across the Web from a Web application.

* * * * *

# Exhibit C

US008108492B2

(12) **United States Patent**       (10) **Patent No.:**       **US 8,108,492 B2**

Arunachalam       (45) **Date of Patent:**       **Jan. 31, 2012**

(54) **WEB APPLICATION NETWORK PORTAL**

(76) Inventor: **Lakshmi Arunachalam**, Menlo Park, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/628,060**

(22) Filed: **Nov. 30, 2009**

(65) **Prior Publication Data**

US 2010/0306102 A1       Dec. 2, 2010

**Related U.S. Application Data**

(60) Division of application No. 11/980,185, filed on Oct. 30, 2007, now Pat. No. 8,037,158, which is a continuation-in-part of application No. 09/792,323, filed on Feb. 23, 2001, now Pat. No. 7,340,506, which is a division of application No. 09/296,207, filed on Apr. 21, 1999, now Pat. No. 6,212,556, which is a continuation-in-part of application No. 08/879,958, filed on Jun. 20, 1997, now Pat. No. 5,987,500, which is a division of application No. 08/700,726, filed on Aug. 5, 1996, now Pat. No. 5,778,178.

(60) Provisional application No. 60/006,634, filed on Nov. 13, 1995.

(51) **Int. Cl.**
**G06F 13/00**       (2006.01)

(52) **U.S. Cl.** .......................... **709/219**; 709/225; 709/228

(58) **Field of Classification Search** .................. 709/217, 709/219, 223, 224, 225, 227, 229
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,829,372 A | 5/1989 | McCalley et al. |
| 4,851,988 A | 7/1989 | Trottier et al. |

| | | | |
|---|---|---|---|
| 4,984,155 A | 1/1991 | Geler et al. |
| 5,125,091 A | 6/1992 | Staas, Jr. et al. |
| 5,148,474 A | 9/1992 | Haralambopoulos et al. |
| 5,159,632 A | 10/1992 | Crandall |
| 5,231,566 A | 7/1993 | Blutinger et al. |
| 5,239,662 A | 8/1993 | Danielson et al. |
| 5,285,383 A | 2/1994 | Lindsey et al. |
| 5,297,249 A | 3/1994 | Bernstein et al. |
| 5,329,589 A | 7/1994 | Fraser et al. |
| 5,329,619 A | 7/1994 | Page et al. |
| 5,347,632 A | 9/1994 | Filepp et al. |
| 5,367,635 A | 11/1994 | Bauer et al. |
| 5,383,113 A | 1/1995 | Kight et al. |
| 5,404,523 A | 4/1995 | Dellafera et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 97/18515 A1 | 5/1997 |
| WO | WO 00/63781 A1 | 10/2000 |

OTHER PUBLICATIONS

U.S. Appl. No. 12/268,060, filed Nov. 30, 2009, Arunachalam.
U.S. Appl. No. 12/628,066, filed Nov. 30, 2009, Arunachalam.
U.S. Appl. No. 12/628,068, filed Nov. 30, 2009, Arunachalam.
U.S. Appl. No. 12/628,069, filed Nov. 30, 2009, Arunachalam.

(Continued)

*Primary Examiner* — Viet Vu

(57) **ABSTRACT**

The present invention provides a method and apparatus for providing real-time, two-way transactional capabilities on the Web. Specifically, one embodiment of the present invention discloses a method for enabling object routing, the method comprising the steps of creating a virtual information store containing information entries and attributes associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities. A method is also disclosed for enabling service management of the value-added network service, to perform OAM&P functions on the services network.

**13 Claims, 13 Drawing Sheets**



US 8,108,492 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,408,619 | A | 4/1995 | Oran |
| 5,414,812 | A | 5/1995 | Filip et al. |
| 5,428,792 | A | 6/1995 | Conner et al. |
| 5,432,937 | A | 7/1995 | Tevanian et al. |
| 5,434,974 | A | 7/1995 | Loucks et al. |
| 5,440,744 | A | 8/1995 | Jacobson et al. |
| 5,442,771 | A | 8/1995 | Filepp et al. |
| 5,442,791 | A | 8/1995 | Wrabetz et al. |
| 5,444,192 | A | 8/1995 | Shetye et al. |
| 5,446,896 | A | 8/1995 | Hegarty et al. |
| 5,452,433 | A | 9/1995 | Nihart et al. |
| 5,455,903 | A | 10/1995 | Jolissaint et al. |
| 5,475,819 | A | 12/1995 | Miller et al. |
| 5,491,800 | A | 2/1996 | Goldsmith et al. |
| 5,517,645 | A | 5/1996 | Stutz et al. |
| 5,519,868 | A | 5/1996 | Allen et al. |
| 5,537,464 | A | 7/1996 | Lewis et al. |
| 5,539,909 | A | 7/1996 | Tanaka et al. |
| 5,557,780 | A | 9/1996 | Edwards et al. |
| 5,560,005 | A | 9/1996 | Hoover et al. |
| 5,577,251 | A | 11/1996 | Hamilton et al. |
| 5,590,197 | A | 12/1996 | Chen et al. |
| 5,592,378 | A | 1/1997 | Cameron et al. |
| 5,604,905 | A | 2/1997 | Tevanian et al. |
| 5,613,148 | A | 3/1997 | Bezviner et al. |
| 5,664,111 | A | 9/1997 | Nahan et al. |
| 5,671,279 | A | 9/1997 | Elgamal et al. |
| 5,677,708 | A | 10/1997 | Matthews, III et al. |
| 5,694,569 | A | 12/1997 | Carlin et al. |
| 5,703,344 | A | 12/1997 | Bezy et al. |
| 5,706,442 | A | 1/1998 | Anderson et al. |
| 5,708,780 | A | 1/1998 | Levergood et al. |
| 5,710,887 | A * | 1/1998 | Chelliah et al. ............ 705/26.62 |
| 5,712,913 | A | 1/1998 | Chaum |
| 5,715,314 | A | 2/1998 | Payne et al. |
| 5,715,444 | A | 2/1998 | Danish et al. |
| 5,724,424 | A | 3/1998 | Gifford |
| 5,737,533 | A | 4/1998 | de Hond |
| 5,742,762 | A | 4/1998 | Scholl et al. |
| 5,742,768 | A | 4/1998 | Gennaro et al. |
| 5,745,681 | A | 4/1998 | Levine et al. |
| 5,754,939 | A | 5/1998 | Herz et al. |
| 5,757,917 | A | 5/1998 | Rose et al. |
| 5,758,072 | A | 5/1998 | Filepp et al. |
| 5,758,327 | A | 5/1998 | Gardner et al. |
| 5,771,354 | A | 6/1998 | Crawford |
| 5,774,670 | A | 6/1998 | Montulli |
| 5,778,178 | A | 7/1998 | Arunachalam |
| 5,780,780 | A | 7/1998 | Ahmed |
| 5,781,631 | A | 7/1998 | Chaum |
| 5,793,964 | A * | 8/1998 | Rogers et al. ................. 709/202 |
| 5,794,221 | A | 8/1998 | Egendorf |
| 5,794,234 | A | 8/1998 | Church et al. |
| 5,809,483 | A | 9/1998 | Broka et al. |
| 5,812,779 | A | 9/1998 | Ciscon et al. |
| 5,822,569 | A | 10/1998 | McPartlan et al. |
| 5,826,085 | A | 10/1998 | Bennett et al. |
| 5,826,241 | A | 10/1998 | Stein et al. |
| 5,828,666 | A | 10/1998 | Focsaneanu et al. |
| 5,835,726 | A | 11/1998 | Schwed |
| 5,845,061 | A | 12/1998 | Miyamoto et al. |
| 5,845,073 | A | 12/1998 | Carlin et al. |
| 5,845,265 | A | 12/1998 | Woolston |
| 5,856,974 | A | 1/1999 | Gervais et al. |
| 5,859,978 | A | 1/1999 | Sonderegger et al. |
| 5,864,866 | A | 1/1999 | Henckel et al. |
| 5,870,473 | A | 2/1999 | Boesch et al. |
| 5,870,724 | A | 2/1999 | Lawlor et al. |
| 5,873,072 | A | 2/1999 | Kight et al. |
| 5,873,093 | A | 2/1999 | Williamson et al. |
| 5,878,043 | A | 3/1999 | Casey et al. |
| 5,878,140 | A | 3/1999 | Chaum |
| 5,878,141 | A | 3/1999 | Daly et al. |
| 5,878,403 | A | 3/1999 | DeFrancesco et al. |
| 5,884,301 | A | 3/1999 | Takano |
| 5,889,957 | A | 3/1999 | Ratner et al. |
| 5,890,137 | A | 3/1999 | Koreeda |
| 5,890,161 | A | 3/1999 | Helland et al. |
| 5,892,821 | A | 4/1999 | Turner |
| 5,893,076 | A | 4/1999 | Hafner et al. |
| 5,895,454 | A | 4/1999 | Harrington |
| 5,897,621 | A | 4/1999 | Boesch et al. |
| 5,901,228 | A | 5/1999 | Crawford |
| 5,909,492 | A | 6/1999 | Payne et al. |
| 5,910,987 | A | 6/1999 | Ginter |
| 5,913,061 | A | 6/1999 | Gupta et al. |
| 5,931,967 | A | 8/1999 | Shimitzu et al. |
| 5,946,509 | A | 8/1999 | Morton et al. |
| 5,956,400 | A | 9/1999 | Chaum et al. |
| 5,956,509 | A | 9/1999 | Kevner |
| 5,958,004 | A | 9/1999 | Helland et al. |
| 5,960,411 | A | 9/1999 | Hartman et al. |
| 5,987,500 | A | 11/1999 | Arunachalam |
| 6,003,085 | A | 12/1999 | Ratner et al. |
| 6,014,651 | A | 1/2000 | Crawford |
| 6,014,666 | A | 1/2000 | Helland et al. |
| 6,049,785 | A | 4/2000 | Gifford |
| 6,049,819 | A | 4/2000 | Buckle et al. |
| 6,055,514 | A | 4/2000 | Wren |
| 6,055,567 | A | 4/2000 | Ganesan et al. |
| 6,073,237 | A | 6/2000 | Ellison et al. |
| 6,092,053 | A | 7/2000 | Boesch et al. |
| 6,094,673 | A | 7/2000 | Dilip et al. |
| 6,101,482 | A | 8/2000 | DeAngelo et al. |
| 6,101,527 | A | 8/2000 | Lejeune et al. |
| 6,119,152 | A | 9/2000 | Carlin et al. |
| 6,125,185 | A | 9/2000 | Boesch |
| 6,125,352 | A | 9/2000 | Franklin et al. |
| 6,128,315 | A | 10/2000 | Takeuchi |
| 6,134,594 | A | 10/2000 | Helland et al. |
| 6,135,646 | A | 10/2000 | Kahn et al. |
| 6,145,090 | A | 11/2000 | Yamaguchi et al. |
| 6,185,609 | B1 | 2/2001 | Rangarajan et al. |
| 6,192,250 | B1 | 2/2001 | Buskens et al. |
| 6,205,433 | B1 | 3/2001 | Boesch et al. |
| 6,212,556 | B1 | 4/2001 | Arunachalam |
| 6,212,634 | B1 | 4/2001 | Gerr et al. |
| 6,249,291 | B1 | 6/2001 | Popp et al. |
| 6,279,001 | B1 | 8/2001 | DeBettencourt et al. |
| 6,289,322 | B1 | 9/2001 | Kitchen et al. |
| 6,295,522 | B1 | 9/2001 | Boesch |
| 6,301,601 | B1 | 10/2001 | Helland et al. |
| 6,327,577 | B1 | 12/2001 | Garrison et al. |
| 6,327,579 | B1 | 12/2001 | Crawford |
| 6,334,116 | B1 | 12/2001 | Ganesan et al. |
| 6,360,262 | B1 | 3/2002 | Guenthner et al. |
| 6,363,362 | B1 | 3/2002 | Burfield et al. |
| 6,411,943 | B1 | 6/2002 | Crawford |
| 6,453,426 | B1 | 9/2002 | Gamache et al. |
| 6,457,066 | B1 | 9/2002 | Mein et al. |
| 6,473,740 | B2 | 10/2002 | Cockrill et al. |
| 6,473,791 | B1 | 10/2002 | Al-Ghosein et al. |
| 6,486,895 | B1 | 11/2002 | Robertson et al. |
| 6,490,567 | B1 | 12/2002 | Gregory |
| 6,530,518 | B1 | 3/2003 | Krichilsky |
| 6,553,427 | B1 | 4/2003 | Chang et al. |
| 6,574,607 | B1 | 6/2003 | Carter et al. |
| 6,625,581 | B1 | 9/2003 | Perkowski |
| 6,678,664 | B1 | 1/2004 | Ganesan |
| 6,678,696 | B1 | 1/2004 | Helland et al. |
| 6,714,962 | B1 | 3/2004 | Helland et al. |
| 6,839,677 | B2 | 1/2005 | Mathur et al. |
| 6,850,996 | B2 | 2/2005 | Wagner |
| 6,856,974 | B1 | 2/2005 | Ganesan et al. |
| 6,931,111 | B1 | 8/2005 | Coffee |
| 6,932,268 | B1 | 8/2005 | McCoy et al. |
| 6,948,063 | B1 | 9/2005 | Ganesan et al. |
| 7,076,784 | B1 | 7/2006 | Russell et al. |
| 7,080,051 | B1 | 7/2006 | Crawford |
| 7,107,244 | B2 | 9/2006 | Kight et al. |
| 7,120,602 | B2 | 10/2006 | Kitchen et al. |
| 7,146,338 | B2 | 12/2006 | Kight et al. |
| 7,175,074 | B2 | 2/2007 | Mejias et al. |
| 7,177,846 | B2 | 2/2007 | Moenickheim et al. |
| 7,213,003 | B1 | 5/2007 | Kight et al. |
| 7,240,031 | B1 | 7/2007 | Kight et al. |
| 7,251,656 | B2 | 7/2007 | Keown et al. |

| | | | | |
|---|---|---|---|---|
| 7,296,004 | B1 | 11/2007 | Garrison et al. | |
| 7,302,408 | B2 | 11/2007 | Engdahl et al. | |
| 7,302,411 | B2 | 11/2007 | Ganesan et al. | |
| 7,330,831 | B2 | 2/2008 | Biondi et al. | |
| 7,334,128 | B2 | 2/2008 | Ganesan et al. | |
| 7,340,506 | B2 | 3/2008 | Arunachalam | |
| 7,366,696 | B1 | 4/2008 | Ganesan et al. | |
| 7,366,697 | B2 | 4/2008 | Kitchen et al. | |
| 7,383,226 | B2 | 6/2008 | Kight et al. | |
| 7,389,514 | B2 | 6/2008 | Russell et al. | |
| 7,392,223 | B1 | 6/2008 | Ganesan et al. | |
| 7,395,243 | B1 | 7/2008 | Zielke et al. | |
| 7,395,319 | B2 | 7/2008 | Harris et al. | |
| 7,451,400 | B2 * | 11/2008 | Bales et al. | 715/734 |
| 7,590,550 | B2 * | 9/2009 | Schoenberg | 705/2 |
| 7,600,027 | B2 * | 10/2009 | Yan | 709/227 |
| 2001/0037318 | A1 | 11/2001 | Lindskog | |
| 2002/0062218 | A1 | 5/2002 | Pianin | |
| 2002/0152200 | A1 | 10/2002 | Krichilsky et al. | |
| 2003/0069922 | A1 | 4/2003 | Arunachalam | |
| 2008/0091801 | A1 | 4/2008 | Arunachalam | |
| 2009/0094347 | A1 * | 4/2009 | Ting et al. | 709/219 |

OTHER PUBLICATIONS

Order, Motion to Bifurcate and for early trial on the Issue of Inequitable Conduct, on Mar. 19, 2009, Dismissal with Prejudice, order dated Dec. 30, 2009, Denied as Moot, Order Granted, signed by JJF, C.A. No. 08-131 (JJF), Allstate Docket #155.
Order, Motion to Bifurcate and for early trial on the Issue of Inequitable Conduct, on Mar. 19, 2009, Dismissal with Prejudice, order dated Dec. 30, 2009, Denied as Moot, C.A. No. 08-132 (JJF) and C.A. No. 08-133 (JJF) , Dell Docket #155, signed by JJF, Order, Motion to Bifurcate and for early trial on the Issue of Inequitable Conduct, on Mar. 19, 2009, Dismissal with Prejudice, order dated Dec. 30, 2009, Denied as Moot, C.A. No. 08-132 (JJF) and C.A. No. 08-133 (JJF), Dell Docket #155.
Plaintiff WebXchange Inc.'s Surreply in Opposition to Defendants' Motion to Bifurcate, and for Early Trial on, the Issue of Inequitable Conduct (C.A. No. 08-132 (JJF) and C.A. No. 08-133 (JJF) , is Granted Plaintiff's Surreply in Opposition to Defendant's Motion to Bifurcate and for Early Trial on, The Issue on Inequitable Conduct is deemed filed (Entered Dec. 30, 2009), Dell Docket #157.
Dell Inc.'s Second Amended Answer and Counterclaims to WebxChange Inc.'s Original Complaint for Patent Infringement (Entered: Jan. 20, 2010), Dell Docket #164.
Plaintiff WebXchange Inc.'s Surreply in Opposition to Defendants' Motion to Bifurcate, and for Early Trial on, The Issue of Inequitable Conduct (Entered Dec. 30, 2009), Fedex Docket #212.
Memorandum Opinion C.A. 08-133-JJF, and C.A. 08-132-JJF (Entered Dec. 30, 2009), Fedex Docket #215.
Defendant's Fedex Corporation, Fedex Kinko's Office & Print Services, Inc., and Fedex Corporate Services, Inc.'s Second Amended Answer, Affirmative Defenses, and Counterclaims to Plaintiff WebXchange, Inc.'s Complaint (Entered Jan. 20, 2010), Fedex Docket #217.
U.S. Appl. No. 60/208,057, filed May 31, 2000, Krichilsky.
U.S. Appl. No. 08/168,519, filed Dec. 1993, Gifford.
UIUC, "The Common Gateway Interface", pp. 1-4, http://hoohoo.ncsa.uiuc.edu/cgi/primer.html, Retrieved on May 22, 2001, WBX 000.
Arnold, K. et al., "Media-Independent Interfaces in a Media-Dependent World", USENIX Conference on Object-Oriented Technologies, Monterey, CA Jun. 1995, WBX001.
Arshad, K.M. et al., "A CORBA based framework for trusted E-Commerce Transactions", Enterprise Distributed Object Computing Conference, pp. 18-25, EDOC '99 Sep. 27, 1999, WBX002.
Atkinson, R. , RFC 1825: "Security Architecture for the Internet Protocol", Naval Research Laboratory, Category: Standards Track, Network Working Group, Aug. 1, 1995 , WBX007.
Banks, M. , "America Online: A Graphics-based Success", Link-Up, Jan./Feb. 1992 , WBX008.
Banks, M. , "Compuserve for Windows", M.I.S Press, 1994, WBX009.

Baquero, C. et al.,"Integration of Concurrency Control in a Language with Subtyping and Subclassing",USENIX Conference on Object-Oriented Technologies, Jun. 1995,WBX010.
Barron, C. and Weil, B., "Dr. Dobbs Portal: Implementing a Web Shopping Cart", Online Transactions in PERL, Sep. 1, 1996 WBX011.
Bharat, K. et al. , "Visual Obliq: A System for Building Distributed, Multi-User Applications by Direct Manipulation", SRC 130a, DEC, Oct. 31, 1995, WBX012.
Bharat,K.et al.,"Distributed Applications in a Hypermedia Setting", Proc. Intl Workshop on Hypermedia Design,http.ww.cc.gatech. edugvupeoplePhDKrishnaIWHD.html,Jun. 1, 1995 WBX013.
"CyberCash Cash Register Internet Payment Service". retrieved May 23, 2001 http://www.cybercash.com/ cashregister pp. 1-2. 1996, WBX034.
"CyberCash—Cash Register—How it Works" retrieved May 23, 2001http://www.cybercash.com/cashregister/howitworks.html  pp. 1-3. 1996, WBX035.
"CyberCash—Industry Leading Features" retrieved May 23, 2001 http://www.cybercash.com/cashregister/features.html pp. 1-4. 1996, WBX036.
"CyberCash Cash Register—Online Secure Payment Service" CashRegister Demos.retrieved May 23, 2001 http://www.webdata. cybercash.com/demos/ pp. 1-2. 1996, WBX038.
"CyberCash FraudPatrol.TM. Service" retrieved oMay 23, 2001 http://www.cybercash.com/fraudpatrol/ pp. 1-2. 1996, WBX039.
"CyberCash FraudPatrol—How It Works" retrieved on May 23, 2001 http://www.cybercash.com/fraudpatrol/howitworks.html pp. 1-2 '96, WBX040.
"CyberCash Home", http://www.cybercash.com [retrieved on May 23, 2001] 1996, WBX041.
"CyberCash ICVerify for Windows" Version 2.5 Upgrade, http:// www.cybercash.com/icverify/upgrade.html pp. 1-2 [retrieved on May 23, 2001] 1996 , WBX043.
Cybercash, "ICVERIFY—Features" retrieved on May 23, 2001 http://www.cybercash.com/icverify/features.html, 1996, pp. 1-3, WBX044.
Brando, T., "Comparing DCE and CORBA", Mitre Document MP 95B-93, Mar. 1, 1995, WBX018.
Business Wire , "Open Market releases first complete software solution" 1995, WBX025.
Business Wire, "Sunsoft delivers early access release of Distributed Objects Environment", Jun. 14, 1995, WBX026.
Case, J. et al. , "Network Management and the Design of SNMP", Connexxions (ISSN 0894-5926), vol. 3, No. 3, Mar. 1989, WBX027.
Chung, S. et al. , "A Heterogeneous Distributed Information System", IEEE, pp. 443–447, 1993, WBX029.
Courtney, A.,"Phantom: An Interpreted Language for Distributed Programming", Proceedings of USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX030.
Cybercash, "Affiliate Marketing Service", http://www.cybercash. com/products/affiliatemarketing.html [retrieved on May 23, 2001] 1996, WBX031.
"CyberCash B2B Payment Services", http://www.cybercash.com/ b2b pp. 1-2 [retrieved May 23, 2001] 1996, WBX032.
CyberCash B2BServices, 1996, WBX033.
CyberCash Cash Register Internet Payment Service—Online Secure Payment Service. retrieved on May 23, 2001from http://www. cybercash.com/cashregister pp. 1-2,'96,WBX034.
"CyberCash—Cash Register—How it Works" retrieved May 23, 2001 from http://www.cybercash.com/cashregister/howitworks. html pp. 1-3. '96,WBX035.
"CyberCash—Industry Leading Features",retrieved May 23, 2001 http://www.cybercash.com/cashregister/features.html pp. 1-4, 1996, WBX 036.
"CyberCash Cash Register—Online Secure Payment Service" CashRegister Demos.retrieved May 23, 2001 http://www.webdata. cybercash.com/demos/pp. 1-2 1996, WBX038.
"CyberCash FraudPatrol.TM. Service" retrieved on May 23, 2001 http://www.cybercash.com/fraudpatrol/ pp. 1-2. 1996, WBX039.
"CyberCash FraudPatrol—How It Works" retrieved onMay 23, 2001, http://www.cybercash.com/fraudpatrol/howitworks.html pp. 1-2 1996,WBX 040.

# US 8,108,492 B2

Page 4

Cybercash, "ICVerify—Features" retrieved on May 23, 2001 from http://www.cybercash.com/icverify/features.html, 1996, pp. 1-3, WBX044.

Cybercash, "Payment Software for Brick and Mortar Merchants" http://www.cybercash.com/pcauthorize 1996-2001, WBX046.

Dr. Gui on Components, COM and ATL, http://msdn.microsoft.com/library/welcome/dsmsdn/msdn_drguion020298.htm, Feb. 2, 1998, pp. 1-61 [retrieved on May 22, 2001], WBX057.

Cybercash,"Products" 1996. retrieved on May 23, 2001 from <URL: http://www.CyberCash.com/products/, 1996, pp. 1-2, WBX048.

Cybercash,"WebAuthorize—Enterprise and Hosting Payment Processing". retrieved on May 23, 2001from <URL:http://www.cybercash.com/webauthorize/, 1996,pp. 1-2, WBX050.

Davis et al., "A Protocol and Server for a Distributed Digital Technical Report Library", Apr. 25, 1994, WBX051.

Davison, A. , "Coding with HTML forms HTML goes interactive", (hypertext markup language)(Tutorial), Dr. Dobb's Journal, Jun. 6, 1995, vol. 20, No. 6, 19 pages, WBX052a.

Davison, A. , "Coding with HTML forms: HTML goes interactive", Dr. Dobb's Journal, Jun. 6, 1995, vol. 20, No. 6, pp. 70-79, WBX052b.

"Distributed Object Technology in the Financial Services Industry: Trading and Risk Management", A White Paper, Sun Microsystems, 1995, WBX053.

Deng, R.H. et al. , "Integrating Security in CORBA-based Architectures", IEEE, Jun. 1995, pp. 50-61, WBX054.

Detlefs,D.et al.,Debugging Storage Management Problems in Garbage Collected Environments, Proc of USENIX Conference on Object-Oriented Technologies, Monterey,CA,Jun. 1995,WBX055.

Dietinger, T. , Object-Oriented Implementation of a Multiprotocol Hyper-G client for MS-Windows, Diplomarbeit inTelematik, TU Graz, Jul. 1, 1995, WBX056.

Birrell A. et al. , "Network Objects", SRC Research Report, Feb. 28, 1994, WBX014.

Edwards, N. , Object Wrapping (for WWW)—The Key to Integrated Services, ANSA Phase III, Apr. 25, 1995 , WBX058.

Ehikioya,S.A.,"An Agent-Based System for Distributed Transactions: a Model for Internet-Based transactions",Elec and Computer Engg IEEE Canadian Conf,V1,May 9, 1999,p. 289-294,WBX059.

Microsoft DJ Order, C-08-05149 WHA "Order Granting Defendant's Motion to Dismiss", Federal Court of Northern California, Feb. 17, 2009, WBX060.

"Portal Solutions, an Open Market eBusiness Solution Brief" White Paper. Open Market, Forrester Research TechRankings, Feb. 2001, WBX061.

"Wireless Solutions, An Open Market eBusiness Solution Brief", WhitePaper. Open Market, Forrester Research Tech Rankings, Feb. 2001, WBX062.

Fraga, J. et al. , "A Programming Model for Real-Time Applications in Open Distributed Systems", IEEE, 1995, pp. 104-111, WBX063.

Birrell A. et al., "Implementing Remote Procedure Calls", Xerox Palo Alto Research Center, ACM Transactions, Feb. 1, 1994 , WBX015.

Bowen, C. et al. , "How to Get the Most out of CompuServe" 5th Ed. 1991, Random House, Inc. 1991, WBX016.

Braden, R. et al. , RFC 1122: "Requirements for Internet Hosts—Communication Layers" Oct. 1, 1989, WBX017.

Broadvision, "Broadvision One-to-One: On-line Marketing and Selling Application System Developers' Guide", 1995, WBX020.

Broadvision, "Broadvision One-to-One: On-Line Marketing and Selling Application System: Dynamic Command Center User's Guide", 1995, WBX021.

Broadvision, "Broadvision One-to-One: On-Line Marketing and Selling Application System: Installation and System Administration Guide" 1995, WBX022.

Broadvision, "Broadvision One-to-One: On-Line Marketing and Selling Application System: Technical Overview", 1995, WBX023.

Glossbrenner, A. , "MasterGuide to Compuserve", "Chapter 15: Travel Services: Join CompuServe and See the World", Prentice Hall, 1987, WBX065.

Gross,C.,"Taking the Splash Diving into ISAPI",ISAPI Programming,Microsoft Interactive Developer, www.Microsoft.com/mind/0197/ISAPI.htm,Jan. 1, 1997, pp. 1-10,retrievedMay 22, 2001 WBX066.

"Open Market Inc, Managing in a Turbulent Environment", Harvard Business School, 9-196-097, Aug. 29, 1996 , WBX067.

Hickey, M., "Shopping at Home: One Modem Line, No Waiting", Home PC, Dec. 1, 1994, p. 307, Dialog, File 647, Acc# 01038162, WBX068A.

Lang , "Cashing In: The Rush is on to Buy and Sell on the Internet But on Sidelines for Now", Advertising Age, Dec. 19, 1994, p. 11, Dialog, File 16, Acc# 05419137, WBX068B.

Lichty, T. , "America Online Tour Guide", MacIntosh Edition, Version 2, Chapter 1, 3, 8,10, 1992, WBX068C.

Tymnet, Wikipedia, the free encyclopedia, http://en.wikipedia.org/wiki/tymnet, Retrieved on May 1, 2007, WBX068D.

Cox, B. et al. , "NetBill Security and Transaction Protocol", Carnegie Millon University, Pittsburgh, PA 15212-3890, undated, WBX068E.

Lamond, K. et al. , "Credit Card Transactions Real World and OnLine", http://www.virtualschool.edu/mon/ElectronProperty/klamond/credit_card.htm, 1996, pp. 1-16, WBX068F.

"Open Market Catalog Centre",Enterprise Content,/www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FT-            Content Server?pagename=FutureTense/Apps/Xcelerate/Render&c=Arti_ZZZ,WBX069.

Business Wire, High Beam Wire, "Open Market releases first complete software solution" Oct. 16, 1995, WBX070.

McCloghrie, K. et al. , RFC 1156, "Management Information Base for Network Management of TCP/IP-based internets", May 1, 1990 , WBX071.

Case, J. et al. , RFC 1157 May 1, 1990, WBX072.

Rose, M. RFC 1283:"SNMP over OSI", Dec. 1, 1991, WBX073.

Rose, M. et al. , RFC 1155: "Structure and Identification of Management Information for TCP/IP-based internets", May 1, 1990, WBX074.

Case, J. et al. , RFC 1442: "Structure of Management Information for version 2 of the Simple Network Management Protocol (SNMPv2)", AllState 00011394 Apr. 1, 1993, WBX075.

"ORBIX Programmer's Guide", IONA Technologies, Oct. 1, 1997, WBX076A-E.

"ORBIX Programmer's Guide", Release 1.3.1, IONA Technologies, Feb. 1, 1995, WBX077.

Ito, J. et al., "Using meta-objects to support optimization in the Apertos Operating System", USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX078.

Jordan, M. et al., "Software Configuration Management in an Object-Oriented Database", USENIX Conference on Object-Oriented Technologies,Monterey,CA,Jun. 1995, WBX079.

Kane, P. , "Prodigy Made Easy", "Chapter 6, Shopping Made Easy", 2nd ed., 1993, WBX080.

Lagoze, C. et al. , "Dienst: Implementation Reference Manual", May 5, 1995, WBX081.

Open Market Commerce Products, Enterprise Content www.openmarket.com/cgi-bin/gx.cgi/

AppLogic+FTContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=A_ZZZ, WBX082.

Lange, D.B. et al., "Program Explorer: A Program Visualizer for C++", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX083.

Laufer. K. , "A Framework for Higher Order Functions in C++", Proceedings of the USENIX Conference on Object- Oriented Technologies, Monterey, CA, Jun. 1995, WBX084.

Li, G. and Bacon, J., "Supporting Distributed Real-Time Objects", IEEE Jul. 1994, pp. 138-143, WBX085.

Limprecht, R. , "Microsoft Transaction Server", IEEE, Compcon '97 Proceedings, 1997, pp. 14-18, WBX086.

Maffeis, S. , "Adding Group Communication and Fault-Tolerance to CORBA", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey,CA, Jun. 1995 , WBX087.

Mahindra, A. et al. , "Dynamic Insertion of Object Services", Proceedings of the USENIX Conference on Object- Oriented Technologies, Monterey,CA, Jun. 1995, WBX088.

McCloghrie, K. et al. , RFC 1213, "Management Information Base for Network Management of TCP/IP-based internets: MIBI-II", SNMP Working Group, Mar. 1, 1991, WBX089.

McCloghrie, K. et al., RFC 1447, "Party MIB for version 2 of the SIMPLE Network Management Protocol", SNMP Security Working Group, Apr. 1, 1993, WBX090.

McKie, S., "EEP Meets Web E-Commerce", DBMS, Jul. 1, 1998, WBX091.

McMaster D. et al., RFC 1516: "802.3 Repeater devices—Definition of Managed Objects", Feb. 9, 1992, WBX092.

"Allstate Connects with Countrywide Producer Network in Seven Months Using Microsoft Visual Studio.NET and the .NET Framework", Microsoft.Net Customer Solution, Jan. 2003, WBX 093.

O'Brien Jones , U.S. Appl. No. 90/010,346 which is the 5,778,178 Re-exam doc, Exhibits Part 1-WBX101, Exhibits Part 2-WBX102, Nov. 21, 2008 Third Party Requests, WBX094.

"Microsoft Component Services, Server Operating System, A Technology Overview", http://www.microsoft.com/wpaper/compsvcs.asp,Aug. 15, 1998, [retrieved on May 22, 2001],WBX095.

Allstate Uses Web Services to Quickly Create Insurance Policy Management Solution, Microsoft .NET Customer Solution Case Study, Jan. 2005, WBX098.

Mitchell et al., "An Overview of the Spring System", Sun Microsystems, WBX099.

Muckelbauer, P. and Russo, V.,"Lingua Franca: An IDL for Structured Subtyping Distributed Object Systems",USENIX Conference:Object-Oriented Technologies,Monterey,CA,WBX100.

Reynolds, J. Posting to comp doc USENET group, http://nyurl.com/53a95p, RFC 1212, 1213- Google groups on concise definitions MIB and MIBII, Exhibit G, Mar. 27, 1991, WBX045.

Relihan, L. et al., "Untangling the World-Wide Web",12th Annual International Conference on Systems Documentation, Oct. 1, 1994, pp. 17-24, ACM, WBX102A.

Rose, M. T., "The Simple Book: An Introduction to Internet Management", 1994, pp. 14-15, 339-387 (2nd ed.) Exhibit F, WBX102C.

"Open Market Enterprise: Content Server",www.openmarket.com/cgi-bin/gx.cgi/

AppLogic+FTContentServer?pagename=FutureTense/Apps/Xceleratlerate/Render&c=Artic, pp. 1-4,WBX103.

"Open Market Enterprise:Content Center", www.openmarket.com/cgi-bin/gx.cgi/

AppLogic+FTContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=Artic,Retrvd5/15/01, WBX104.

"Open Market Enterprise:Content-Driven eBusiness", www.openmarket.com/cgi-bin/gx.cgi/AppLogic+FT

ContentServer?pagename=FutureTense/Apps/Xcelerate/Render&c=Artic, WBX105.

"Open Market ShopSite 5.0", Retrieved on May 15, 2001 from:<URI.http://www.openmarket.com/cgi-bin/gx.cgi/

AppLogic+FTCont- entServer?pagename=Future Tense/Apps, WBX 112.

Orfali, R. et al., "Essential Client/Server Survival Guide"-John Wiley and Sons—Set 1, 1994, WBX114.

Orfali, R. et al., "Essential Client/Server Survival Guide"-John Wiley and Sons—Set 2, 1994, WBX115.

Orfali, R.; Harkey, D.; Edwards, J., "Essential Client/Server Survival Guide" John Wiley and Sons, Sets 1-4, Jun. 16, 2005, WBX116.

Orfali, R. et al., "Essential Client/Server Survival Guide"-John Wiley and Sons—Set 4, 1994, WBX117.

Pavlou, G. et al. , "A Generic Management Information Base Browser", WBX119.

Peterson, L. et al. , "Computer Networks, A Systems Approach", Morgan Kaufmann Publishers, Inc., 1996, pp. 472-507, WBX120.

Pitkow, J. et al.,"Using the Web as a Survey Tool: Results from the Second WWW User Survey",conducted10/15& Nov. 1994,presented at 3rd Intl WWW Conference Apr. 10-14, 1995, WBX121.

Netscape Unveils New Versions of Commercial Applications for Enhanced Integration with Corporate Databases, NetScape Press Release, May 13, 1996, WBX122.

Raatikainen, K. , "Database Access in Intelligent Networks", Proceedings of IFIP TC6 Workshop on Intelligent Networks, pp. 163-183, WBX123.

Radia, S. R. et al. , "The Spring Object Model", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX124.

Rosenberry, et al. , "OSF Distributed Computing Environment—Understanding DCE"—O'Reilly & Associates, Jun. 1993, WBX126.

Rubin, C. "Wired: In the Bag", Jun. 1997, WBX127.

Schepp et al. , "The Complete Guide to CompuServe: Chapter 12: Travel Services: See the World Today the Compuserve Way", 1990, pp. 409-437, McGraw Hill, WBX128.

Schmidt, D. et al.,"Object-Oriented Components for High-Speed Network Programming", Prcdgs of USENIX Conference on Object-Oriented Technologies, Monterey,CA, Jun. 1995, WBX 129.

Siegel, J., "Common Object Services Specification vol. 1, Rev 1, First Edition", OMG Doc Jan. 1, 1994, Mar. 1, 1994, WBX130, WBX130A.

"Common Desktop Environment: Product Glossary", SunSoft, 1994-1995, WBX131.

"Common Desktop Environment: Applications Builder User's Guide", SunSoft, 1994-1995, WBX132.

"OpenStep Development Tools", SunSoft, 1996, WBX133A, WBX133B.

Porting NextStep 3.2/3.3 Applications to OpenStep on Solaris, Sunsoft, 1996, WBX134.

"Solstice X.500 Programming Reference", SunSoft, 1996 , WBX135, A, B.

Tatters, W. , "Navigating the Internet with Compuserve: Chapter 17: Business on the Net", 1995, pp. 352-374, Sams Publishing, WBX136.

Technical Staff,"The Conductor Financial Services Framework":Distributed Objects on the Internet,Block Financial Corporation White Paper,BFC Technology Center, Oct. 17, 1995WBX137.

Vogler, H. et al.,"The Transaction Internet Protocol in Practice: Reliability for WWW Applications",IEEE 1999 Internet Workshop IWS99,(ISSN-0-7803-5925-9),Feb. 18, 1992,WBX146.

Weich, C.,"Generic Containers for a Distributed Object Store", Prcgs of the USENIX Conference (Jun. 1995) on Object-Oriented Technologies, Monterey,CA, May 18, 1995,WBX150.

"SmallTalk" Wikipedia SmallTalk http://www.objs.com/x3h7/smalltalk.htm and http://en.wikipedia.org/wiki/Smalltalk WBX151.

Wollrath, A. et al. , "Simple Activation for Distributed Objects", Proceedings of the USENIX Conference on Object-Oriented Technologies, Monterey, CA, Jun. 1995, WBX152.

USENIX , "Agenda of Proceedings of the USENIX Conference on Object-Oriented Technologies", Monterey, CA, Jun. 1995, WBX153.

"Common Desktop Environment: Desktop Kornshell User's Guide", Sun Microsystems, 1994-1995 , WBX154.

"Common Desktop Environment: Help System Author's and Programmer's Guide", Sun Microsystems, 1994-1995, (Three parts) WBX155.

"Common Desktop Environment: Internationalization Programmer's Guide", Sun Microsystems, 1994-1995, WBX156.

"Common Desktop Environment: Tooltalk Messaging Overview", Sun Microsystems, 1994-1995 , WBX157.

"Common Desktop Environment: Common StyleGuide and Certification CheckList", SunSoft, 1994-1995 , WBX158, 158C.

"Common Desktop Environment: Programmer's Overview", SunSoft, 1994-1995 , WBX159.

Developer's Guide to Internationalization, Sun Microsystems, 1994, WBX160.

"Dr. Gui's Gentle Guide to COM", http://www.microsoft.com/Com/news/drgui.asp [retrieved on May 22, 2001], Nov. 1, 1999, WBX161.

"iPIN Company Info", http://www.ipin.com/01comp.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX162.

"iPIN Home", http://www.ipin.com [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX163.

"iPIN Service Options", http://www.ipin.com/02prod_service.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX164.

"iPIN Solutions", http://www.ipin.com/02prod_solution.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX165.

"iPIN Partners", http://www.ipin.com/03part.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX166.

"iPIN Technology", http://www.ipin.com/02prod_tech.html [retrieved on May 23, 2001], iPIN Interactive Transaction Services, Inc., 2000, WBX167.

NetScape Products: Open and Secure Internet Software, 1995, WBX168A.

NetScape Merchant System, Data Sheet 1995, WBX168B.

NetScape Internet Applications, Customer Showcase 1995, WBX168C.

NetScape Server API, 1995, WBX 168D.

NetScape Object-Oriented Pradigm of Server Configuration, 1995, WBX168E.

RSA: Verisign Redirection Information, Important Announcement 1995, WBX168F.

RSA: Verisign to Provide Digital IDs for Open Market's Secure WebServer, 1995, WBX168G.

Verisign Adds the Missing Component to Online Security Solutions 1995, WBX168H.

Hickman, K.E.B.; Netscape, "The SSL Protocol", 1995, WBX168I.

NetScape iStore DataSheet, 1995, WBX168J.

Choudhury, A.K. et al. , "Copyright Protection for Electronic Publishing over Computer Networks", 1995 IEEE Network, 9, May/Jun., vol. 3 pp. 12-20 (1995) WBX168L.

NSAPI Basics, (Chapter 1) http://developer.netscape.com/docs/manuals/enterprise/nsapi/svrop.htm [retrieved on May 22, 2001], 1997, WBX174.

"OpenStep User Interface Guidelines", SunSoft, 1996, WBX175.

"OpenStep Programming Reference", SunSoft, 1996 , (12 parts) WBX176.

"QuickStart to Using the Open Step Desktop", SunSoft, 1996, WBX177.

Rose, M. et al. , "RFC 1065:Structure and Identification of Management Information for TCP/IP-based internets",Aug. 1, 1988, WBX178.

Stewart, B. , RFC 1318: "Definition of Managed Objects for Parallel-printer-like Hardware Devices", Apr. 1, 1992, WBX179.

Rivest, R., "RFC 1321: The MD5 Message-Digest Algorithm", 1997, WBX180.

Solaris Common Desktop Envirnment: MOTIF Transition Guide, Sun Microsystems, 1997, WBX181.

"Solaris Common Desktop Environment: Programmer's Guide", Sun Microsystems, 1994-1995, WBX182.

"The iPin Approach", http://www.ipin.com/02prod.html, 2000, [retrieved on May 23, 2001], Interactive Transaction Services, Inc., WBX183.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part1-1, John Wiley and Sons, 1996, WBX201.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part1-2, John Wiley and Sons, 1996 , WBX202.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part1-3, John Wiley and Sons, 1996, WBX203.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part2-1, John Wiley and Sons, 1996, WBX204.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part2-2, John Wiley and Sons, 1996 , WBX205.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part2-3, John Wiley and Sons, 1996, WBX206.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part3-1, John Wiley and Sons, 1996 , WBX207.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part3-2, John Wiley and Sons, 1996 , WBX208.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part3-3, John Wiley and Sons, 1996, WBX209.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part4-1, John Wiley and Sons, 1996, WBX210.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part4-2, John Wiley and Sons, 1996, WBX211.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part4-3, John Wiley and Sons, 1996, WBX212.

Orfali, R. et al. , "The Essential Distributed Objects Survival Guide"-Part4-4, John Wiley and Sons, 1996, WBX213.

Broadvision , "Broadvision One-to-One: Programmer's Reference, Part 1" 1995 , WBX214.

Broadvision , "Broadvision One-to-One: Programmer's Reference, Part 2" 1995 , WBX215.

OMG , "The Common Object Request Broker: Architecture and Specification", CORBA v2.0_(NYC-#1655390-v1), Jul. 1995-1996, WBX216.

The Open Group , "Inter-domain Management: Specification Translation", 1997, WBX222.

The Open Group , "Inter-domain Management_Summary of Similarities and Differences", 1997, WBX223.

The Open Group , "Inter-domain Management_object models comparison", 1997, WBX224.

Miller, M. , "Managing Internetworks with SNMP", 1993, pp. 138-139, M&T Books., '506 Inter Partes Re-examination Exhibit 12, Dec. 2008, WBX225.

Umar, A. , "Distributed Computing: A Practical Synthesis", "Appendix B: Tutorial on TCP/IP Protocol Suite", (BellCore), 1993, WBX226.

Umar, A. , "Distributed Computing: A Practical Synthesis", "Chapter 5: Client-Server Systems and Application- Interconnectivity", (BellCore), 1993, WBX227.

SPERO,"Binary Gateway Interface-An API for Dynamically Extensible http Servers",Jul. 1, 1994, Retrieved on Apr. 5, 2009 from http://www.ibiblio.org/mdma-release/BGI-spec.txt, WBX228.

"Point, Click and Shop Never So Easy;The CheckFree Wallet",NewsHound,SJMercury News, PRNewswire,Apr. 10, 1995, Retrieved Apr. 5, 2009 from http://besser.tsoa.nyu.ed_ZZZ,WBX229.

DEC  ObjBroker,I.0.9,Apr. 3, 1996,http://209.85.173.132/search?q=cache:c3iJxZca3aUJ:www.faqs.org/faqs/object-faq/part3/+DEC%27s+ObjectBroker+Service&cd=9&,hl=en&ct=clnk&g_ZZZ,WBX230.

Arunachalam , U.S. Appl. No. 11/980,185_Duty of Candor Rule 56 Disclosure, Feb. 11, 2009, WBX220.

Arunachalam , U.S. Appl. No. 11/980,185_Duty of Candor Rule 56 Disclosure, Mar. 4, 2009, WBX221.

NYC-#1579692-v1-WebXchange _—_March_3_DELL_Complaint.DOC, Mar. 3, 2008, WBX217.

NYC-#1579751-v1-WebXchange _—_March_3_Allstate_Complaint.DOC, Mar. 3, 2008, WBX218.

NYC-#1579947-v1-WebXchange _—_March_3_FedEx_Complaint.DOC, Mar. 3, 2008, WBX219.

"Easel Corporation Introduces Comprehensive Program",Mar. 13, 1995, Business Wire, http://209.85.173.132/search?q=cache:MescjZC2srEJ:findarticles/mi_m0EIN/ is_1995_Marc_ZZZ, WBX231.

"Internet Information Commerce:The First Virtual",Jul. 1995,1st USENIX Wkshp:E-Commerce,NY Retrvd Apr. 9, 2009http://www.usenix.org/publications/library/proceedings/ec95/f_ZZZ,WBX232.

"O'Reilly Releases Website",WebView,EIT,May 12, 1995,V7:Issue41,ISSN1004-042X, Computer underground Digest, RtrvdApr. 5, 2009http://cu-digest.org/CUDS7/cud74_ZZZ,WBX233.

"RSA And EIT JointVenture", Terisa Systems, EIT and RSA: Secure HTTP, Jun. 13, 1994, Retrieved on Apr. 5, 2009 http://1997.webhistory.org/www.lists/www-talk.1994q2/0980.html,WBX234.

"CommerceNet The First Large-Scale Market Trial",EIT:CommerceNet, Aug. 3, 1994, Proc.May 1994, Ties That Bind conference, Rtrvd Apr. 5, 2009 http://internet.eser_ZZZ, WBX235.

Rubin, A.,"IETF-Stockholm meeting" NetCheck:E-signatures,Aug. 5, 1995,pp. 1-2,CIPHER,NewsletterIEEE Computer Society's TC 8, http://www.ieee-security.org/Cipher/PastIssu_ZZZ,WBX236.

Open Market, "FastCGI:A High-Performance Web Server Interface", Apr. 1996, Retrieved on Apr. 5, 2009 http://www.fastcgi.com/devkit/doc/fastcgi-whitepaper/fastcgi.htm,WBX 237.

**US 8,108,492 B2**

Page 7

Sun Microsystems, "HotJava", Wikipedia, the free encyclopedia, Jun. 1995, Retrieved on Apr. 5, 2009 from http://en.wikipedia.org/wiki/HotJava, WBX238.

W3C Status Codes, HTRESP__html__w3__org, 1992 WBX239.

Hewlett Packard, "HP Odapter/OpenODB", Jul. 1994, Retrieved on Apr. 5, 2009 from http://web.bilkent.edu.tr/Online/oofaq/oo-faq-S-8.13.0.5.html, WBX240.

Internet Shopping Network__ISN Business Newswire (1995) WBX241.

NCR Co-operative Frameworks 3, (1993) WBX242.

Distributed Objects Everywhere, NEO, Wikipedia (1996) WBX243.

NetMarket (1996) WBX244.

Enterprise Object Netorks, Wikipedia (1996) WBX245.

OMG Document No. 91__12__1 Revision 1__1 (1997) WBX246.

DigiCash Smartcards (1997) WBX247.

IBM System Object Model__SOM (1998) WBX248.

IBM System Object Model__SOM,DSOM (1998) WBX249.

Open Market StoreBuilder (1995) WBX250.

WebXpress Web StoreFront (1996) WBX251.

PNC, Industry.Net do eCommerce (1996) WBX252.

10KPowerShip,PowerPartner (1996) WBX253.

T. Berners Lee Hypertext Mark up Language RFC1866(1995) WBX 254.

E. Nebel RFC1867 (1995) WEBX255.

RFC1942 (1996) WEBX256.

J. Seidman RFC1980 (1996) WBX257.

HTML—Wikipedia, the free encyclopedia—Notepad (1998) WBX258.

Berners-Lee, T., RFC 1630, "Universal Resource Identifiers in WWW", Network Working Group, CERN, Jun. 1994 WBX259.

Object Broker Service Middleware Sourcebook (1995) WBX260.

WBXexecsummary4809new2bizplan[1] (2009) WBX268.

Kramer, Douglas Java Whitepaper May 1996, WBX500.

* cited by examiner



**FIG. 1A** (PRIOR ART)



**FIG. 1B** (PRIOR ART)



**FIG. 2**



OSI MODEL
<u>300</u>

| APPLICATION |
| :-- |
| <u>307</u> |
| PRESENTATION |
| <u>306</u> |
| SESSION |
| <u>305</u> |
| TRANSPORT |
| <u>304</u> |
| NETWORK |
| <u>303</u> |
| DATA LINK |
| <u>302</u> |
| PHYSICAL |
| <u>301</u> |

# FIG. 3

FIG. 4A



FIG. 4B



## FIG.  5A



## FIG.  5B



FIG. 5C



**FIG. 5D**



# FIG. 5E



**FIG. 6A**



# FIG. 6B



**FIG. 7**



**FIG. 8**

US 8,108,492 B2

1
# WEB APPLICATION NETWORK PORTAL

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a divisional and claims the priority benefit of U.S. patent application Ser. No. 11/980,185 filed Oct. 30, 2007 now U.S. Pat. No. 8,037,158, which is a continuation-in-part of U.S. patent application Ser. No. 09/792,323, now U.S. Pat. No. 7,340,506, filed Feb. 23, 2001, which is a divisional of U.S. patent application Ser. No. 09/296,207, filed Apr. 21, 1999, now U.S. Pat. No. 6,212,556, which is a continuation-in-part of U.S. patent application Ser. No. 08/879,958, now U.S. Pat. No. 5,987,500, filed Jun. 20, 1997, which is a divisional and claims the priority benefit of U.S. patent application Ser. No. 08/700,726, now U.S. Pat. No. 5,778,178, filed Aug. 5, 1996, which claims the priority benefit of U.S. provisional application 60/006,634 filed Nov. 13, 1995. This application also claims benefit under 35 U.S.C. 119(e) to U.S. Provisional application Ser. No. 60/006,634 filed Nov. 13, 1995. The following applications are related applications: application Ser. Nos. 09/863,704; 12/628,066; 12/628,068; 12/628,069, 12/932,758 and 60/206,422.

## BACKGROUND

### 1. Field of the Invention

The present invention relates to the area of Internet communications. Specifically, the present invention relates to a method and apparatus for configurable value-added network switching and object routing.

### 2. Background of the Invention

With the Internet and the World Wide Web ("the Web") evolving rapidly as a viable consumer medium for electronic commerce, new on-line services are emerging to fill the needs of on-line users. An Internet user today can browse on the Web via the use of a Web browser. Web browsers are software interfaces that run on Web clients to allow access to Web servers via a simple user interface. A Web user's capabilities today from a Web browser are, however, extremely limited. The user can perform one-way, browse-only interactions. Additionally, the user has limited "deferred" transactional capabilities, namely electronic mail (e-mail) capabilities. E-mail capabilities are referred to as "deferred transactions" because the consumer's request is not processed until the e-mail is received, read, and the person or system reading the e-mail executes the transaction. This transaction is thus not performed in real-time.

FIG. 1A illustrates typical user interactions on the Web today. User 100 sends out a request from Web browser 102 in the form of a universal resource locator (URL) 101 in the following manner: http://www.car.com. URL 101 is processed by Web browser 102 that determines the URL corresponds to car dealer Web page 105, on car dealer Web server 104. Web browser 102 then establishes browse link 103 to car dealer Web page 105. User 100 can browse Web page 105 and select "hot links" to jump to other locations in Web page 105, or to move to other Web pages on the Web. This interaction is typically a browse-only interaction. Under limited circumstances, the user may be able to fill out a form on car dealer Web page 105, and e-mail the form to car dealer Web server 104. This interaction is still strictly a one-way browse mode communications link, with the e-mail providing limited, deferred transactional capabilities.

Under limited circumstances, a user may have access to two-way services on the Web via Common Gateway Interface (CGI) applications. CGI is a standard interface for running

2
external programs on a Web server. It allows Web servers to create documents dynamically when the server receives a request from the Web browser. When the Web server receives a request for a document, the Web server dynamically executes the appropriate CGI script and transmits the output of the execution back to the requesting Web browser. This interaction can thus be termed a "two-way" transaction. It is a severely limited transaction, however, because each CGI application is customized for a particular type of application or service.

For example, as illustrated in FIG. 1B, user 100 may access bank 150's Web server and attempt to perform transactions on checking account 152 and to make a payment on loan account 154. In order for user 100 to access checking account 152 and loan account 154 on the Web, CGI application scripts must be created for each account, as illustrated in FIG. 1B. The bank thus has to create individual scripts for each of its services to offer users access to these services. User 100 can then interact in a limited fashion with these individual applications. Creating and managing individual CGI scripts for each service is not a viable solution for merchants with a large number of services.

As the Web expands and electronic commerce becomes more desirable, the need increases for robust, real-time, bidirectional transactional capabilities on the Web. A true real-time, bi-directional transaction would allow a user to connect to a variety of services on the Web, and perform real-time transactions on those services. For example, although user 100 can browse car dealer Web page 105 today, the user cannot purchase the car, negotiate a car loan or perform other types of real-time, two-way transactions that he can perform with a live salesperson at the car dealership. Ideally, user 100 in FIG. 1A would be able to access car dealer Web page 105, select specific transactions that he desires to perform, such as purchase a car, and perform the purchase in real-time, with two-way interaction capabilities. CGI applications provide user 100 with a limited ability for two-way interaction with car dealer Web page 105, but due to the lack of interaction and management between the car dealer and the bank, he will not be able to obtain a loan and complete the purchase of the car via a CGI application. The ability to complete robust real-time, two-way transactions is thus not truly available on the Web today.

## SUMMARY OF THE INVENTION

It is therefore an object of the present invention to provide a method and apparatus for providing real-time, two-way transactional capabilities on the Web. Specifically, one embodiment of the present invention discloses a configurable value-added network switch for enabling real-time transactions on the World Wide Web. The configurable value added network switch comprises means for switching to a transactional application in response to a user specification from a World Wide Web application, means for transmitting a transaction request from the transactional application, and means for processing the transaction request.

According to another aspect of the present invention, a method and apparatus for enabling object routing on the World Wide Web is disclosed. The method for enabling object routing comprises the steps of creating a virtual information store containing information entries and attributes, associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities.

3

Other objects, features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description.

## BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of the present invention will be apparent from the accompanying drawings and from the detailed description of the present invention as set forth below.

FIG. 1A is an illustration of a current user's browse capabilities on the Web via a Web browser.

FIG. 1B is an illustration of a current user's capabilities to perform limited transactions on the Web via CGI applications.

FIG. 2 illustrates a typical computer system on which the present invention may be utilized.

FIG. 3 illustrates the Open Systems Interconnection (OSI) Model.

FIG. 4A illustrates conceptually the user value chain as it exists today.

FIG. 4B illustrates one embodiment of the present invention.

FIG. 5A illustrates a user accessing a Web server including one embodiment of the present invention.

FIG. 5B illustrates the exchange component according to one embodiment of the present invention.

FIG. 5C illustrates an example of a point-of-service (POSvc) application list.

FIG. 5D illustrates a user selecting a bank POSvc application from the POSvc application list.

FIG. 5E illustrates a three-way transaction according to one embodiment of the present invention.

FIG. 6A illustrates a value-added network (VAN) switch.

FIG. 6B illustrates the hierarchical addressing tree structure of the networked objects in DOLSIBs.

FIG. 7 illustrates conceptually the layered architecture of a VAN switch.

FIG. 8 is a flow diagram illustrating one embodiment of the present invention.

## DETAILED DESCRIPTION

The present invention relates to a method and apparatus for configurable value-added network switching and object routing and management. "Web browser" as used in the context of the present specification includes conventional Web browsers such as NCSA Mosaic™ from NCSA and Netscape Mosaic™ from Netscape™. The present invention is independent of the Web browser being utilized and the user can use any Web browser, without modifications to the Web browser. In the following detailed description, numerous specific details are set forth in order to provide a thorough understanding of the present invention. It will be apparent to one of ordinary skill in the art, however, that these specific details need not be used to practice the present invention. In other instances, well-known structures, interfaces and processes have not been shown in detail in order not to unnecessarily obscure the present invention.

FIG. 2 illustrates a typical computer system 200 in which the present invention operates. The preferred embodiment of the present invention is implemented on an IBM™ Personal Computer manufactured by IBM Corporation of Armonk, N.Y. Alternate embodiments may be implemented on a Macintosh™ computer manufactured by Apple™ Computer, Incorporated of Cupertino, Calif. It will be apparent to those

4

of ordinary skill in the art that other alternative computer system architectures may also be employed.

In general, such computer systems as illustrated by FIG. 2 comprise a bus 201 for communicating information, a processor 202 coupled with the bus 201 for processing information, main memory 203 coupled with the bus 201 for storing information and instructions for the processor 202, a read-only memory 204 coupled with the bus 201 for storing static information and instructions for the processor 202, a display device 205 coupled with the bus 201 for displaying information for a computer user, an input device 206 coupled with the bus 201 for communicating information and command selections to the processor 202, and a mass storage device 207, such as a magnetic disk and associated disk drive, coupled with the bus 201 for storing information and instructions. A data storage medium 208 containing digital information is configured to operate with mass storage device 207 to allow processor 202 access to the digital information on data storage medium 208 via bus 201.

Processor 202 may be any of a wide variety of general purpose processors or microprocessors such as the Pentium™ microprocessor manufactured by Intel™ Corporation or the Motorola™ 68040 or Power PC™ brand microprocessor manufactured by manufactured by Motorola™ Corporation. It will be apparent to those of ordinary skill in the art, however, that other varieties of processors may also be used in a particular computer system. Display device 205 may be a liquid crystal device, cathode ray tube (CRT), or other suitable display device. Mass storage device 207 may be a conventional hard disk drive, floppy disk drive, CD-ROM drive, or other magnetic or optical data storage device for reading and writing information stored on a hard disk, a floppy disk, a CD-ROM a magnetic tape, or other magnetic or optical data storage medium. Data storage medium 208 may be a hard disk, a floppy disk, a CD-ROM, a magnetic tape, or other magnetic or optical data storage medium.

In general, processor 202 retrieves processing instructions and data from a data storage medium 208 using mass storage device 207 and downloads this information into random access memory 203 for execution. Processor 202, then executes an instruction stream from random access memory 203 or read-only memory 204. Command selections and information input at input device 206 are used to direct the flow of instructions executed by processor 202. Equivalent input device 206 may also be a pointing device such as a conventional mouse or trackball device. The results of this processing execution are then displayed on display device 205.

The preferred embodiment of the present invention is implemented as a software module, which may be executed on a computer system such as computer system 200 in a conventional manner. Using well known techniques, the application software of the preferred embodiment is stored on data storage medium 208 and subsequently loaded into and executed within computer system 200. Once initiated, the software of the preferred embodiment operates in the manner described below.

FIG. 3 illustrates the Open Systems Interconnection (OSI) reference model. OSI Model 300 is an international standard that provides a common basis for the coordination of standards development, for the purpose of systems interconnection. The present invention is implemented to function as a routing switch within the "application layer" of the OSI model. The model defines seven layers, with each layer communicating with its peer layer in another node through the use of a protocol. Physical layer 301 is the lowest layer, with responsibility to transmit unstructured bits across a link. Data

link layer **302** is the next layer above physical layer **301**. Data link layer **302** transmits chunks across the link and deals with problems like checksumming to detect data corruption, orderly coordination of the use of shared media and addressing when multiple systems are reachable. Network bridges operate within data link layer **302**.

Network layer **303** enables any pair of systems in the network to communicate with each other. Network layer **303** contains hardware units such as routers that handle routing, packet fragmentation and reassembly of packets. Transport layer **304** establishes a reliable communication stream between a pair of systems, dealing with errors such as lost packets, duplicate packets, packet reordering and fragmentation. Session layer **305** offers services above the simple communication stream provided by transport layer **304**. These services include dialog control and chaining. Presentation layer **306** provides a means by which OSI compliant applications can agree on representations for data. Finally, application layer **307** includes services such as file transfer, access and management services (FTAM), electronic mail and virtual terminal (VT) services. Application layer **307** provides a means for application programs to access the OSI environment. As described above, the present invention is implemented to function as a routing switch in application layer **307**. Application layer routing creates an open channel for the management, and the selective flow of data from remote databases on a network.

A. Overview

FIG. **4A** illustrates conceptually the user value chain as it exists today. The user value chain in FIG. **4A** depicts the types of transactions that are performed today, and the channels through which the transactions are performed. A "transaction" for the purposes of the present invention includes any type of commercial or other type of interaction that a user may want to perform. Examples of transactions include a deposit into a bank account, a request for a loan from a bank, a purchase of a car from a car dealership or a purchase of a car with financing from a bank. A large variety of other transactions are also possible.

A typical user transaction today may involve user **100** walking into a bank or driving up to a teller machine, and interacting with a live bank teller, or automated teller machine (ATM) software applications. Alternatively, user **100** can perform the same transaction by using a personal computer (PC), activating application software on his PC to access his bank account, and dialing into the bank via a modem line. If user **100** is a Web user, however, there is no current mechanism for performing a robust, real-time transaction with the bank, as illustrated in FIG. **4A**. CGI scripts provide only limited two-way capabilities, as described above. Thus, due to this lack of a robust mechanism by which real-time Web transactions can be performed, the bank is unable to be a true "Web merchant," namely a merchant capable of providing complete transactional services on the Web.

According to one embodiment of the present invention, as illustrated in FIG. **4B**, each merchant that desires to be a Web merchant can provide real-time transactional capabilities to users who desire to access the merchants' services via the Web. This embodiment includes a service network running on top of a facilities network, namely the Internet, the Web or e-mail networks. For the purposes of this application, users are described as utilizing PC's to access the Web via Web server "switching" sites. (Switching is described in more detail below). Users may also utilize other personal devices such as network computers or cellular devices to access the merchants' services via appropriate switching sites. These switching sites include non-Web network computer sites and

cellular provider sites. Five components interact to provide this service network functionality, namely an exchange, an operator agent, a management agent, a management manager and a graphical user interface. All five components are described in more detail below.

As illustrated in FIG. **5A**, user **100** accesses Web server **104**. Having accessed Web server **104**, user **100** can decide that he desires to perform real-time transactions. When Web server **104** receives user **100**'s indication that he desires to perform real-time transactions, the request is handed over to an exchange component. Thus, from Web page **105**, for example, user **100** can select button **500**, entitled "Transactions" and Web server **104** hands user **100**'s request over to the exchange component. The button and the title can be replaced by any mechanism that can instruct a Web server to hand over the consumer's request to the exchange component.

FIG. **5B** illustrates exchange **501**. Exchange **501** comprises Web page **505** and point-of-service (POSvc) applications **510**. Exchange **501** also conceptually includes a switching component and an object routing component (described in more detail below). POSvc applications **510** are transactional applications, namely applications that are designed to incorporate and take advantage of the capabilities provided by the present invention. Although exchange **501** is depicted as residing on Web server **104**, the exchange can also reside on a separate computer system that resides on the Internet and has an Internet address. Exchange **501** may also include operator agent **503** that interacts with a management manager (described in more detail below). Exchange **501** creates and allows for the management (or distributed control) of a service network, operating within the boundaries of an IP-based facilities network. Thus, exchange **501** and a management agent component, described in more detail below, under the headings "VAN Switch and Object Routing," together perform the switching, object routing, application and service management functions according to one embodiment of the present invention.

Exchange **501** processes the consumer's request and displays an exchange Web page **505** that includes a list of POSvc applications **510** accessible by exchange **501**. A POSvc application is an application that can execute the type of transaction that the user may be interested in performing. The POSvc list is displayed via the graphical user interface component. One embodiment of the present invention supports Hyper-Text Markup Language as the graphical user interface component. Virtual Reality Markup Language and Java™ are also supported by this embodiment. A variety of other graphical user interface standards can also be utilized to implement the graphical user interface.

An example of a POSvc application list is illustrated in FIG. **5C**. User **100** can thus select from POSvc applications Bank **510(1)**, Car Dealer **510(2)** or Pizzeria **510(3)**. Numerous other POSvc applications can also be included in this selection. If user **100** desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user **100**, as illustrated in FIG. **5D**. For the purposes of illustration, exchange **501** in FIG. **5D** is shown as running on a different computer system (Web server **104**) from the computer systems of the Web merchants running POSvc applications (computer system **200**). Exchange **501** may, however, also be on the same computer system as one or more of the computer systems of the Web merchants.

Once Bank POSvc application **510** has been activated, user **100** will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing

7

data from a host or data repository **575** in the Bank "Back Office." The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data. This connection between user **100** and Bank services is managed by exchange **501**. As illustrated in FIG. **5**D, once the connection is made between Bank POSvc application **510**(1), for example, and Bank services, an operator agent on Web server **104** may be activated to ensure the availability of distributed functions and capabilities.

Each Web merchant may choose the types of services that it would like to offer its clients. In this example, if Bank decided to include in their POSvc application access to checking and savings accounts, user **100** will be able to perform real-time transactions against his checking and savings accounts. Thus, if user **100** moves $500 from his checking account into his savings account, the transaction will be performed in real-time, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine. Therefore, unlike his prior access to his account, user **100** now has the capability to do more than browse his bank account. The ability to perform these types of robust, real-time transactions from a Web client is a significant aspect of the present invention.

Bank can also decide to provide other types of services in POSvc application **510**(1). For example, Bank may agree with Car dealership to allow Bank customers to purchase a car from that dealer, request a car loan from Bank, and have the entire transaction performed on the Web, as illustrated in FIG. **5**E. In this instance, the transactions are not merely two-way, between the user and Bank, but three-way, amongst the consumer, Bank and Car dealership. According to one aspect of the present invention, this three-way transaction can be expanded to n-way transactions, where n represents a predetermined number of merchants or other service providers who have agreed to cooperate to provide services to users. The present invention therefore allows for "any-to-any" communication and transactions on the Web, thus facilitating a large, flexible variety of robust, real-time transactions on the Web.

Finally, Bank may also decide to provide intra-merchant or intra-bank services, together with the inter-merchant services described above. For example, if Bank creates a POSvc application for use by the Bank Payroll department, Bank may provide its own employees with a means for submitting timecards for payroll processing by the Bank's Human Resources (HR) Department. An employee selects the Bank HR POSvc application, and submits his timecard. The employee's timecard is processed by accessing the employee's payroll information, stored in the Bank's Back Office. The transaction is thus processed in real-time, and the employee receives his paycheck immediately.

B. Van Switching and Object Routing

As described above, exchange **501** and management agent **601**, illustrated in FIG. **6**A, together constitute a value-added network (VAN) switch. These two elements may take on different roles as necessary, including peer-to-peer, client-server or master-slave roles. Management manager **603** is illustrated as residing on a separate computer system on the Internet. Management manager **603** can, however, also reside on the same machine as exchange **501**. Management manager **603** interacts with the operator agent **503** residing on exchange **501**.

VAN switch **520** provides multi-protocol object routing, depending upon the specific VAN services chosen. This multi-protocol object routing is provided via a proprietary protocol, TransWeb™ Management Protocol (TMP). TMP incorporates the same security features as the traditional Simple Network Management Protocol, SNMP. It also allows

8

for the integration of other traditional security mechanisms, including RSA security mechanisms.

One embodiment of the present invention utilizes TMP and distributed on-line service information bases (DOLSIBs) to perform object routing. Alternatively, TMP can incorporate s-HTTP, Java™, the WinSock API or ORB with DOLSIBs to perform object routing. DOLSIBs are virtual information stores optimized for networking. All information entries and attributes in a DOLSIB virtual information store are associated with a networked object identity. The networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects, and each networked object is assigned an Internet address. The Internet address is assigned based on the IP address of the node at which the networked object resides.

For example, in FIG. **5**A, Web server **104** is a node on the Internet, with an IP address. All networked object associated with Web server **104** will therefore be assigned an Internet address based on the Web server **104**'s IP address. These networked objects thus "branch" from the node, creating a hierarchical tree structure. The Internet address for each networked object in the tree essentially establishes the individual object as an "IP-reachable" or accessible node on the Internet. TMP utilizes this Internet address to uniquely identify and access the object from the DOLSIB. FIG. **6**B illustrates an example of this hierarchical addressing tree structure.

Each object in the DOLSIB has a name, a syntax and an encoding. The name is an administratively assigned object ID specifying an object type. The object type together with the object instance serves to uniquely identify a specific instantiation of the object. For example, if object **610** is information about models of cars, then one instance of that object would provide user **100** with information about a specific model of the car while another instance would provide information about a different model of the car. The syntax of an object type defines the abstract data structure corresponding to that object type. Encoding of objects defines how the object is represented by the object type syntax while being transmitted over the network.

C. Management and Administration

As described above, exchange **501** and management agent **601** together constitute a VAN switch. FIG. **7** illustrates conceptually the layered architecture of VAN switch **520**. Specifically, boundary service **701** provides the interfaces between VAN switch **520**, the Internet and the Web, and multi-media end user devices such as PCs, televisions or telephones. Boundary service **701** also provides the interface to the on-line service provider. A user can connect to a local application, namely one accessible via a local VAN switch, or be routed or "switched" to an application accessible via a remote VAN switch.

Switching service **702** is an OSI application layer switch. Switching service **702** thus represents the core of the VAN switch. It performs a number of tasks including the routing of user connections to remote VAN switches, described in the paragraph above, multiplexing and prioritization of requests, and flow control. Switching service **702** also facilitates open systems' connectivity with both the Internet (a public switched network) and private networks including back office networks, such as banking networks. Interconnected application layer switches form the application network backbone. These switches are one significant aspect of the present invention.

Management service **703** contains tools such as Information Management Services (IMS) and application Network Management Services (NMS). These tools are used by the end users to manage network resources, including VAN

**9**

switches. Management service **703** also provides applications that perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions. These OAM&P functions include security management, fault management, configuration management, performance management and billing management. Providing OAM&P functions for applications in this manner is another significant aspect of the present invention.

Finally, application service **704** contains application programs that deliver customer services. Application service **704** includes POSvc applications such as Bank POSvc described above, and illustrated in FIG. **6A**. Other examples of VAN services include multi-media messaging, archival/retrieval management, directory services, data staging, conferencing, financial services, home banking, risk management and a variety of other vertical services. Each VAN service is designed to meet a particular set of requirements related to performance, reliability, maintenance and ability to handle expected traffic volume. Depending on the type of service, the characteristics of the network elements will differ. VAN service **704** provides a number of functions including communications services for both management and end users of the network and control for the user over the user's environment.

FIG. **8** is a flow diagram illustrating one embodiment of the present invention. A user connects to a Web server running an exchange component in step **802**. In step **804**, the user issues a request for a transactional application, and the web server hands off the request to an exchange in step **806**. The exchange activates a graphical user interface to present user with a list of POSvc application options in step **808**. In step **810**, the user makes a selection from the POSvc application list. In step **812**, the switching component in the exchange switches the user to the selected POSvc application, and in step **814**, the object routing component executes the user's request. Data is retrieved from the appropriate data repository via TMP in step **816**, and finally, the user may optionally continue the transaction in step **818** or end the transaction.

Thus, a configurable value-added network switching and object routing method and apparatus is disclosed. These specific arrangements and methods described herein are merely illustrative of the principles of the present invention. Numerous modifications in form and detail may be made by those of ordinary skill in the art without departing from the scope of the present invention. Although this invention has been shown in relation to a particular preferred embodiment, it should not be considered so limited. Rather, the present invention is limited only by the scope of the appended claims.

What is claimed is:

1. A system, comprising:
   a Web server, including a processor and a memory, for offering one or more Web applications as respective point-of-service applications in a point-of-service application list on a Web page;
   each Web application of the one or more Web applications for requesting a real-time Web transaction;
   a value-added network (VAN) switch running on top of a facilities network selected from a group consisting of the World Wide Web, the Internet and an e-mail network, the VAN switch for enabling the real-time Web transactions from the one or more Web applications;
   a service network running on top of the facilities network for connecting through the Web server to a back-end transactional application; and
   a computer system executing the Back-end transactional application for processing the transaction request in real-time.

**10**

2. The system of claim 1, wherein the VAN switch is an application layer switch in the application layer of the OSI model.

3. The system of claim 1, wherein the VAN switch enables the switching to Web merchant services in response to a Web server's receipt of a selection of one of the point-of-service applications corresponding to the Web merchant services from the point-of-service application list on the Web page.

4. The system of claim 1, wherein each Web merchant service includes one of the one or more Web applications offered as a VAN service, utilizing the VAN switch.

5. The system of claim 1, wherein each Web application of the one or more Web applications is a value-added network (VAN) service or online service atop the Web, utilizing the VAN switch.

6. The system of claim 1, wherein the service network includes the one or more Web applications and wherein the service network manages the flow of real-time Web transactions from the one or more Web applications and includes the VAN switch.

7. The system of claim 1, wherein the Web server is configured to receive a Web transaction request and wherein the Web transaction request is a request to perform one of the real-time Web transactions from one of the one or more Web applications, utilizing the VAN switch.

8. The system of claim 1, further comprising:
   a computer system executing a back-end transactional application for processing the transaction request in real-time, wherein said computer system includes a data repository, wherein the data repository is a data repository to store banking data, and wherein retrieving data includes retrieving banking data to complete a real-time Web banking transaction as one of the real-time Web transactions from a banking Web application as one of the one or more Web applications.

9. The system of claim 1, further comprising the one or more Web applications offered as software-as-a-service atop the Web.

10. A method for performing real-time Web transactions from a Web application, comprising:
   receiving a request at a Web server, including a processor and a memory, for a real-time Web transaction from a Web application on a Web page, wherein the Web server is configured to hand over the request to a Value Added Network (VAN) switch;
   offering a plurality of Web applications including the Web application on a Web page, upon receipt from a Web server a selection of the Web application from the offered Web applications, the Web application corresponding to a respective back-end transactional application, wherein the back-end transactional application is an application running at the back-office server of one or more Web merchants or at the back-end;
   receiving a request for Web merchant services upon receipt by a Web server a selection of the Web application, wherein the request for Web merchant services is a request to connect to the selected back-end transactional application to perform an interactive real-time Web transaction from the Web application, wherein the transactional application is an on-line service provided by one or more Web merchants or the back-end;
   switching utilizing the VAN switch to the back-end transactional application in response to receiving the request from the Web server;

**11**

providing distributed control of a service network, operating within the boundaries of an IP-based facilities network;

connecting to specified ones of the Web merchant services or to back-end services, wherein the connection to the Web merchant services or back-end transactional services is managed;

accessing data from a host or data repository coupled to the back office server of one or more Web merchants or to the back-end transactional application, wherein the back office server or back-end is coupled to legacy databases and other data repositories that are utilized by the one or more of the Web merchants or the back-end transactional application to store data; and

completing the real-time Web transactions from the Web application.

**11**. The method of claim **10**, wherein the real-time Web transactions are Web transactions from the Web application accessing a value-added network service.

**12**. A computer-implemented system, operated by a business entity comprising:

a Web application network portal, wherein the portal includes memory and a processor and one or more Web applications offered respectively by one or more Web merchants or other service providers, or by multiple sub-entities of the business entity who have agreed to cooperate to provide on-line Value Added Network (VAN) services atop the Web for access by employees of the business entity;

**12**

a list of one or more point-of-service employee Web applications on a Web page offered by the business entity that operates the portal, said portal allowing access to the one or more point-of-service applications on the Web page from said list, and wherein the portal offers the one or more point-of-service applications as on-line services on the Web page, and further wherein the portal is operated by the business entity over a service network running on top of a facilities network, the facilities network being selected from a group consisting of: the World Wide Web, the Internet and email networks, said service network including a VAN Switch;

one or more back-end transactional applications running at one or more back-end host computers, corresponding, respectively to the one or more point-of-service applications accessed, to complete a real-time Web transaction from the Web application on the Web page.

**13**. The portal of claim **12**, wherein the one or more Web applications include a plurality of point-of-service applications on the Web page, wherein the business entity and the sub-entities offer Web applications which are selected from a group consisting of payroll Web applications, human resources Web applications, expense report Web applications, time card Web applications, travel Web applications, vacation Web applications, financial Web applications and sales commission Web applications.

\*    \*    \*    \*    \*

# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PI-NET INTERNATIONAL INC., )
                               )
       Plaintiff, )
                               )
   v. )     Civ. No. 12-282-SLR
                               )
JPMORGAN CHASE & CO., )
                               )
       Defendant. )

---

George Pazuniak, Esquire of O'Kelly Ernst & Bielli, LLC, Wilmington, Delaware. Counsel for Plaintiff.

Robert Scott Saunders, Esquire and Jessica Raatz, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Danie A. DeVito, Esquire, Douglas R. Nemec, Esquire, Edward L. Tulin, Esquire and Andrew Gish, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP.

---

**MEMORANDUM OPINION**

Dated: May 14, 2014
Wilmington, Delaware

ROBINSON, District Judge

At Wilmington this    day of May, 2014, having heard argument on, and having

reviewed the papers submitted in connection with, the parties' proposed claim

construction; the court issues its claim construction decision as to the disputed claim

language of U.S. Patent Nos. 8,108,492 (the "'492 patent"), 5,987,500 (the "'500

patent"), and 8,037,158 (the "'158 patent"), consistent with the tenets of claim

construction set forth by the United States Court of Appeals for the Federal Circuit in

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

### 1. Limitations Found in Multiple Patents

    **a. "[R]eal-time:"**[1] "In a complete and non-deferred manner, without

assembling, disassembling, formatting, or reformatting the transaction information."[2] .

The specification describes, for example, e-mail capabilities, which are not real-time

transactions but, rather, exemplify "'deferred transactions' because the consumer's

request is not processed until the e-mail is received, read, and the person or system

reading the e-mail executes the transaction." (1:44-58)[3] The specification describes

that

> typical user interactions on the [world wide web ("web")] today [include] . .
> . two-way services . . . via Common Gateway Interface (CGI)
> applications. CGI is a standard interface for running external programs on
> a Web server. It allows Web servers to create documents dynamically
> when the server receives a request from the Web browser. When the
> Web server receives a request for a document, the Web server

---

[1]Claims 1 and 10 of the '492 patent; claims 1 and 10 of the '500 patent; and
independent claim 1 (not asserted) and dependent claim 4 of the '158 patent.

[2]This construction of "real-time" applies to the use of the limitation in subsequent
constructions for the patents-in-suit.

[3]All citations are to the '492 specification unless otherwise indicated.

dynamically executes the appropriate CGI script and transmits the output of the execution back to the requesting Web browser. This interaction can thus be termed a "two-way" transaction. It is a severely limited transaction, however, because each CGI application is customized for a particular type of application or service.

(1:49-2:11) In comparison, "[a] true real-time, bi-directional transaction would allow a user to connect to a variety of services on the Web, and perform real-time transactions on those services, . . . with two-way interaction capabilities." (2:26-38) For example, a financial "transaction will be performed in real-time, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine." (7:16-19)

During prosecution, the applicant argued that her invention's "real-time" transactions were different from the prior art's deferred two-way transactions, as "[e]ven if [the prior art reference] taught of completing a transaction, it was through the use of CGI, which strips field-by-field from a Web form and sends it as standard I/O to the application that is local to the [b]ack-[e]nd, and that must assemble/disassemble the information again," therefore, "[t]he transaction is not completed in real-time." (D.I. 75, ex. E at 188)[4] The applicant also argued that a different prior art reference

deals with processing documents using CGI scripts, which the [a]pplicant has clearly described in this present [a]pplication as well as in the parent patents that CGI involves standard I/O and formatting and reformatting at both ends so as to be compatible with HTML files is [a] 'deferred transaction,' . . . not with true two-way or N-way, real-time transactional capabilities . . . . [The prior art reference] discloses deferred transactional capabilities utilizing CGI, not real[-]time Web transactions from a World Wide Web application, as in [a]pplicant's specification . . . nor as in Figs 5C or 5D of the subject application.

---

[4]Prosecution history of the '158 patent, hereinafter "ex. E."

2

(D.I. 75, ex. H at 19)[5] Therefore, the construction describes "real-time" (in a way helpful to a jury) by distinguishing the limitation from the prior art deferred transactions, as argued by the applicant during patent prosecution.

    **b. "[V]alue-added network switch."** "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton Energy Svcs. v. M-ILLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citation omitted). The definiteness requirement does not compel absolute clarity. Only claims "not amenable to construction" or "insolubly ambiguous" are indefinite. *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1348 (Fed. Cir. 2005) (citations omitted).

  Figure 7 represents the value added network switch ("VAN switch") as having four components - "switching service 702," "management service 703," "boundary service 701," and "application service 704." (Fig 7) The "boundary service 701 provides the interface[] between VAN switch 520, the Internet and the Web, and multi-media end user devices such as PCs, televisions or telephones. Boundary service 701 also provides the interface to the on-line service provider." (8:41-48) "Switching service 702 is an OSI application layer switch, . . . represents the core of the VAN switch . . . [and] performs a number of tasks including the routing of user

---

[5]Arguments made during the prosecution of application no. 12/628,066.

3

connections to remote VAN switches, . . . multiplexing and prioritization of requests, and flow control, . . . [as well as] facilitat[ing] open systems' connectivity with both the [i]nternet (a public switched network) and private networks including back office networks, such as banking networks." (8:52-60)  "Management service 703 contains tools . . .used by the end users to manage network resources, including VAN switches. Management service 703 also provides applications that perform . . . functions includ[ing] security management, fault management, configuration management, performance management and billing management." (8:64-9:6)  "[A]pplication service 704 contains application programs that deliver customer services.  Application service 704 includes [point-of-service] applications . . . ." (9:9-11)

The specification further provides that the "[e]xchange 501 also conceptually includes a switching component" (6:20-21) and the "exchange 501 and management agent 601 . . . together constitute a [VAN] switch" (7:52-54, 8:41-42).  The specification describes "management agent" as one of the components interacting to provide service network functionality.  (6:1-5)  The "exchange and a management agent component . . . together perform the switching, object routing, application and service management functions according to one embodiment of the present invention." (6:35-38)  The specification offers no explanation or examples as to what the management agent does nor how it works to perform the listed functions.

Claim 1 of the '492 patent recites that the VAN switch is "running on top of the facilities network."  The specification discloses only one embodiment of the VAN switch: "VAN switch 520 provides multi-protocol object routing, depending upon the specific VAN services chosen . . .  provided via a proprietary protocol, TransWeb™

4

Management Protocol (TMP)." (7:62-65)  The inventor testified that "there never had

been any proprietary protocol, and TMP was intended to refer to the protocols as

described in the patents." (D.I. 150, ex. AB at 14)  Bardash avers TMP "is merely a

shorthand for the general protocol that is described in the patent." (D.I. 150, ex. AC at

9)  JP Morgan's expert, Spielman, responds that

> a person of ordinary skill in the art would have had no guidance regarding
> what constitutes TMP or how to use that protocol within the context of the
> invention. TMP is defined strictly in terms of its function, without any
> description of how it can be used.  Thus, a person of skill in the art would
> essentially had to have developed her own protocol to implement and
> operate the claimed VAN Switch, with no description from the
> patents-in-suit themselves to aid in that effort.

(D.I. 150, ex. AJ at ¶ 53)  Spielman opined that the "patents-in-suit provide no

algorithms, source code, or any other descriptive language offering any guidance as to

how to configure a VAN Switch so as to perform 'real-time' transactions using TMP or

any other protocol." (Id. at ¶ 48)  Bardash agrees that figures 6A and 7 "explain more

abstract concepts," but argues that these and other concepts would be "very

understandable to one of ordinary skill in the art." (D.I. 141, ex. BE at ¶¶ 37-38)

    Turning to the plain and ordinary meaning of the limitation, a 1997 computer

dictionary defines "switch" as "[i]n communications, a computer or electromechanical

device that controls routing and operation of a signal path;" "[i]n operating systems such

as MS-DOS, an argument used to control the execution of a command or an

application, typically starting with a slash character (/)."[6]  A 2001 dictionary offers a

similar definition of "switch:" "[a] mechanical or electronic device that directs the flow of

---

[6]*Computer Dictionary* (Microsoft Press, 3d ed. 1997).

electrical or optical signals from one side to the other.  Switches with multiple input and output ports such as a PBX are able to route traffic;" "[i]n programming, a bit or byte used to keep track of something.  Sometimes refers to a branch in a program."[7]  These definitions[8] are not helpful in the context of the patents-in-suit, which contemplate the VAN switch as a software type component.

The court concludes that the VAN switch is described in several different ways in the patent specification.  The abstract drawings do not illustrate the VAN switch or its protocol, so as to allow it to be implemented.  While the "invention relates to a method and apparatus for configurable value-added network switching and object routing," the specification does not describe this switch as to allow one of ordinary skill in the art to identify the scope of the invention.  The specification offers overlapping and competing definitions for the VAN switch and its four components.  Therefore, the limitation is indefinite.

     **c.  "[S]witching."**[9]  The claims of the patents-in-suit describe "switching" as done by the VAN switch:  "[T]he VAN switch enables the switching" (claim 3 of the '492 patent); "switching utilizing the VAN switch" (claim 10 of the '492 patent); and a method for configuring a VAN switch comprising "switching" (claim 10 of the '500 patent).  As discussed above, the VAN switch is made up of four components, including

---

    [7]*The Computer Glossary, The Complete Illustrated Dictionary* (AMACOM, American Management Association, 9th ed. 2001).

    [8]The dictionary does not define "network switch."  A google search for "network switch" reveals that it is understood to be a computer networking device used to connect devices together on a computer network.

    [9]Claims 3 (dependent) and 10 of the '492 patent and claim 10 of the '500 patent.

a "switching service," which is "the core of the VAN switch." (8:52-63) The court concluded that the limitation "VAN switch" is indefinite. The specification does not disclose how the VAN switch or the switching service (within the VAN switch) accomplishes "switching," therefore, the court concludes that this limitation is similarly indefinite.[10]

    **d. "[S]ervice network."**[11] The specification describes an "embodiment includ[ing] a service network running on top of a facilities network, namely the Internet, the Web or e-mail networks . . . , [with] [f]ive components interact[ing] to provide this service network functionality, namely an exchange, an operator agent, a management agent, a management manager and a graphical user interface." (5:55-6:5) The "[e]xchange 501 creates and allows for the management (or distributed control) of a service network, operating within the boundaries of an IP-based facilities network." (6:30-33)

  During prosecution, the applicant argued that the prior art did not disclose "a transactional Web application, offered as an online service atop the Web, with an "object" or transactional data structure, that connects to a transactional application across a service network atop the World Wide Web, as these terms would be understood by one skilled in the art after reading the subject application" or a "service network across the Web." (D.I. 75, ex. E at 186) "[T]he service network atop the web has access to OSI application layer services that are not available" in the prior art. (D.I.

_____

   [10]This analysis is informed by the discussion below of the limitation "means for switching" which is also indefinite. *See infra* part 3a.

   [11]Claims 1 and 10 of the '492 patent and claim 1 of the '158 patent.

75, ex F at 68)[12] Moreover, the applicant emphasized that "[t]here is a significant difference between a physical network or 'a facilities network' on the one hand, and the 'service network' 'atop a facilities network' (such as the physical Internet, Web, 'email networks' or 'other IP-based facilities networks') . . . ." (*Id*. at 48)

> The language of claim 1 of the '492 patent describes:
>
> A system comprising
> . . .
> a [VAN] switch running on top of a facilities network selected from a group consisting of the World Wide Web, the Internet and an e-mail network, the VAN switch for enabling the real-time Web transactions from the one or more Web applications;
> a service network running on top of the facilities network for connecting through the Web server to a back-end transactional application; . . . .

(9:49-67) This claim distinguishes the "service network" from a "facilities network," as well as the "VAN switch" from a "service network." As discussed above, the specification describes that the "exchange 501 and management agent 601 . . . together constitute a [VAN] switch." (7:52-54, 8:41-42) These two components also are two of five components involved in the service network functionality.

Pi-Net's proposed construction, "an online network," does not differentiate "facilities networks" which, according to the specification, are the internet, Web or e-mail networks (and, thus, "online"), from "service network." The court cannot discern the meaning of "service network," the components of which overlap those used to describe the VAN switch. As the specification provides no clarity to this limitation, the limitation is indefinite.

---

[12]Prosecution history of the '492 patent, hereinafter "ex. F."

8

e. **"[T]ransactional services:"**[13] "Services from a merchant available on the web." This construction finds support in the specification which states "a true 'Web merchant' [is] a merchant capable of providing complete transactional services on the Web." (5-51-54)

f. **"[W]eb transaction:"**[14] "Any type of commercial or other type of interaction performed by a user over the world wide web." The parties agree that a "transaction" is "any type of commercial or other type of interaction that a user may want to perform." (D.I. 64 at 3) The specification defines "the World Wide Web ('the Web')." (1:33)

## 2. Application Limitations

a. **"[P]oint-of-service application[s]"**[15] and **"transactional application[s]:"**[16] "A software program that transmits a user's request for a service." The specification describes "point-of-service applications"[17] as "transactional applications, namely applications that are designed to incorporate and take advantage of the capabilities provided by the present invention." (6:22-25) The figures represent point-of-service applications as being those available from merchants (on the "front-end"), i.e. "Bank 510(1), Car Dealer 510(2) or Pizzeria 510(3)." (Fig 5C, 6:51-55) For

---

[13]Claim 10 of the '492 patent and claims 1 and 10 of the '500 patent.

[14]Claims 1 and 10 of the '492 patent and claim 1 of the '158 patent.

[15]Claim 1 of the '492 patent and claims 1 and 4 of the '158 patent.

[16]Claim 1 of the '500 patent.

[17]The specification also uses "POSvc application."

9

example, "[i]f user 100 desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user 100 . . . ." (6:55-57)

In the prosecution history, the applicant described that "[e]ach transactional application is capable of providing the user with a complete set of transactional services offered by a certain network merchant . . . . For example, if the user selects a Bank transactional application, the Bank application is activated and the user is connected to a variety of Bank services." (D.I. 75, ex. D at 21)[18]

This construction is also consistent with the claim language. For example, claim 1 of the '492 patent describes the point-of-service application as listed on a web page, i.e., at the front-end, and "a computer system executing the [b]ack-end transactional application for processing the transaction request in real-time." (10:49-67; *see also* claim 1 of the '500 patent, 10:44-57)

**b. "[W]eb application"[19] and "network application:"[20]** "A software program running on a facilities network." The claim language, specification and prosecution history describe a "point-of-service application" or "transactional application" as a type of "web application." This supports a broader construction of the present limitations. The claim language recites "offering one or more Web applications as respective point-of-service applications." (Claim 1 of the '492 patent, 10:49-54) The

---

[18]Prosecution history of the '500 patent, hereinafter "ex. D."

[19]Claims 1 and 10 of the '492 patent and claim 4 of the '158 patent.

[20]Claims 1, 10 and 35 of the '500 patent.

10

specification differentiates the present limitations from "point-of-service applications" or "transactional applications," namely "[t]he configurable value added network switch comprises means for switching to a transactional application in response to a user specification from a World Wide Web application . . . ." (2:54-59)

Moreover, applicant explained in the prosecution history that the "'point[-]of[-]service application' is a Web application running atop the Web" and that the prior art did not disclose "a Web application or a [p]oint-of-[s]ervice application provided on a Web page as an on-line service on a Web page." (D.I. 75, ex. F at 48, 51) The limitation "web application" was used by persons of ordinary skill in the art prior to the filing of the provisional patent application. For example, an article regarding the World Wide Web in 1994 describes a "prototype World-Wide Web application," which software program allowed users to click on links to certain research departments.[21]

    **c. "[S]aid user application:"[22]** "A network application." There are two applications identified in the claim language ("transactional application" and "network application") and the claim refers to a "link between said user application and said transactional application." ('500 patent, 12:47-49) By default, this limitation must refer to the network application to make grammatical sense.

    **d. "[B]ack-end transactional application[s],"[23] and "the selected**

---

[21]Tim Berners-Lee, et al., *The World-Wide Web*, 37 Communications of the ACM No. 8, 76, 76 & 79 fig. 1 (1994).

[22]Claim 35 of the '500 patent.

[23]Claims 1 and 10 of the '492 patent.

**back-end transactional application:"**[24] "A software program that executes a user's request for a service." The claims distinguish between point-of-service applications, which are front-end applications as described above, and back-end transactional applications. For example, claim 1 of the '492 patent recites "a computer system executing the [b]ack-end transactional application for processing the transaction request in real-time." (9:65-67) Claim 10 of the '492 patent describes "switching . . . to the back-end transactional application in response to receiving the request from the Web server." (10:65-67) Figure 4B represents an embodiment of the invention and depicts a "back office" with an operating system and applications.

### 3. Means Plus Function Limitations

Generally, "in a means-plus-function claim 'in which the disclosed structure is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm.'" *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)). The specification can express the algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted).

The description of the algorithm must do more than describe the function to be

---

[24]Claim 10 of the '492 patent.

performed, it must describe how the function is to be performed. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009) (finding "[t]he specification contains no description of the structure or the process that the access control manager uses to perform the "assigning" function."). It is insufficient to aver that a disclosure has enough structure for a person of ordinary skill to devise some method or write some software to perform the desired function. *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) (citing *Blackboard*, 574 F.3d at 1385).

In *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361 (Fed. Cir. 2012), the Federal Circuit explained that a narrow exception to the requirement for an algorithm exists.

> [A] general-purpose computer is sufficient structure if the function of a term such as 'means for processing' requires no more than merely 'processing,' which any general-purpose computer may do without any special programming. If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies. It is only in the rare circumstances where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed.

*Id.* at 1364 (citing *In re Katz*, 639 F.3d 1303, 1316 (Fed. Cir. 2011)).

**a. "[M]eans for switching to a transactional application in response to a user specification from a network application."**[25] According to Pi-Net, the function recited by the claim is to "switch to a transactional application in response to a user specification from a network application" and the structure is a "switching service."

---

[25]Claims 1 and 35 of the '500 patent.

13

The patent specification describes a "switching service" as "an OSI application layer

switch." (8:52) The switching service

> performs a number of tasks including the routing of user
> connections to remote VAN switches, . . . , multiplexing and
> prioritization of requests, and flow control. Switching service
> 702 also facilitates open systems' connectivity with both the
> [i]nternet (a public switched network) and private networks
> including back office networks, such as banking networks.
> Interconnected application layer switches form the
> application network backbone. These switches are one
> significant aspect of the present invention.

(8:52-63) Moreover, "users are described as utilizing PC's to access the Web via Web

server 'switching' sites." (5:61-63)

Relying on the specification, Bardash opined that, "a person skilled in the art

reading the patent would understand the term and could apply it." (D.I. 150, ex. AA at

42) Bardash also opined[26] that figure 8, specifically "the algorithm shown in block 806

through block 818" and the supporting description, showed the transaction flow. (D.I.

66 at ¶ 37) Spielman opined that, "at the time of the alleged invention, an algorithm

would be required for a computer processor to carry out the functions of [the means

plus function limitations]."[27] (D.I. 150, ex. AJ at ¶¶ 75-79) In her opinion, "the

specification of the patents-in-suit discloses no algorithm at all. There are no

step-by-step instructions for how to carry out any of the claimed processing steps—and

---

[26]This opinion was directed to the limitation "keeping the transaction flow
captive," but also referenced the specification's description of "switching means."

[27]This opinion is directed to each of the means plus function claims discussed
below. Moreover, "an algorithm would be required for the computer system required in
claim 1 of the '492 patent to process the claimed transaction request." (D.I. 150, ex. AJ
at ¶ 75)

no instructions for how to carry out any steps in 'real time.'" (*Id.* at ¶ 76) Nor do the figures disclose algorithms. Spielman explained that figure 8 is a flow diagram, which "provides a list of functions, but omits any discussion or depiction of the underlying steps that would be needed in order to achieve the functional results." (*Id.* at ¶ 78)

The court concludes that the specification does not provide an algorithm or other structure which discloses how the "switching service" performs the claimed function of "switching to a transactional application," which may involve one of a "number of tasks," including "routing user connections," "multiplexing and prioritizing requests," "flow control," and "facilitating connectivity." *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) (citing *Blackboard*, 574 F.3d at 1385) (It is insufficient to aver that a disclosure has enough structure for a person of ordinary skill to devise some method or write some software to perform the desired function.). Without algorithms to show how a switch would accomplish the claimed function (and is able to perform one or all of the tasks), the limitation is indefinite.

### i. Dependent claim 2

Claim 2 of the '500 patent is a dependent claim which recites:

> The configurable value-added network switch as claimed in claim 1 wherein **said means for switching to a transactional application further comprises**: means for receiving said user specification; means for enabling a switch to said transactional application; and means for activating said transactional application.

('500 patent, 9:58-65 (emphasis added)) The parties have submitted the component

limitations "means for receiving said user specification,"[28] "means for enabling a switch to said transactional application,"[29] and "means for activating said transactional application"[30] for construction. Dependent claim 2 adds these components to the "means for switching" limitation, which is indefinite. The added components do not clarify the structure of the "means for switching" limitation, i.e., how the "means for switching" would accomplish the claimed function of "switching to a transactional application," or any of the tasks ("routing user connections," "multiplexing and prioritizing requests," "flow control," and "facilitating connectivity") recited in the specification. Therefore, the "means for switching" limitation is indefinite in claim 2.

Moreover, each of the component limitations recites a "means" by which a certain function is accomplished. Pi-Net asserts that the corresponding structures are: "web server" for the "means for receiving;"[31] the "boundary service" in the VAN switch for the "means for enabling;"[32] and the "selected point-of-service application" for the

---

[28]Claims 2 and 4 of the '500 patent.

[29]Claim 2 of the '500 patent.

[30]Claims 2 and 3 of the '500 patent.

[31]    As illustrated in FIG. 5A, user 100 accesses Web server 104. Having accessed Web server 104, user 100 can decide that he desires to perform real-time transactions. When Web server 104 receives user 100's indication that he desires to perform real-time transactions, the request is handed over to an exchange component.

(6:6-10; *see also* 9:26-28)

[32]See discussion of the VAN switch limitation. *Supra* part 1(b) (citing 8:43-48).

"means for activating."[33]  Each of the claimed functions (respectively, "receiving said user specification," "enabling a switch to the transactional application," and "activating the transactional application") is more complex than the type of function that can be performed by a general purpose computer with no special programming.  As previously discussed, the patent specification does not provide any algorithms or other structure for any of the "means" limitations.  The cited passages of the specifications describe the functions, but not how the alleged structures perform those functions.  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382-83 (Fed. Cir. 2009) (The specification must contain a description of how the function is to be performed by the structure.).  As such, each of these component limitations is indefinite.

### ii. Dependent claim 3

Claim 3 is dependent of claim 2 and recites:

> The configurable value-added network switch as claimed in claim 2 wherein **said means for activating said transactional application further includes** means for creating a transaction link between said network application and said transactional application.

(9:67-10:3 (emphasis added))  The "means for activating said transactional application" limitation is indefinite as discussed above.  The inclusion of a "means for creating a transaction link"[34] further defines the function of the "means for activating" limitation, but does not further describe the structure.  Therefore, this limitation remains indefinite in claim 3.

---

[33]See discussion of the point-of-service application limitation.  *Supra* part 1(a) (citing 6:55-58); (*see also* figs. 5C, 5D & 8, 6:22-25, 6:39-7:38, 9:24-37)

[34]Claim 3 of the '500 patent.

Pi-Net avers that the structure for the "means for creating a transition link" limitation is the "the object data structure (with information entries and attributes) displayed (e.g. checking account object in POSvc application 510 in Fig. 5D) in the selected [p]oint-of-[s]ervice application as displayed by Web server on web page." The specification describes that "[o]nce Bank POSvc application 510 has been activated," the user may connect to the bank services and use the application to perform transactions, "thus accessing data from a host or data repository" in the bank's back office. (6:65-7:2) The specification does not define or use the term "object data structure," or "transaction link."[35] Nor does the specification provide an algorithm or explain how this alleged structure could perform the claimed function (creating a transaction link between said network application and said transactional application). Therefore, the "means for creating" limitation is indefinite.

### iii. Dependent claim 4

Claim 4 is dependent of claim 2 and further defines the components of the "means for receiving said user specification" limitation, which limitation is indefinite. The parties have submitted the component limitations "means for presenting said user with a list of transactional applications"[36] and "means for submitting said user specification according to a user's selection of said transactional application from said list of transactional applications"[37] for construction. Claim 4 recites:

---

[35]This limitation is discussed *infra* at part 5(d).

[36]Claim 4 of the '500 patent.

[37]Claim 4 of the '500 patent.

18

> The configurable value-added network switch as claimed in
> claim 2 wherein **said means for receiving said user**
> **specification further comprises**:
> means for presenting said user with a list of transactional
> applications, each of said transactional application[s] being
> associated with a particular value-added network
> service provider; and
> means for submitting said user specification according to a
> user's selection of said transactional application from said
> list of transactional applications.

('500 patent, 10:4-13) The court concluded above that the limitation "means for

receiving said user specification" is indefinite. While the component limitations further

define the function performed by the "means for receiving said user specification"

limitation, they do not elucidate its structure. Therefore, this limitation remains indefinite

in dependent claim 4.

Pi-Net avers that the structure of the "means for presenting" is "the webpage that

includes POSvc Applications, as depicted in Figures 5C and 5D,"[38] and the structure of

the "means for submitting" is "the interactive data structure displayed on a Web page

that includes information entries and attributes in a Web application displayed via the

graphical user interface component."[39] As above, the functions of these means

limitations (presenting said user with a list of transactional applications and submitting

said user specification according to certain criteria) go beyond the type of function that

---

[38]Figures 5C and 5D are box illustrations and do not illuminate the relationship of
the parts shown or the structure of the limitation.

[39]     The exchange activates a graphical user interface to present
         user with a list of POSvc application options in step 808. In
         step 810, the user makes a selection from the POSvc
         application list.

(9:28-33; *see also* 6:41-50)

19

can be performed by a general purpose computer with no special programming. The

patent specification offers no algorithm or explanation for how either of the proposed

structures would perform the claimed functions. Therefore, each of the component

limitations is indefinite.

b. "Means for transmitting a transaction request from said

transactional application."[40] Pi-Net proposes that the structure for this limitation is

the exchange, which the specification describes for a preferred embodiment "as a

software module . . . executed on a computer system." (4:49-52) The exchange may

reside either on a web server or "on a separate computer system that resides on the

[i]nternet." (6:14-16) The specification describes the exchange in functional language.

The exchange "creates and allows for the management (or distributed control) of a

service network" and, together with the management agent component, "perform[s] the

switching, object routing, application and service management functions." (6:30-38) It

works with other components to provide "service network functionality." (6:1-5) It also

"processes the consumer's request and displays an exchange Web page . . . ." (6:39-

40) However, the specification is devoid of any disclosure regarding **how** the exchange

performs these various functions.

The specification identifies commercially available computers and brands of

processors for use with the invention. (3:60-67, 4:20-25) The specification then refers

to "instructions for the processor," "processing instructions," and "execut[ing] an

instruction stream," but does not explain or illustrate these instructions or provide an

---

[40]Claims 1 and 35 of the '500 patent.

algorithm for the processor to "process" or "execute."  (4:7, 4:37-48)

Nor does the specification describe "transmitting a transactional request."  Pi-Net's expert, Bardash, explains the "request" term of this limitation:

> [A]s shown [in figures 5C and 5D], a list of available POSvc Applications are presented to the user on the web page. When the user selects a particular POSvc application, a web server request activates the selected POSvc application (Web application) and that POSv Application in turn connects to Bank or other Web merchant services, and user 100 will be able to access data from a host or data repository 575 in the Bank Back-Office and thus perform Web banking transactions using the Web application.  This connection between user 100 and Bank services is managed by Exchange 501.  The critical point is that, as shown in Figure 5D, the POSvc Application displays the "object" data structure with its attributes and it provides a mechanism to retrieve (or send) information entries from (or to) the service provider's system corresponding to the Web transaction request.  Thus, with the webpage and POSvc Application (collectively the Exchange 501), the user can transmit a transaction request from the transactional application.

(D.I. 66 at ¶ 15)

Based on Bardash's explanation, the transmission of the request "activates an application" and "connects to merchant services," to allow a user to access data and perform web transactions.  While Pi-Net argues that "exchange 501" performs the "transmitting" function (or alternatively that a "web server 104," a "well known structure," performs the function), the specification does not provide an algorithm for performing this function, which is more than a simple "transmission."  Therefore, this limitation is indefinite.

c. **"[M]eans for processing said transaction request."**[41] Bardash avers that the structures for this limitation include "the 'computer system 200' connecting to the 'host or data repository 575 in the Bank 'Back Office,'" and the "Web server 104." Bardash opines that a person of ordinary skill could also consult figure 4B, which includes the "components that would be viewed as parts of the 'computer system 200'" and, therefore, "a person skilled in the art would be able to implement the function of 'processing said transaction request' based on the disclosure of the [p]atent, and utilizing the structures depicted . . . ." (D.I. 66 at ¶¶ 21-22) As discussed above, Spielman opined that each of the means limitations would necessitate an algorithm.

The specification provides examples of transaction requests including "banking transactions," which may access "data from a host or data repository 575 in the Bank Back Office.' The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data. This connection between user 100 and [b]ank services is managed by exchange 501." (6:67-7:5)

Bardash opines that the "claims are directed to the 'front-end'" and that "[t]he [p]atent recognizes that merchants will have a variety of 'back office' systems, but these systems are not in any way part of the invention. The invention requires only an [e]xchange which can make calls to or otherwise obtain information from the back office . . . ." (D.I. 66 at ¶ 18; D.I. 150, ex. AA at 23)

The court concludes that these transactions would necessitate processing using an algorithm and no such algorithm is disclosed. Indeed, figure 4B shows the back

---

[41]Claims 1 and 35 of the '500 patent.

22

office computer system as including a number of "applications," but provides no explanations on processing. Therefore, this limitation is indefinite.

### i. Dependent claim 5

Dependent claim 5 recites:

> The configurable value-added network switch as claimed in claim 1 wherein **said means for processing said transaction request** further comprises means for coupling **said means for transmitting** to a host means.

('500 patent, 10:14-18) The court concluded that the "means for processing" and "means for transmitting" limitations in claim 1 are indefinite. The additional means language in claim 5 does not provide further detail on the structure of these limitations and they are thus indefinite in this claim as well.

Pi-Net proposes that the structure for the "means for coupling"[42] limitation is the "POSvc application 510 on a web page." This proposed structure does not find support in the specification. Indeed, the specification does not use the term "coupling" outside of the claim at issue. This limitation is also indefinite.

### d. "[M]eans for activating an agent to create a transaction link between said user application and said transactional application."[43] Pi-Net

proposes that the structure for this limitation is "information entries in an object in a [p]oint-of-[s]ervice (POSvc) application on a Web page." Pi-Net explains that "[t]he transaction link is the object. The transactional application creates the objects, which includes attributes such as "Name" and "Password" shown in figure 5D. The users input

---

[42]Claim 5 of the '500 patent.

[43]Claim 35 of the '500 patent.

23

their information, and the objects are routed to the back-end transactional applications for processing. Therefore, the structured data of the objects creates the link, because that structured data is passed between the front-end and the back-end."[44] (D.I. 74 at 128)

The claim limitation at issue also includes the term "agent." The specification uses "operator agent" and "management agent." (Figs. 5B, 5D, 6:3) The exchange "may also include operator agent 503 that interacts with a management manager." (6:28-30; 7:59-60) The specification describes "management agent" as one of the components interacting to provide service network functionality. (6:1-5) The "exchange and a management agent component . . . together perform the switching, object routing, application and service management functions according to one embodiment of the present invention." (6:35-38) Pi-Net argues that this limitation should be accorded its ordinary meaning, as there are "recognized protocols or programs through which online services can be managed, data can be retrieved, and data can be manipulated and delivered." (D.I. 74 at 104) However, the management agent with the exchange (a term coined by the inventor) together constitute a VAN switch. (7:52-53, 8:41-42) The specification offers no explanation or examples as to what the management agent does nor how it works to perform the listed functions.

The limitation "activates an agent" does not indicate to what "agent" the claim refers. Moreover, the claimed function (activating an agent to create a transition link) would involve more than "merely processing" as the agent would be required to create

---

[44]Pi-Net also avers that the analysis of the "means for creating a transition link" discussed *supra* at part 3(a)(ii), informs the current analysis. (6:65-7:2)

24

said transition link between two specific applications. As discussed above, both agents are described as able to perform multiple functions, with no indication of how the agents perform the functions. Therefore, the court concludes that this limitation requires disclosure of an algorithm, which the specification does not disclose. The specification offers no definition or explanation for "activating an agent" or linking applications. Therefore, this limitation is indefinite.

### e. "[C]omputer system executing the back-end transactional application for processing the transaction request in real-time."[45]

#### i. Applicability of § 112, ¶ 6

A claim limitation that "contains the word 'means' and recites a function is presumed to be drafted in means-plus-function format under 35 U.S.C. § 112, ¶ 6." *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008). To avoid the application of § 112, ¶ 6 when a claim recites the term "means," it must "specif[y] the exact structure that performs the functions in question." *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).

Where the claim language does not recite the term "means," there is a presumption that the limitation does not invoke § 112, ¶ 6. *Personalized Media Commc'ns, LLC v. ITC*, 161 F.3d 696, 702 (Fed. Cir. 1998). This presumption can be overcome if the challenger demonstrates that "the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *CCS Fitness v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed.

---

[45]Claims 1 and 8 of the '492 patent.

25

Cir. 2002) (internal citations omitted).  To determine whether a claim term that lacks the word "means" is subject to § 112, ¶ 6, the court must consider the words of the claims themselves, the written description, the prosecution history, and any relevant intrinsic evidence.  *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1356 (Fed. Cir. 2011) (citing *Personalized Media*, 161 F.3d at 704 (The presumption that a claim lacking the term "means" recites sufficiently definite structure can be rebutted "if the evidence intrinsic to the patent and any relevant extrinsic evidence so warrant[s]."")).

In *Inventio*, the Federal Circuit considered the terms "modernizing device" and "computing unit."  649 F.3d at 1357-60.  The Court held that § 112, ¶ 6 was not applicable because the claimed "modernizing device" connoted sufficiently definite structure.  *Id.* at 1359.  "[T]he claims recite[d] a 'modernizing device,' delineate[d] the components that the modernizing device is connected to, describe[d] how the modernizing device interacts with those components, and describe[d] the processing that the modernizing device performs.  The written descriptions additionally show[ed] that the modernizing device convey[ed] structure to skilled artisans."  *Id.*  With respect to the "computing unit," the Court again found that the limitation connoted sufficiently definite structure based upon a reading of the claims[46] and the written description."[47]  *Id.*

---

[46]     The claims recite that the computing unit is connected to the modernizing device and generates a destination signal for transmission to the modernizing device. . . .  The claims elaborate that the computing unit is connected to the floor terminals of the elevator system, and evaluates incoming call reports, destination floors, and identification codes to generate the destination signal for processing by the modernizing device.

*Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 649 F.3d 1350, 1359 (Fed. Cir.

26

at 1359-60.

The claims in dispute require a "computer system executing the back-end transactional application for processing the transaction request in real-time." However, the specification provides no details on the type of application being executed, nor how the transaction request is processed in real time. As discussed above regarding the "means for processing said transaction request,"[48] the specification offers no details about the back office computer system or its "applications." Moreover, the specification does not discuss how the applications would process the transaction requests. In contrast to the disputed terms in *Inventio*, where the Federal Circuit found that the claims and specification recited the connections made by the "computing unit" and detailed how the "computing unit" performed its required function, *see Inventio* at 1359-60, the present claims and written description fail to provide any detail regarding the

---

2011).

[47]    As the claim term implies, the written descriptions refer to the computing unit as a computer, where one of its functions is to store and execute a computer program product. . . . stating that the "computing unit" is a commercially available personal computer or workstation" and that the "computing unit" includes "at least one processor and at least one data memory"; . . . "it is entirely possible to perform the computer program product on any computer, for example on the computing unit of the system or on a remote server." The written descriptions also explain the steps that the computer program product performs, . . . , as well as the interaction between the computing unit and modernizing device, . . . , and the computing unit and the floor terminals.

*Id*. at 1359-60.

[48]*Supra* at part 3(c).

27

"computer system" limitation, including its interaction with any other components of the claimed system. This limitation, therefore, is subject to analysis under § 112, ¶ 6.

### ii. Indefiniteness

Using the same analysis as presented above, the specification does not provide any structure for the computer system under § 112, ¶ 6. The function "executing . . . a back-end application" is more complex than merely processing and, therefore, requires an algorithm. *Ergo Licensing,* 673 F.3d at 1364. The specification does not provide an algorithm for the "computing system," identify the "back-end applications," or describe how requests are processed," therefore, the limitation is indefinite.

### 4. The '158 patent

a. **"[O]bject routing:"**[49] "System for transmitting data on a network using the TransWeb Management Protocol in which a unique IP address is hierarchically assigned to each object, e.g., each bank account." The specification states that the "VAN switch 520 provides multi-protocol object routing, depending upon the specific VAN services chosen. This multi-protocol object routing is provided via a proprietary protocol, TransWeb™ Management Protocol (TMP)." (7:62-65) All of the disclosed embodiments use TMP. (8:3-7, fig. 8, 9:24-37) The specification further provides that "[a]ll networked object[s] associated with Web server 104 will therefore be assigned an Internet address based on the Web server 104's IP address." (8:18-20; *see also* 2:63-67 ("assigning a unique network address to each of the object identities")) Figure 6B shows each object with an assigned IP address. The patent prosecution history also

---

[49]Claim 4 of the '158 patent.

28

explains that the "object" is what is being routed.  (D.I. 75, ex. E at 93-94; *see also* ex. D at 23-24 (objects are assigned unique IP addresses))

### b.  "[A] routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application:"[50]

"Back-end real-time response to a user's request for a service."  The limitation "routed transactional data structure" does not appear in the patent specification.  The limitation was added to overcome rejection.  The applicant argued that the "object" is the "transactional data structure," and "the routing of the transactional data structure and subsequent providing of requested multimedia online services atop the Web from the point-of-service application occur in a service network atop the World Wide Web, and as part of a complete, non-deferred, and realtime Web transaction from a Web application." (D.I. 75, ex. E at 93, 116)  The limitation appears in claim 1, which describes the back-end operations, "transferring funds from the checking account to the savings account in real-time utilizing a routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals." ('158 patent, 10:10-15)

### ·  5. The '500 Patent

### a.  "[K]eeping a transaction flow captive:"[51]  "Maintaining continuous control over a real-time transaction."   This limitation does not appear in the

---

[50]Claim 1 of the '158 patent.

[51]Claims 1, 10, and 35 of the '500 patent.

29

specification. In distinguishing CGI in a prior art reference, the applicant argued during

prosecution that:

> The CGI application does not allow a user to connect to a variety of
> services on the Web and to perform real-time transactions on those
> services nor does it allow the value-added network service provider
> to keep the transaction flow captive at the network entry point.
> Instead, the CGI application can only allow a user to interact with a
> single service. As described in the . . . present application . . ., a
> CGI application is not a viable solution for merchants with a large
> number of services because such an application does not provide
> true real-time, bi-directional capabilities on the Web.

(D.I. 75, ex. D at 21) From this prosecution history, Bardash defines the limitation as

"maintain continuous control (over a real-time Web transaction)" and explains that "the

term was introduced by the inventor as a readily understandable shorthand for

maintaining continuous control of a transaction at the network entry point, to distinguish

the prior art's CGI." (D.I. 66 at ¶¶ 35-37)

      **b. "[V]alue-added network service provider:"**[52] "Provider of a point-of-

service application." This construction finds support in the specification, which is

directed to "a configurable value-added network switching and object routing method

and apparatus" (9:48-49), and discloses the following providers: "merchants or other

service providers who have agreed to cooperate to provide services to users" and

"on-line service provider[s]." (7:34-35, 8:48) The applicant argued during prosecution

that "[e]ach transactional application is capable of providing the user with a complete

set of transactional services offered by a certain network merchant (i.e., a certain

network service provider)." (D.I. 75, ex. D at 21)

---

[52]Claims 1, 10, and 35 of the '500 patent.

**c. "[V]alue-added network system:"**[53]  The limitation does not appear in the specification, apart from the patent title "Value-Added Network System for Enabling Real-Time, By-Directional Transactions on a Network."  Claim 35 recites "[a] configurable value-added network system for enabling real-time transactions on a network, said configurable value-added network system comprising . . . ." ('500 patent, 12:35-37)  Each of the means limitations which comprise the system are indefinite as discussed above.  The court concludes that this limitation is indefinite as a person of ordinary skill would not be able to determine the bounds of the invention.

**d. "[T]ransaction link:"**[54] "A link between two applications."  This limitation is not found in the specification, but is only used in the claim language, which describes creating a link between two applications.

An appropriate order shall issue.

---

[53]Claim 35 of the '500 patent.

[54]Claims 3, 12, and 35 of the '500 patent.

31

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PI-NET INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. No. 12-282-SLR |
| | ) | |
| JPMORGAN CHASE & CO., | ) | |
| | ) | |
| Defendant. | ) | |

**O R D E R**

At Wilmington this 14th day of May, 2014,

IT IS ORDERED that the disputed claim language of U.S. Patent Nos. 8,108,492

(the '"492 patent"), 5,987,500 (the '"500 patent"), and 8,037,158 (the "'158 patent") shall

be construed consistent with the memorandum opinion issued this same date.

_____
United States District Judge

# Exhibit F

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PI-NET INTERNATIONAL INC.,      )
                                )
          Plaintiff,            )
                                )
     v.                         )      Civ. No. 12-282-SLR
                                )
JPMORGAN CHASE & CO.,           )
                                )
          Defendant.            )

---

George Pazuniak, Esquire of O'Kelly Ernst & Bielli, LLC, Wilmington, Delaware. Counsel for Plaintiff.

Robert Scott Saunders, Esquire and Jessica Raatz, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: Danie A. DeVito, Esquire, Douglas R. Nemec, Esquire, Edward L. Tulin, Esquire and Andrew Gish, Esquire of Skadden, Arps, Slate, Meagher & Flom LLP.

---

**MEMORANDUM OPINION**

Dated: May 14, 2014
Wilmington, Delaware

ROBINSON, District Judge

## I. INTRODUCTION

Plaintiff Pi-Net International, Inc. ("plaintiff") filed a complaint alleging patent infringement against JPMorgan Chase & Co. ("defendant") on March 1, 2012 alleging infringement of three patents: U.S. Patent Nos. 5,987,500 ("the '500 patent"), 8,037,158 ("the '158 patent"), and 8,108,492 ("the '492 patent") (collectively, the "patents-in-suit"). (D.I. 1)  Defendant answered the complaint, asserting affirmative defenses of invalidity and non-infringement, on May 23, 2012.  (D.I. 11)

Presently before the court are several motions for summary judgment: defendant's motion for summary judgment of non-infringement (D.I. 113) and for invalidity of the patents-in-suit (D.I. 121), as well as defendant's motion for partial summary judgment of laches for the '500 patent (D.I. 111).  Plaintiff moved to strike defendant's opening brief in support of its partial summary judgment of laches for the '500 patent.  (D.I. 132)  The parties also filed motions to exclude testimony: defendant's motion to exclude certain testimony of Stevan Porter (D.I. 109) and plaintiff's motions to exclude the expert testimony of Susan Spielman (D.I. 115), certain testimony by Michael Siegel (D.I. 117), and certain testimony by Dawn Hall (D.I. 119). The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. BACKGROUND

### A. The Parties

Plaintiff is a California corporation with a principal place of business in Menlo Park, California.  (D.I. 1 at ¶ 1)  Plaintiff provides innovative software products, services

and solutions that enable distributed transaction processing and control over public and private networks, including (without limitation) the Internet and the World-Wide Web. Plaintiff owns the patents-in-suit. (*Id.*)  Defendant is a Delaware corporation with a registered agent in Wilmington, Delaware and an office in New York, New York.  (D.I. 11 at ¶ 3)  Defendant is a global financial services firm that operates in various locations, including the United States of America, conducting business in the fields of investment banking, financial services for consumers and small businesses, commercial banking, financial transaction processing, asset management, and private equity.  (*Id.*)

### B. Technology Overview

The patents-in-suit generally claim a system and method for online transactions, wherein a user takes an action at the "front-end" that causes data to be routed through a system and used as a basis to execute a transaction at the "back-end," thereby completing a non-deferred (or "real time") transaction.  Plaintiff accuses six online banking instrumentalities of infringing the '500 patent and the '492 patent:  Account Transfers; Payments; Customer Center; Account Activity (Business Card); Wire Transfers; and Chase Mobile Application, QuickPaysm ("Mobile QuickPay").  Only the Account Transfers instrumentality is accused of infringing the '158 patent.  With the exception of Mobile QuickPay, all of the accused instrumentalities are accessible to defendant's customers through its website.  (D.I. 114 at 4-5)

## III. STANDARDS OF REVIEW

### A. Summary Judgment

2

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of

3

some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment," a factual dispute is genuine where "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is

merely colorable, or is not significantly probative, summary judgment may be granted."

*Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S.

317, 322 (1986) (stating entry of summary judgment is mandated "against a party who

fails to make a showing sufficient to establish the existence of an element essential to

that party's case, and on which that party will bear the burden of proof at trial").

### B. Infringement

A patent is infringed when a person "without authority makes, uses or sells any

patented invention, within the United States . . . during the term of the patent." 35

U.S.C. § 271(a). A two-step analysis is employed in making an infringement

determination. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.

Cir. 1995). First, the court must construe the asserted claims to ascertain their meaning

and scope. *See id.* Construction of the claims is a question of law subject to de novo

review. *See Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998). The

trier of fact must then compare the properly construed claims with the accused

infringing product. *See Markman*, 52 F.3d at 976. This second step is a question of

fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform each and every step or element

of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373,

4

1378 (Fed. Cir. 2007), *overruled on other grounds by* 692 F.3d 1301 (Fed. Cir. 2012).

"If any claim limitation is absent from the accused device, there is no literal infringement as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas*, 870 F.2d at 1552) (internal quotations omitted). A product that does not literally infringe a patent claim may still infringe under the doctrine of equivalents if the differences between an individual limitation of the claimed invention and an element of the accused product are insubstantial. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if one or more limitations of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is ... appropriate where the patent owner's

5

proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused product is covered by the claims (as construed by the court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

### C. Invalidity

#### 1. Indefiniteness

The definiteness requirement is rooted in § 112, ¶ 2, which provides that "the specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Personalized Media Comm., LLC v. Int'l Trade Com'n*, 161 F.3d 696, 705 (Fed. Cir. 1998).

> Determining whether a claim is definite requires an analysis of whether one skilled in the art would understand the bounds of the claim when read in light of the specification . . . If the claims read in light of the specification reasonably apprise those skilled in the art of the scope of the invention, § 112 demands no more.

*Id.* (citing *Miles Lab., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993)).

Under 35 U.S.C. § 112 ¶ 6, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure ... in support thereof, and such claim shall be construed to cover the corresponding structure ... described in the specification and equivalents thereof." This

6

allows "the use of means expressions in patent claims without requiring the patentee to recite in the claims all possible structures that could be used as means in the claimed apparatus." *Medical Instrumentation and Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (citing *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576, 1583 (Fed. Cir. 1997)). The quid pro quo is the "duty [of the patentee] to clearly link or associate structure to the claimed function." *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1377 (Fed. Cir. 2001) (citations omitted). "The price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof." *O.I. Corp.*, 115 F.3d at 1583.

Whether the written description adequately sets forth the structure corresponding to the claimed function must be considered from the perspective of a person skilled in the art. *Telcordia Techs., Inc. v. Cisco Sys.*, 612 F.3d 1365, 1376 (Fed. Cir. 2010) (citing *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1365–66 (Fed. Cir. 2003)). "The question is not whether one of skill in the art would be capable of implementing a structure to perform the function, but whether that person would understand the written description itself to disclose such a structure." *Id.* (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1338 (Fed. Cir. 2008). Ultimately, if no corresponding structure is disclosed in the specification, the claim term must be construed as indefinite. *See Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007) ("If there is no structure in the specification corresponding to the means-plus-function limitation in the claims, the claim will be found invalid as indefinite.").

7

## 2. Enablement and written description

The statutory basis for the enablement and written description requirements, 35

U.S.C. § 112 ¶1, provides in relevant part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . .

"The enablement requirement is met where one skilled in the art, having read the

specification, could practice the invention without 'undue experimentation.'" *Streck, Inc.*

*v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (citation

omitted). "While every aspect of a generic claim certainly need not have been carried

out by the inventor, or exemplified in the specification, reasonable detail must be

provided in order to enable members of the public to understand and carry out the

invention." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997).

The specification need not teach what is well known in the art. *Id.* (citing *Hybritech v.*

*Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986)). A reasonable

amount of experimentation may be required, so long as such experimentation is not

"undue." *ALZA Corp. v. Andrx Pharms., Inc.*, 603 F.3d 935, 940 (Fed. Cir. 2010).

"Whether undue experimentation is needed is not a single, simple factual

determination, but rather is a conclusion reached by weighing many factual

considerations." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378

(Fed. Cir. 2009) (citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The Federal

Circuit has provided several factors that may be utilized in determining whether a

8

disclosure would require undue experimentation: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d at 737. These factors are sometimes referred to as the "*Wands* factors." A court need not consider every one of the *Wands* factors in its analysis, rather, a court is only required to consider those factors relevant to the facts of the case. *See Streck, Inc.*, 655 F.3d at 1288 (citing *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991)).

The enablement requirement is a question of law based on underlying factual inquiries. *See Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298-99 (Fed. Cir. 2010) (citation omitted); *Wands*, 858 F.2d at 737. Enablement is determined as of the filing date of the patent application. *In re '318 Patent Infringement Litigation*, 583 F.3d 1317, 1323 (Fed. Cir. 2009) (citation omitted). The burden is on one challenging validity to show, by clear and convincing evidence, that the specification is not enabling. *See Streck, Inc.*, 665 F.3d at 1288 (citation omitted).

A patent must also contain a written description of the invention. 35 U.S.C. § 112, ¶ 1. The written description requirement is separate and distinct from the enablement requirement. *See Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2011). It ensures that "the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed."

9

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). The Federal Circuit has stated that the relevant inquiry – "possession as shown in the disclosure" – is an "objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351.

This inquiry is a question of fact: "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* (citation omitted). While compliance with the written description requirement is a question of fact, the issue is "amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *Id.* at 1307 (citing *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072-73 (Fed. Cir. 2005)).

## IV. DISCUSSION

### A. Indefiniteness

#### 1. The '492 patent

The claims and specification of a patent serve an important public notice function, apprising others of what is available to them. *See, e.g., Johnson & Johnston Associates Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (citing *Mahn v. Harwood*, 112 U.S. 354, 361 (1884)) (claims give notice to the public of the scope of the patent); *Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1371 (Fed. Cir. 2001). "Because claims delineate the patentee's right to exclude, the

10

patent statute requires that the scope of the claims be sufficiently definite to inform the

public of the bounds of the protected invention, i.e., what subject matter is covered by

the exclusive rights of the patent. Otherwise, competitors cannot avoid infringement,

defeating the public notice function of patent claims." *Halliburton Energy Svcs. v. M-*

*ILLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) (citing *Athletic Alternatives, Inc. v. Prince*

*Mfg., Inc.*, 73 F.3d 1573, 1581 (Fed. Cir. 1996)).

Plaintiff asserted independent claims 1 and 10 and dependent claims 2-8 and

11. Independent claim 1 of the '492 patent recites:

> A system, comprising:
> a Web server, including a processor and a memory, for offering one or
> more Web applications as respective point-of-service applications in a
> point-of-service application list on a Web page;
> each Web application of the one or more Web applications for requesting
> a real-time Web transaction;
> a value-added network (VAN) switch running on top of a facilities network
> selected from a group consisting of the World Wide Web, the Internet and
> an e-mail network, the
> VAN switch for enabling the real-time Web transactions from the one or
> more Web applications;
> a service network running on top of the facilities network for connecting
> through the Web server to a back-end transactional application; and
> a computer system executing the Back-end transactional application for
> processing the transaction request in real-time

('492 patent, 9:50-67)

The limitations "value-added network ('VAN') switch," "switching," "service

network," and "computer system executing the back-end transactional application for

processing the transaction request in real-time" are indefinite for the reasons set forth in

the claim construction order. The court concludes, therefore, that independent claims 1

and 10 (which each contain three of these limitations) are invalid for indefiniteness.

11

Claims 2-8 are dependent on claim 1 and each recites the limitation "VAN switch."

Claim 3 additionally recites the limitation "switching," claim 6 the limitation "service

network," and claim 8 the limitation "computer system." Therefore, each of these

dependent claims is invalid. Claim 11 depends on claim 10 and further describes that

"the real-time Web transactions are Web transactions from the Web application

accessing a value-added network service." This description does not illuminate the

meaning of the indefinite limitations "VAN switch," "switching," and "service network,"

found in independent claim 10. Claim 11 is invalid. The court grants defendant's

motion for summary judgment of invalidity as to the asserted claims of the '492 patent.

### 2. The '500 patent

Plaintiff asserted independent claims 1, 10, and 35, as well as dependent claims

2-6, 12, 14-16 of the '500 patent. Independent claim 1 recites:

> A configurable value-added network switch for enabling real-time
> transactions on a network, said configurable value-added network switch
> compromising:
> means for switching to a transactional application in response to a user
> specification from a network application, said transactional application
> providing a user with a plurality of transactional services managed by at
> least one value-added network service provider, said value-added network
> service provider keeping a transaction flow captive, said plurality of
> transactional services being performed interactively and in real time;
> means for transmitting a transaction request from said transactional
> application; and
> means for processing said transaction request.

('500 patent, 9:44-58)

The court concluded that certain limitations of the asserted claims, "VAN switch,"

"switching," "value-added network system," and each of the "means" limitations were

indefinite for the reasons set forth in the claim construction order. Independent claim 1

and 35 each require the "means for switching," "means for transmitting," and "means for processing" limitations. Claim 1 additionally recites the "VAN switch" limitation and claim 35 the "value-added network system" limitation. Independent claim 10 recites the limitations "VAN switch" and "switching." Therefore, independent claims 1, 10, and 35 are invalid for indefiniteness. Dependent claims 2-5 each recite the limitation "VAN switch" and add additional indefinite "means" limitations as discussed in the claim construction order. Each of dependent claims 2-5 is likewise invalid.

Dependent claim 6 recites: "The configurable value-added network switch as claimed in claim 5 wherein said host means contains data corresponding to said transaction request." ('500 patent, 10:17-20) The court concluded that dependent claim 5's limitation "means for coupling said means for transmitting to a host means" was indefinite as discussed in the claim construction order. The claim language of dependent claim 6 further defines the "host means,"[1] but does not clarify the meaning of "VAN switch," therefore, claim 6 is invalid for indefiniteness.

Dependent claim 11 recites:

The method for configuring said value-added network switch as claimed in claim 10 wherein said step of switching to a transactional application further comprises the steps of:
receiving said user specification;
enabling a switch to said transactional application; and
activating said transactional application.

---

[1] The limitation "host means" is a means-plus-function claim and, as discussed in the claim construction order, the specification provides insufficient structure. Claim 35 recites "a host means for processing." (12:52) The limitation "host means" is indefinite.

13

('500 patent 10:49-54)  The court analyzed the limitation "switching" in the claim

construction order, concluding that the specification does not disclose how the VAN

switch or the switching service (within the VAN switch) accomplishes "switching."

Dependent claim 11 adds details to the limitation "switching to a transactional

application in response to a user specification from a network application," however,

these details do not further describe how the "receiving," "enabling," and "activating"

would be accomplished.  Therefore, the dependent claim does not provide definiteness

to the limitations "VAN switch" or "switching," and dependent claim 11 is invalid for

indefiniteness.

Dependent claim 12 recites:

The method for configuring said value-added network switch as claimed in
claim 11 wherein said step of activating said transactional application
further includes a step of creating a transaction link between said network
application and said transactional application.

('500 patent, 10:55-60)  This dependent claim adds the step of "creating a transaction

link," but again does not provide any information on how this step would be

accomplished by the invention.  Therefore, dependent claim 12 does not supply

definiteness to the limitations "VAN switch" or "switching," and is invalid for

indefiniteness.

Similarly, dependent claim 14 provides information on the "step of receiving said

user specification" in claim 11:

The method for configuring said value-added network switch as claimed in
claim 11 wherein said step of receiving said user specification further
comprises steps of:
presenting said user with a list of transactional applications, each of said
transactional application being associated with a particular Internet service
provider; and

14

submitting said user specification according to a user's selection of said transactional application from said list of transactional applications.

('500 patent, 11:2-12) The additional steps of "presenting said user with a list of transactional applications" and "submitting said user specification" do not illustrate how the "switching" is accomplished by the VAN switch (or the switching service) and, therefore, claim 14 is indefinite.

Dependent claim 15 further defines the "step of processing said transaction request" of claim 10 as " compris[ing] the step of transmitting said transaction request to a host means." (11:12-16) Dependent claim 16 further defines the "host means" of claim 15, as "contain[ing] data corresponding to said transaction request." Neither of these dependent claims clarify the indefinite limitations "VAN switch" or "switching;" these dependent claims (15 and 16) are invalid as indefinite. Based on the above analysis of each of the asserted claims, the court grants defendant's motion for summary judgment of invalidity as to each of the asserted claims of the '500 patent.

### 3. The '158 patent

Plaintiff asserted dependent claim 4 of the '158 patent, which claim depends from independent claim 1. Independent claim 1 of the'158 patent recites:

A method for performing a real time Web transaction from a Web application over a digital network atop the Web, the method comprising: providing a Web page for display on a computer system coupled to an input device;
providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;
accepting a first signal from the Web user input device to select the point-of-service application;
accepting subsequent signals from the Web user input device; and

15

transferring funds from the checking account to the savings account in
real-time utilizing a routed transactional data structure that is both
complete and non-deferred, in addition to being specific to the
point-of-service application, the routing occurring in response to the
subsequent signals.

('158 patent, 9:40-10:15) Dependent claim 4 recites "[t]he method of claim 1, wherein

object routing is used to complete the transfer of funds in a Web application." ('158

patent, 10:21-22)

The court concluded that the "service network" limitation, found in claim 1, is

indefinite as detailed in the claim construction order. Claim 4's further limitation of

"object routing," construed by the court as "system for transmitting data on a network

using the TransWeb Management Protocol in which a unique IP address is

hierarchically assigned to each object, e.g., each bank account," does not further

describe the indefinite limitation "service network." Therefore, claim 4 is invalid for

indefiniteness, and defendant's motion for summary judgment is granted in this regard.

### B. Enablement

"To be enabling, the specification of a patent must teach those skilled in the art

how to make and use the full scope of the claimed invention without 'undue

experimentation.'" *ALZA Corp. v. Andrx Pharm., LLC*, 603 F.3d 935, 940 (Fed. Cir.

2010) (citations omitted). The specification need not disclose what is well-known in the

art. *Genentech*, 108 F.3d at 1366. "[T]he rule that a specification need not disclose

what is well known in the art is 'merely a rule of supplementation, not a substitute for a

basic enabling disclosure.'" *ALZA*, 603 F.3d at 940-41 (quoting *Auto. Techs. Int'l, Inc.*

*v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007)).

16

The three patents-in-suit share a specification, which purports to present "a configurable value-added network switching and object routing method and apparatus . . . ." ('492 patent, 9:38-39) The specification distinguishes the invention from Common Gateway Interface ("CGI"), a standard interface for running external programs on a web server, stating that "CGI scripts provide only limited two-way capabilities," while the invention allows web merchants to "provide real-time transactional capabilities to users." (*Id.*, 5:49-58) The specification presents the concept of a "VAN switch," which allows "multi-protocol object routing." (*Id.*, 7:62-63) However, the specification does not actually define, in language that would allow a person of ordinary skill in the art to make and use the invention, what a "VAN switch" is and how it accomplishes "object routing" or real-time transactions. Instead, the specification presents an abstract concept of real-time transactions, in which a merchant and a user interact. *Genentech*, 108 F.3d at 1366 ("Patent protection is granted in return for an enabling disclosure of an invention, not for vague intimations of general ideas that may or may not be workable.").

The specification discloses a proprietary protocol, TransWeb™ Management Protocol (TMP), which the VAN switch may use to perform object routing. ('492 patent, 7:62-65) Plaintiff does not dispute that the protocol was never implemented. Plaintiff's expert, Bardash, asserts that the patent describes a general protocol (D.I. 150, ex. AC at 9) and that

> persons skilled in the art who could write the CGI code, having knowledge of the Pi-Net patents would have sufficient information to write a web server code implementing web applications. . . . Spielman's complaint that development would take the work of dozens of software engineers, and several months of trial and error, assumes the development of a commercial-level product. The system can be implemented with far less

17

effort by a skilled artisan who knew web servers, CGI and similar basic
skill sets.

(D.I. 150, ex. AB at 19) In contrast, Spielman[2] opines that "a person of skill in the art

would essentially had to have developed her own protocol to implement and operate

the claimed VAN Switch," as the specification provides no description or guidance. (D.I.

150, ex. AJ at ¶ 53) Indeed, Bardash admits that a person of ordinary skill would need

to write such a protocol, but argues that the patents provide guidance. The court

agrees with Spielman that the implementation of the invention would require undue

experimentation. (D.I. 150, ex. AJ) Spielman describes as an example that "TMP is

described as incorporating, in the alternative, 's-HTTP, JavaTM, the WinSock API or

ORB with DOLSIBs to perform object routing,'" which "is counterintuitive," and the

specification does not offer any examples of how this can be accomplished. (D.I. 150,

ex. AJ at ¶ 50)

   In discussing the point-of-service application,[3] Spielman opined that,

> [a]lthough this portion of the specification describes what a Web
> [a]pplication, upon activation, should be able to do, there is no description
> as to how to perform the contemplated transactions. Again, the person of
> ordinary skill in the art would be entirely on her own when it comes to
> attempting to make and use the claimed Web application.

This opinion applies to any of the applications disclosed by the specification, i.e., the

specification implicates, but does not describe, how to make or use point-of-service

---

[2]As discussed below in part V, plaintiff's motion to exclude Spielman's report is
denied.

[3]According to the patents-in-suit, point-of-service applications allow a user "to
connect to [b]ank services and utilize the application to perform banking transactions,
thus accessing data from a host or data repository 575 in the Bank 'Back Office.'" ('492
patent, 6:65-7:9)

18

applications and transactional applications (construed as "a software program that transmits a user's request for a service") or back-end transactional applications[4] (construed as "a software program that executes a user's request for a service"). The specification offers no explanation or information on any software programs. Figure 8, which Bardash contends provides an "algorithm," only discloses, as explained by Spielman, a flowchart with boxes listing functions. (D.I. 66 at ¶ 37; D.I. 150, ex. AJ at ¶ 78) As previously discussed in the claim construction order, each of the means-plus-function limitations and the "computer system" limitation require algorithms or other analogous structure, which the specification does not provide.

For the foregoing reasons, the court concludes that the specification does not enable one of skill in the art to make or use the invention without "undue experimentation." "It is the specification, not the knowledge of one skilled in the art, that must supply the novel aspects of an invention in order to constitute adequate enablement." *Genentech*, 108 F.3d at 1366. The specification distinguishes the prior CGI art, but is devoid of direction, guidance, and/or working examples of how the supposed superior invention is to be implemented. The claims are written in broad language, but the specification lacks any disclosures of how to practice the "real-time" transactions contemplated by the invention. Therefore, the asserted claims are invalid for lack of enablement.

---

[4]Each of the asserted claims implicates this limitation. Independent claim 1 of the '492 patent requires that a computer system process the transaction request in real time, and independent claim 10 requires using the VAN switch to switch to the back-end transactional application. The independent claims of the '500 patent require processing the transaction request. The asserted claim of the '158 patent requires using object routing to transfer funds.

19

## C. Written description

"[T]he hallmark of written description is disclosure." *Ariad*, 598 F.3d at 1351. A disclosure satisfies the written description requirement when it "allow[s] one skilled in the art to visualize or recognize the identity of the subject matter purportedly described." *Enzo Biochem, Inc. v. Gen–Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002). The disclosure does not have to "contain 'either examples or an actual reduction to practice;' rather, the critical inquiry is whether the patentee has provided a description that 'in a definite way identifies the claimed invention' in sufficient detail that a person of ordinary skill would understand that the inventor was in possession of it at the time of filing." *Alcon Research Ltd. v. Barr Laboratories, Inc.*, 745 F.3d 1180, 1190-91 (Fed. Cir. 2014) (citing *Ariad*, 598 F.3d at 1350, 1352; *Koito Mfg. Co. v. Turn–Key–Tech, LLC*, 381 F.3d 1142, 1154 (Fed. Cir. 2004)).

The patented invention sets forth terms coined by the inventor: "VAN switch" and "point-of-service application." The specification describes the "VAN switch" in conflicting and overlapping ways as discussed in the claim construction order. Figure 7 represents the VAN switch as having four components - "switching service 702," "management service 703," "boundary service 701," and "application service 704." ('492 patent, fig 7) The specification provides no usable description or structure for any of these components. In this regard, Spielman opined that the specification offers "no context for where [the boundary service and switching service] begin and end, or how they relate to one another." (D.I. 150, ex. AJ at ¶ 44) Moreover, the specification discloses TMP as a protocol used by the VAN switch to perform "object routing," but

20

such a protocol was never implemented. Indeed, as discussed by Spielman, the specification "provide[s] no algorithms, source code, or any other descriptive language offering any guidance as to how to configure a VAN Switch so as to perform 'realtime' transactions using TMP or any other protocol." (*Id.* at ¶ 48)

The court construed the "point-of-service application" as "a software program that transmits a user's request for a service." The specification describes these "point-of-service applications" by block diagrams denoting "Bank 510(1), Car Dealer 510(2) or Pizzeria 510(3)," but offers no further description of any of the requests for service available to a user. ('492 patent, fig 5C, 6:51-55) The specification similarly lacks any details as to how the VAN switch would accomplish allowing a user to connect to a point-of-service application.

Each of the asserted claims implicates the back-end transactional application, which processes the user's request. However, the specification only offers a block diagram of a "back-office," generally identifying a system and applications. (*Id.*, fig. 4B) Nowhere in the specification does the inventor indicate that she had possession of such a system or the applications that process the user's request. The crux of the invention is "real-time" transactions for the user; there is no disclosure of how these occur. The court concludes that the patents-in-suit are invalid for lack of written description.

### D. Infringement

As the court finds certain claim limitations indefinite for each of the patents-in-suit, the court cannot complete a meaningful infringement analysis. *See Markman*, 52 F.3d at 976. Additionally, all the asserted claims are invalid, therefore, by operation of

law they are not infringed. *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1320 (Fed. Cir. 2009) ("invalid claim[s] cannot give rise to liability for infringement") (citation omitted). Moreover, "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." *Wahpeton Canvas.*, 870 F.2d at 1553 & n.9. For these reasons, the court grants defendant's motion for non-infringement of all asserted claims of the patents-in-suit.

## V. MOTION TO EXCLUDE

Plaintiff moves to exclude Spielman's testimony and strike her reports[5] based on the fact that she did not apply "any construction of any claim limitation in any of her invalidity analyses."[6] (D.I. 116 at 5) The court addresses the motion as it relates to excluding the reports.[7] As to the indefiniteness of the asserted claims, Spielman focused on the limitations "VAN switch," "routed transactional data structure," "keeping a transaction flow captive," the application limitations, and the means-plus-function limitations, including the "computer system" required in claim 1 of the '492 patent. Defendant did not propose a construction for these limitations, instead arguing that each limitation was indefinite, which position was explained by Spielman for each limitation. Spielman did not provide a complete analysis of whether plaintiff's proposed

---

[5]Plaintiff's motion refers to Spielman's initial report (D.I. 150, ex. AJ) and reply report (D.I. 150, ex. AK), but does not indicate which report plaintiff requests that the court strike. (D.I. 116 at 2) The court's decision applies to both reports.

[6]Plaintiff also argues that Spielman did not analyze the PTO constructions. However, Spielman was not required to address such. Plaintiff's references to the "court's constructions" are premature as the court had not yet issued constructions.

[7]As no issues remain for trial, plaintiff's motion as it relates to Spielman's trial testimony is moot.

22

construction for each of these limitations would also render the claims indefinite. Spielman's reports are properly considered for the analysis contained therein, including Spielman's opinions regarding how the indefiniteness of the limitations affect the indefiniteness of the claim.

Plaintiff faults Spielman's opinions regarding written description and enablement for not considering any construction of claims, or addressing specific claims. Spielman opines that "all asserted claims in the '500 patent and the '492 patent require a VAN switch or VAN system," and then explains why the VAN switch is not adequately described or enabled. Moreover, defendant argued that the term was indefinite, thus not amenable to construction. Spielman's explanations comport with this argument. As to enablement, Spielman opines that several of the *Wands* factors are not met, including the quantity of experimentation necessary, the amount of direction or guidance presented, the absence of working examples, and the nature of the invention. She then uses these factors to conclude that "the patents-in-suit failed to enable one skilled in the art to understand, make, and use the full scope of the subject-matter of the asserted claims." (D.I. 150, ex. AJ at ¶ 79)

As to written description, Spielman opined, for example, that "a person of skill in the art as of the date of the alleged invention would not have understood from the specification of the patents-in-suit that the patentee had possession of a VAN [s]witch configurable to perform 'real-time' transactions." (D.I. 150, ex. AJ at ¶ 46) Spielman supported her conclusion with explanations as to why the specification did not "describe an invention understandable to that skilled artisan." While plaintiff may disagree with

23

these conclusions, this disagreement does not make the reports inadmissible.

Plaintiff's motion to strike the reports is denied.

## VI. CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary

judgment of non-infringement (D.I. 113) and defendant's motion for summary judgment

of invalidity of the patents-in-suit (D.I. 121). The court denies plaintiff's motion to

exclude the testimony of Susan Spielman.[8]  (D.I. 115)  An appropriate order shall issue.

---

[8]The remaining motions, defendant's motion for partial summary judgment of laches for the '500 patent (D.I. 111) and plaintiff's motion to strike defendant's opening brief in support of its partial summary judgment of laches for the '500 patent (D.I. 132), as well as the parties' motions to exclude testimony (D.I. 109; D.I. 117; D.I. 119), are denied as moot as no issues remain for trial.

24

# Exhibit G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

PI-NET INTERNATIONAL INC.,          )
                                    )
            Plaintiff,              )
                                    )
      v.                            )     Civ. No. 12-282-SLR
                                    )
JPMORGAN CHASE & CO.,               )
                                    )
            Defendant.              )

**O R D E R**

At Wilmington this 14th day of May 2014, consistent with the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendant's motion for summary judgment of invalidity of the patents-in-suit (D.I. 121) is granted.

2. Defendant's motion for summary judgment of non-infringement (D.I. 113) is granted.

3. Plaintiff's motion to exclude the expert testimony of Susan Spielman (D.I. 115) is denied.

4. Defendant's motion for partial summary judgment of laches for the '500 patent (D.I. 111) is denied as moot.

5. Plaintiff's motion to strike defendant's opening brief in support of its partial summary judgment of laches for the '500 patent (D.I. 132) is denied as moot.

6. Defendant's motion to exclude certain testimony of Stevan Porter (D.I. 109) is denied as moot.

7. Plaintiff's motion to exclude certain testimony by Dr. Michael Siegel (D.I. 117) is denied as moot.

8. Plaintiff's motion to exclude certain testimony by Dawn Hall (D.I. 119) is denied as moot.

United States District Judge

2